UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 20-9893 JGB (SHKx)** | Date | March 15, 2023 |
| Title | ***Immigrant Defenders Law Center, et al. v. Alejandro Mayorkas, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **Order (1) GRANTING IN PART and DENYING IN PART Defendants' Motion to Dismiss (Dkt. No. 189); and (2) GRANTING Plaintiffs' Motion for Class Certification (Dkt. No. 205) IN CHAMBERS)**

Before the Court are two matters: (1) a motion to dismiss filed by Defendants ("Motion to Dismiss," Dkt. No. 189) and a motion for class certification filed by Plaintiffs ("Certification Motion," Dkt. No. 205) (collectively, "the Motions.")  On May 16, 2022, the Court held a hearing on the Motions.  On September 2, 2022, the Court held a status conference with the parties regarding the Motions.  After considering the papers filed in support of and in opposition to the Motions, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss and GRANTS Plaintiff's Certification Motion.

# I.    BACKGROUND

## A.  Procedural Posture

What follows is an abbreviated summary of the proceedings in this case.

On October 28, 2020, Plaintiffs Immigrant Defenders Law Center ("ImmDef"), Jewish Family Service of San Diego ("JFS") (together, "Organizational Plaintiffs"), and eight individuals filed a Complaint for Injunctive and Declaratory Relief against Defendants. ("Complaint," Dkt. No. 1.)  Defendants included the Secretary of the Department of Homeland Security ("DHS"), the Chief of U.S. Border Patrol, U.S. Immigrations and Customs Enforcement ("ICE") and others.  (Id.)  As alleged in the Complaint, Organizational Plaintiffs are nonprofit organizations which exist to serve immigrant and refugee communities.  (Id. ¶¶ 21,

22.)  Individual Plaintiffs are asylum seekers subject to the Migrant Protection Protocols ("MPP") and required to wait in Mexico while their asylum applications are adjudicated.  (Id. ¶¶ 14-20.)  Plaintiffs sought to enjoin Defendants from continuing to implement policies affecting asylum seekers waiting at the U.S.-Mexico border.  (Id. ¶ 10.)

On November 9, 2020, Plaintiffs filed an emergency motion for provisional class certification (Dkt. No. 35) and an emergency motion for a preliminary injunction (Dkt. No. 36.)  On November 24, 2020, Defendants opposed both motions.  (Dkt. Nos. 87, 88.)  On November 30, 2020, Plaintiffs replied.  (Dkt. Nos. 91, 92, 93.)  On December 14, 2020, the Court held a telephonic hearing on both of Plaintiffs' motions.

After the telephonic hearing, Defendants filed a Motion to Transfer Venue, which the Court denied on January 22, 2021.  (Dkt. No. 108.)  The same day, the Court ordered supplemental briefing on the suspension of new MPP enrollment.  (Dkt. No. 109.)  On March 3, 2021, Defendants filed a supplemental brief in opposition to Plaintiffs' motions.  (Dkt. No. 119.)  On March 15, 2021, Plaintiffs filed their supplemental brief in support of their motions.  (Dkt. No. 121.)

On April 7, 2021, Defendants filed a motion to stay.  (Dkt. No. 126.)  Plaintiffs opposed on April 26, 2021.  (Dkt. No. 129.)  Defendants replied on May 5, 2021.  (Dkt. No. 130.)

Defendants filed an ex parte application to extend their time to respond to the Complaint on May 27, 2021.  (Dkt. No. 134.)

On June 2, 2021, the Court issued an Order (1) denying Plaintiffs' emergency motion for provisional class certification; (2) denying Plaintiffs' emergency motion for a preliminary injunction; (3) denying Defendants' motion to stay the case; and (4) granting Defendants' ex parte application for an extension of time to answer.  ("June 2, 2021 Order," Dkt. No. 135.)

On August 13, 2021, Plaintiffs filed a First Amended Complaint.  ("FAC," Dkt. No. 143.)

On November 2, 2021, Plaintiffs filed an ex parte application for a temporary restraining order.  ("TRO Application," Dkt. No. 157.)  On November 16, 2021, Defendants opposed.  (Dkt. No. 163.)  On November 23, 2021, Plaintiffs replied.  (Dkt. No. 165.)

On December 1, 2021, Defendants filed a motion to dismiss the FAC.  (Dkt. No. 167.)

On December 3, 2021, Defendants filed a notice of agency action related to the motion to dismiss and the TRO Application, referencing a court-ordered reimplementation of the MPP program.  (Dkt. No. 168.)

On December 22, 2021, Plaintiffs filed a Second Amended Complaint.  ("SAC," Dkt. No. 175.)  In addition to the Organizational Plaintiffs, the SAC was filed on behalf of twelve individuals: Lidia Doe, Antonella Doe, Rodrigo Doe, Chepo Doe, Yesenia Doe, Sofia Doe,

Gabriela Doe, Ariana Doe, Francesco Doe, Reina Doe, Carlos Doe, and Dania Doe (collectively, "Individual Plaintiffs.") (SAC ¶¶ 13-25.) The SAC names DHS Secretary Alejandro Mayorkas, DHS, U.S. Customs and Border Protection ("CBP") Commissioner Chris Magnus, Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO") William A. Ferrara, Border Patrol Chief Raul Ortiz, CBP, Acting Director of ICE Tae D. Johnson, and ICE as Defendants. (Id. ¶¶ 26-33.) The SAC alleges harms arising from the initial implementation of MPP by the Trump Administration and certain actions by the Biden Administration in ceasing its wind-down of the policy. (See id.) Plaintiffs assert the following claims for relief: (1) violation of the Administrative Procedure Act (APA) premised on the violation of the right to apply for asylum; (2) violation of the APA premised on access to counsel; (3) violation of the Fifth Amendment Due Process Clause right to a full and fair hearing; (4) violation of the APA premised on the unlawful cessation of the MPP wind-down; (5) violation of the First Amendment (on behalf of Individual Plaintiffs); and (6) violation of the First Amendment (on behalf of Organizational Plaintiffs.) (Id. ¶¶ 329-391.)

On January 26, 2022, Defendants filed a motion to dismiss the SAC. (Motion to Dismiss.)

On February 2, 2022, the Court denied Defendants' motion to dismiss the FAC as moot. (Dkt. No. 193.)

On February 16, 2022, the parties filed a stipulation for an order to set a briefing schedule on Plaintiffs' class certification motion. (Dkt. No. 204.) On February 17, 2022, Plaintiffs filed the Certification Motion. (Certification Motion.) The same day, the Court approved the stipulation. (Dkt. No. 206.) On February 23, 2022, Plaintiffs filed an opposition to the Motion to Dismiss. ("Opp. to MTD," Dkt. No. 207.) On March 7, 2022, Defendants replied in support of the Motion to Dismiss. ("MTD Reply," Dkt. No. 208.)

On March 10, 2022, Defendants opposed the Certification Motion. ("Opp. to Cert.," Dkt. No. 210.)

On March 23, 2022, the Court held telephonic proceedings regarding Plaintiffs' motions for a preliminary injunction and class certification. (Dkt. No. 213.) On March 29, 2022, the parties filed a stipulation to continue the hearings on the Motions from April 18, 2022 to May 2, 2022. (Dkt. No. 215.)

On March 31, 2022, Plaintiffs replied in support of the Certification Motion. ("Cert. Reply," Dkt. No. 216.)

On April 12, 2022, the Court approved the parties' stipulation to continue the hearings on the Motions to May 2, 2022. (Dkt. No. 217.) On April 29, 2022, the Court continued the hearing on the Motions from May 2, 2022 to May 16, 2022. (Dkt. No. 221.) On May 16, 2022, the Court held a hearing on the Motions and took them under submission. (Dkt. No. 224; Transcript, Dkt. No. 225.) At the conclusion of the hearing, the Court indicated that it would

wait to rule on the Motions until the Supreme Court issued an opinion on a case involving the Biden Administration's termination of MPP.  (Id.; see Biden v. Texas, 142 S. Ct. 2528 (2022).)

On September 2, 2022, following the Supreme Court's ruling, the Court held a status conference with the parties.  (Dkt. No. 237.)  The Court ordered the parties to file supplemental briefing on how the Supreme Court's opinion affected this case.  (Id.)  On September 9, 2022, Plaintiffs filed a supplemental brief in support of their motion for class certification and in opposition to the motion to dismiss.  ("Plaintiffs' Supplemental," Dkt. No. 240.)  On September 12, 2022, the parties filed a stipulation for an order setting a hearing date on the supplemental briefing on October 3, 2022.  (Dkt. No. 241.)  On September 12, 2022, the Court approved the stipulation.  (Dkt. No. 242.)  On September 16, 2022, Defendants filed a supplemental brief in support of their motion to dismiss and in opposition to the motion for class certification. ("Defendants' Supplemental," Dkt. No. 243.)  On September 29, 2022, the Court continued the hearing on the supplemental briefing from October 3, 2022 to October 17, 2022.  (Dkt. No. 244.)

In support of the Certification Motion, Plaintiffs also filed:

- Declaration of Matthew Heartney ("Heartney Declaration," Dkt. No. 205-3);
- Exhibits to the Heartney Declaration (Dkt. Nos. 205-4, 205-5);
- Declaration of Melissa Crow (Dkt. No. 205-6);
- Declaration of Stephen Manning (Dkt. No. 205-7);
- Declaration of Efren Olivares (Dkt. No. 205-8);
- Declaration of Sirine Shebaya (Dkt. No. 205-9);
- Declaration of Adam Isacson (Dkt. No. 205-10);
- Declaration of Kenniji Kizuki (Dkt. No. 205-11);
- Declaration of Steven Shulman (Dkt. No. 205-12);
- Declaration of Tess Hellgren ("Hellgren Declaration," Dkt. No. 205-13);
- Exhibits to the Hellgren Declaration (Dkt. Nos. 205-14, 205-15, 205-16, 205-17, 205-18, 205-19);
- Declaration of Cindy Woods (Dkt. No. 205-20);
- Declaration of Nicolas Palazzo (Dkt. No. 205-21);
- Declaration of Margaret Cargioli (Dkt. No. 205-22);
- Declaration of Luis Gonzalez (Dkt. No. 205-23);
- Declaration of Plaintiff Ariana Doe (Dkt. No. 205-24);
- Declaration of Plaintiff Francisco Doe (Dkt. No. 205-25);
- Declaration of Plaintiff Lidia Doe (Dkt. No. 205-26);
- Declaration of Plaintiff Sofia Doe (Dkt. No. 205-27);
- Declaration of Plaintiff Antonella Doe (Dkt. No. 205-28);
- Declaration of Plaintiff Carlos Doe (Dkt. No. 205-29);
- Declaration of Plaintiff Chepo Doe (Dkt. No. 205-30);
- Declaration of Plaintiff Dania Doe (Dkt. No. 205-31);
- Declaration of Plaintiff Gabriela Doe (Dkt. No. 205-32);
- Declaration of Plaintiff Reina Doe (Dkt. No. 205-33);
- Declaration of Plaintiff Rodrigo Doe (Dkt. No. 205-34);

- Declaration of Plaintiff Yesenia Doe (Dkt. No. 205-35).

In support of the Cert. Reply, Plaintiffs also filed:

- Supplemental Declaration of Tess Hellgren (Dkt. No. 216-1).

In support of the Plaintiffs' Supplemental, Plaintiffs also filed:

- Declaration of Hannah R. Coleman ("Coleman Declaration," Dkt. No. 240-1);
- Exhibits to Coleman Declaration (Dkt. No 240-2).

On October 13, 2022, the parties filed a stipulation to continue the hearing on the supplemental briefing from October 17, 2022 to October 31, 2022, which the Court approved. (Dkt. Nos. 246-247.)  Between October 18, 2022 and December 2, 2022, the Court continued the hearing on the supplemental briefing four times, from October 31, 2022 to January 9, 2023.  (Dkt. Nos. 251-254.)  On January 4, 2023, the Court vacated the hearing on the supplemental briefing and took the Motions under advisement.  (Dkt. No. 256.)

On December 4, 2022, Plaintiff Rodrigo Doe filed a notice of voluntary dismissal of individual claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).  (Dkt. No. 255.)[1]

On January 6, 2023, Defendants filed a supplemental statement in support of their Motion to Dismiss and Opposition to Plaintiffs' Certification Motion.  (Dkt. No. 257.)

On February 2, 2023, Plaintiff Yesenia Doe filed a notice of case reopening, indicating that her immigration court proceedings were reopened on January 17, 2023.  (Dkt. No. 258.)

## B.  Related Proceedings

On August 13, 2021, the District Court for the Northern District of Texas issued a nationwide permanent injunction, ordering the Government to "enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 12[2]5 without releasing any aliens because of a lack of detention resources."  Texas v. Biden, 554 F. Supp. 3d 818, 857 (N.D. Tex.), enforcement granted in part, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and aff'd, 20 F.4th 928 (5th Cir. 2021), as revised (Dec. 21, 2021), cert. granted, 142 S. Ct. 1098 (2022), and rev'd and remanded, 142 S. Ct. 2528 (2022).

---

[1] Because his individual claims were later dismissed, the Court does not consider him as a proposed class representative or analyze the merits of his claims.  Nonetheless, because there were twelve named Plaintiffs at the time of the filing of the SAC, the Court continues to refer to that group of twelve where appropriate.  However, as of the issuance of this order, there are eleven Individual Plaintiffs with live claims, not twelve.

On August 19, 2021, the United States Court of Appeals for the Fifth Circuit denied the Government's request for a stay of the injunction.  State v. Biden, 10 F.4th 538 (5th Cir. 2021).  On August 24, 2021, the Supreme Court also denied the Government's request for a stay of the injunction pending appeal.  Biden v. Texas, 142 S. Ct. 926, 927 (2021).

On October 29, 2021, Defendant Secretary Mayorkas issued memoranda terminating MPP and explaining the reasons for doing so.  Secretary of Homeland Security Alejandro N. Mayorkas: Termination of the Migrant Protection Protocols (Oct. 29, 2021) ("Termination Memo"), available at: https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-terminationmemo.pdf; U.S. Dep't of Homeland Security, Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021) ("Explanation Memo"), available at: https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf (collectively, "October 29 Memoranda.")

On December 13, 2021, the Fifth Circuit affirmed the injunction on the merits.  Texas v. Biden, 20 F.4th 928 (5th Cir. 2021), as revised (Dec. 21, 2021).  On February 18, 2022, the Supreme Court granted the Government's petition for a writ of certiorari.  Biden v. Texas, S. Ct. 1098 (2022).  On June 30, 2022, the Supreme Court reversed and remanded, holding that the Government's rescission of MPP did not violate section 1225 of the Immigration and National Act (INA) and the October 29 Memoranda did constitute final agency action.  Biden v. Texas, 142 S. Ct. 2528 (2022).

On August 3, 2022, the Fifth Circuit issued an order remanding the case to the U.S. District Court for the Northern District of Texas.  Texas v. Biden, 43 F.4th 446 (5th Cir. 2022).  On August 6, 2022, the Fifth Circuit's mandate issued.  Texas v. Biden, Case No. 21-cv-00067 (N.D. Tex.), Dkt. No. 145.  On August 8, 2022, the District Court lifted the nationwide injunction.  Id., Dkt. No. 147.  On December 15, 2022, the District Court issued an order "stay[ing] the October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of th[e] action."  Texas v. Biden, 2022 WL 17718634, at *18 (N.D. Tex. Dec. 15, 2022).  On February 14, 2023, the Government appealed that order to the Fifth Circuit.

On June 13, 2022, the Supreme Court held that a provision of the INA, 8 U.S.C. § 1252(f)(1), deprived two District Courts of jurisdiction to entertain detained noncitizens' requests for class-wide injunctive relief.  Garland v. Aleman Gonzalez, 142 S. Ct. 2057 (2022).

## II.    FACTS

Asylum is designed to provide legal status to noncitizens who fear persecution in other countries.  Noncitizens are eligible for asylum in the United States if they have either been persecuted or have a well-founded fear of future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion, and if they are unable or unwilling to return to their country of origin because of that persecution or fear.  8 U.S.C. §

1101(a)(42)(A). Although a grant of asylum is discretionary, the right to apply is not. 8 U.S.C. § 1158(a)(1).

From January 2019 to February 2021, the "MPP 1.0" or "Initial Protocols" policy orchestrated by Defendants trapped nearly 70,000 asylum seekers in Mexico in dangerous conditions that impeded their ability to access the U.S. asylum system or obtain legal representation. (SAC ¶¶ 1, 57, 60, 61.) In February 2021, Defendants suspended MPP and initiated a "wind-down" process for asylum seekers with active cases. (Id. ¶ 79.) In doing so, Defendant Secretary Mayorkas conceded that MPP 1.0's "[i]nadequate access to counsel casts doubt on the reliability of removal proceedings." (Id. ¶ 61.)

The wind-down allowed some individuals who were subjected to MPP 1.0 to enter the United States to pursue their asylum claims. (Id. ¶ 79) In June 2021, Defendants expanded the wind-down process to include individuals with terminated cases and *in absentia* removal orders. (Id. ¶ 81.) However, those with *in absentia* removal orders were required to successfully reopen their cases to be eligible to enter the United States. (Id.)

On August 13, 2021, the U.S. District Court for the Northern District of Texas issued a nationwide permanent injunction ordering the Government to restart MPP for certain new arrivals at the U.S.-Mexico Border. (Id. ¶¶ 74-75.) In response, Defendants ceased the wind-down process to comply with the order. (Id.) During this period, thousands of individuals with final orders of removal or terminated cases remained outside of the U.S. in "legal limbo," deprived of meaningful access to the U.S. asylum system and their right to counsel, to a full and fair hearing, and to petition the courts. (Id. ¶¶ 85, 97-102.)

The twelve Individual Plaintiffs are asylum seekers who were subjected to MPP 1.0 and either had their cases terminated or received final orders of removal. (Id. ¶¶ 13-23, 110-268.) They assert that MPP 1.0 stranded them in perilous conditions outside the United States with no viable way to pursue their asylum claims. (Id. ¶¶ 86-93.) Organizational Plaintiffs allege that they were forced to expend resources they would otherwise invest in different programs responding to the barriers to legal representation presented by MPP 1.0; this diversion of resources frustrated their missions. (Id. ¶ 270.) Plaintiffs allege that the implementation of MPP 1.0 violated their statutory rights to seek asylum and access counsel, their Fifth Amendment right to a full and fair hearing, and their First Amendment rights. (Id. ¶¶ 329-91.) They also claim that Defendants' cessation of the wind-down was unlawful. (Id. ¶¶ 361-72.) Plaintiffs seek declaratory and injunctive relief and costs incurred in maintaining the action. (Id., Prayer for Relief.) Among other forms of relief, Plaintiffs seek an order that would "[a]llow each of the Individual Plaintiffs and class members to return to the United States . . . for a period sufficient to enable them to seek legal representation, and pursue their asylum proceedings from inside the United States." (Id.)

All Individual Plaintiffs remained outside the United States as of the filing date of the SAC, December 21, 2021. (Opp. to MTD at 2.) However, by September 9, 2022, ten of the twelve Individual Plaintiffs had entered the United States under grants of humanitarian parole or

Title 42 exemptions.  (Plaintiffs' Supplemental at 8.)  As of that date, one individual was detained by ICE and placed in immigration court proceedings; the other, Chepo Doe, was located in El Salvador.  (Id.)  On December 14, 2022, Rodrigo Doe voluntarily dismissed his claims; eleven Individual Plaintiffs remain in this action.

"As a matter of policy, Defendants do not defend MPP or its prior implementation" by the Trump Administration.  (Motion to Dismiss at 3.)  In the October 29 Memoranda terminating MPP, Defendant Secretary Mayorkas concluded that any benefits of MPP were greatly outweighed by its costs, the program suffered endemic flaws, and detracted from other important administration goals.  (Id. at 2-3.)  Instead, Defendants note that "whether MPP is valid as a policy matter is distinct from whether MPP is lawful."  (Id.)  Accordingly, Defendants raise a series of legal arguments in opposition to the Certification Motion and in support of their Motion to Dismiss.

### III.    LEGAL STANDARD

Defendants move to dismiss the SAC pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (See Motion to Dismiss.)  Plaintiffs move for class certification pursuant to Rule 23.  (See Certification Motion.)

### A.  Rule 12(b)(1)

"A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence."  Warren v. Fox Fam. Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003).  Thus, a jurisdictional challenge can be either facial or factual.  White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

In a facial attack, the moving party asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  When evaluating a facial attack, the court must accept the factual allegations in the plaintiff's complaint as true.  Whisnant v. United States, 400 F.3d 1177, 1179 (9th Cir. 2005).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  Safe Air for Everyone, 373 F.3d at 1039.  In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment."  White, 227 F.3d at 1242.  "Where jurisdiction is intertwined with the merits, [the Court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'"  Warren, 328 F.3d at 1139 (quoting Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987)).

//
//

## B.  Rule 12(b)(6)

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).  Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).  Courts also need not accept as true allegations that contradict facts which may be judicially noticed.  See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## C.  Rule 23

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are

---

**CIVIL MINUTES—GENERAL**                  Initials of Deputy Clerk mg

typical of the claims or defenses of the class; and (4) the
representative parties will fairly and adequately protect the
interests of the class.

Fed. R. Civ. P. 23(a).  After satisfying the four prerequisites of numerosity, commonality,
typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that
separate actions would create incompatible standards of conduct for the defendant or prejudice
individual class members not parties to the action; (2) the defendant has treated the members of
the class as a class, making appropriate injunctive or declaratory relief with respect to the class as
a whole; or (3) common questions of law or fact predominate over questions affecting individual
members and that a class action is a superior method for fairly and efficiently adjudicating the
action.  See Fed. R. Civ. P. 23(b)(1)-(3).

A trial court has broad discretion regarding whether to grant a motion for class
certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).
However, "[a] party seeking class certification must affirmatively demonstrate compliance with
[Rule 23]—that is, the party must be prepared to prove that there are in fact sufficiently
numerous parties, common questions of law or fact, etc."  Wal-Mart Stores, Inc. v. Dukes, 564
U.S. 338, 350 (2011).  A district court must conduct a "rigorous analysis" that frequently "will
entail some overlap with the merits of the plaintiff's underlying claim."  Id. at 351.

Rule 23 further provides that "[w]hen appropriate, an action may be brought or
maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the
"class may be divided into subclasses that are each treated as a class under this rule," Fed. R.
Civ. P. 23(c)(5).  "This means that each subclass must independently meet the requirements of
Rule 23 for the maintenance of a class action."  Betts v. Reliable Collection Agency, Ltd., 659
F.2d 1000, 1005 (9th Cir. 1981).

**D.  Rule 15**

Federal Rule of Civil Procedure 15 ("Rule 15") provides that leave to amend "shall be
freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that
"'[t]his policy is to be applied with extreme liberality.'"  Eminence Capital, L.L.C. v. Aspeon,
Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244
F.3d 708, 712 (9th Cir. 2001)).  Generally, a "district court should grant leave to amend even if
no request to amend the pleading was made, unless it determines that the pleading could not
possibly be cured by allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir.
2000) (en banc) (internal quotation marks and citation omitted).

## IV.   MOTION TO DISMISS

The Court considers each of the arguments raised by Defendants in their Motion to
Dismiss in turn.

## A. Potential Conflict with the <u>Texas</u> Injunction

The first argument raised by Defendants in their Motion to Dismiss, filed on January 26, 2022, is that the SAC should be dismissed because it seeks relief that conflicts with the nationwide permanent injunction issued in <u>Texas v. Biden</u>, 554 F. Supp. 3d 818, 857 (N.D. Tex.), <u>enforcement granted in part</u>, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and <u>aff'd</u>, 20 F.4th 928 (5th Cir. 2021), <u>as revised</u> (Dec. 21, 2021), <u>cert. granted</u>, 142 S. Ct. 1098 (2022), and <u>rev'd and remanded</u>, 142 S. Ct. 2528 (2022). (Motion to Dismiss at 3-6.) The Supreme Court vacated the injunction in <u>Biden v. Texas</u>, 142 S. Ct. 2528 (2022). Defendants now acknowledge, "the vacatur of the <u>Texas v. Biden</u> injunction moots Defendants' argument that the relief Plaintiffs request in the SAC conflicts with the <u>Texas v. Biden</u> injunction." (Defendants' Supplemental at 2.) Plaintiffs agree that the vacatur of the injunction moots the argument and removes any impediment precluding this Court from moving forward with the case. (Plaintiffs' Supplemental at 4-5.)

The Court finds that Defendants' argument is moot and a determination on the merits of the Motions will not conflict with proceedings in other cases.

## B. Whether the SAC Asserts Moot Claims

Defendants argue, "Claims 1-3 & 5-6 should be dismissed as moot, as should Claim 4 to the extent plaintiffs seek an order declaring the original MPP unlawful." (Motion to Dismiss at 8.) The SAC asserts an APA challenge premised on a violation of the right apply for asylum (Claim 1); an APA challenge premised on a violation of access to counsel (Claim 2); a Due Process violation of the Fifth Amendment's right to a full and fair hearing (Claim 3); and violations of the First Amendment (on behalf of Individual Plaintiffs, Claim 5; Organizational Plaintiffs, Claim 6). (SAC ¶¶ 329-391.) Whereas these claims "challenge the *prior administration's* past implementation of a now defunct version of MPP" (Motion to Dismiss at 6-7), Claim 4 challenges the Biden Administration's cessation of the wind-down of MPP. (<u>See</u> SAC ¶¶ 361-372.)

Mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 397 (1980) (internal quotation marks omitted). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" <u>Arizonans for Off. Eng. v. Arizona</u>, 520 U.S. 43, 67 (1997) (internal quotations and citations omitted). "A case becomes moot . . . 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" <u>Am. Diabetes Ass'n v. United States Dep't of the Army</u>, 938 F.3d 1147, 1152 (9th Cir. 2019) (internal quotations and citations omitted.) The Supreme Court cautions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495–96 (1974). Another way of determining whether a "live controversy" exists is to assess the relief a Court may grant:

"A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party.'" <u>Knox v. Serv. Emps. Int'l Union, Loc. 1000</u>, 567 U.S. 298, 307 (2012) (internal quotations and citations omitted.)  "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." <u>Ellis v. Railway Clerks</u>, 466 U.S. 435, 442 (1984).

As it relates to all but the fourth claim for relief, Defendants contend that Plaintiffs cannot show a "legally cognizable interest in the outcome," <u>Am. Diabetes Ass'n</u>, F.3d at 1152, because "the SAC itself recognizes [that] the original MPP no longer exists [] and none of the Individual Plaintiffs or proposed class members are currently in the original MPP." (Motion to Dismiss at 7.)  As the SAC asks this Court to "Declare that MPP as implemented violates federal statutes and the United States Constitution" (SAC, Prayer for Relief ¶ (c)), Defendants also believe that such requested relief is moot because "any judgment declaring the original MPP unlawful 'would be an advisory opinion, which the Constitution prohibits'" (Motion to Dismiss at 8) (quoting <u>McQuillion v. Schwarzenegger</u>, 369 F.3d 1091, 1095 (9th Cir. 2004)).  As Plaintiffs' fourth claim for relief asserts that the Biden Administration's cessation of the wind-down of MPP was unlawful in various ways, and thus might necessitate the same declaration that MPP 1.0 was illegal, Defendants believe that claim is also moot for the same reason.  (<u>See</u> Motion to Dismiss at 8.)

The Court finds these arguments unpersuasive.  As Plaintiffs note, "[e]ach of Plaintiffs' claims seeks redress for the *continuing adverse effects* of Defendants' unlawful conduct." (Opp. to MTD at 7) (emphasis added).  The SAC consistently alleges ongoing harms to Plaintiffs in various forms. (<u>See</u> SAC ¶¶ 340, 346, 352, 359, 367, 371, 377, 380, 389, 391.)  Throughout the SAC, Plaintiffs claim that *past* decisions continue to cause *ongoing* injury.  An example illustrates the pattern:

> Defendants' Migrant Protection Protocols and their implementation have subverted and violated the right to access to counsel by trapping individuals in conditions that obstruct their access to legal representation and impose systemic obstacles to the ability of Individual Plaintiffs and similarly situated individuals to access legal representation, the cumulative effect of which is tantamount to a denial of counsel. The ongoing effects of the Protocols' implementation continue to violate this right, including by impeding individuals' ability to access counsel when seeking to restart or reopen their immigration cases or appeal an unfavorable decision.

(SAC ¶ 346.)  Plaintiffs thus repeatedly allege past and ongoing violations of their statutory and constitutional rights, which in turn cause them present injuries.  They allege precisely the "continuing, present adverse effects" that establish their "past exposure to illegal conduct" remains an active controversy.  <u>O'Shea v. Littleton</u>, 414 U.S. at 495–96.  Beyond superficially raising the issue, Defendants fail to explain why the Biden Administration's decision to terminate

MPP 1.0 erases any ongoing harms from the policy; indeed, they do not appear to meaningfully dispute the existence of such injuries.[2]

The Court also disagrees that granting the declaratory relief Plaintiffs seek would constitute an advisory opinion.  "There was a time when [the Supreme Court] harbored doubts about the compatibility of declaratory-judgment actions with Article III's case-or-controversy requirement."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007).  The Supreme Court "dispelled those doubts" long ago.  Id. (citing Nashville, C. & St. L.R. Co. v. Wallace, 288 U.S. 249 (1933) and Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937)).  In MedImmune, 549 U.S. 118, the Supreme Court teaches:

> Our decisions have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." . . . "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

Id. at 127 (internal citations and quotations omitted.)  Plaintiffs explain that they "seek a declaratory judgment that Defendants' implementation of MPP 1.0 violated their rights so that Plaintiffs can seek to vindicate those rights."  (Opp. to MTD at 9.)  Because they allege that Defendants' conduct continues to harm them and seek specific relief from those injuries, the Court finds that the instant dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests."  MedImmune, 549 U.S. at 127.  While the Court may lack jurisdiction to order at least some of the injunctive relief Plaintiffs seek (as discussed below), it can grant the minimum "effectual relief" required by Article III.  Knox, 567 U.S. at 307.

---

[2] As noted below, Plaintiffs argue that the vacatur of the Texas v. Biden injunction does not provide relief to Individual Plaintiffs or the putative class.  (See Plaintiffs' Supplemental at 4-6.)  Defendants do not challenge this characterization.  (See Defendants' Supplemental.)  As such, the Court finds that Plaintiffs' ongoing injuries have not been rendered moot by developments in the Texas v. Biden litigation.

"However small" the concrete interests the parties may have in the outcome of the litigation, it is enough to find that the case is not moot.  Ellis, 466 U.S. at 442.[3] [4]

Under a different mootness rationale (and related argument), the Court finds that the fourth cause of action must be dismissed; that ruling is discussed below.

## C.  Whether Plaintiffs' Claims for Injunctive Relief are Barred Under 8 U.S.C. § 1252(f)(1)

Defendants argue that Plaintiffs' claims are barred by a series of subsections of 8 U.S.C § 1252.  The section is entitled "[j]udicial review of *orders of removal*." (emphasis added.)  The Court addresses each subsection in turn.

After the parties filed their original briefing on the Motion to Dismiss, the Supreme Court decided Biden v. Texas, 142 S. Ct. 2528 (2022) and Garland v. Aleman Gonzalez, 142 S. Ct. 2057 (2022).  The parties acknowledge that this intervening authority shifts the landscape concerning the application of 8 U.S.C. § 1252(f)(1), which Defendants claim bars at least some of the relief Plaintiffs seek.  (See Plaintiffs' Supplemental; Defendants' Supplemental.)

The provision states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV [8 U.S.C. §§ 1221-1232] of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

---

[3] In their MTD Reply, Defendants raise an additional mootness argument: that the claims of the Individual Plaintiffs who have been granted humanitarian parole should be dismissed because they "have already received the ultimate relief they seek through this lawsuit (return to the United States)."  (MTD Reply at 4.)  The Court addresses the potential mootness of certain Individual Plaintiffs below, in its discussion of Class Certification.

[4] Because Plaintiffs do not rely on the argument here, the Court does not address whether an exception to mootness applies, such as voluntary cessation or a dispute "capable of repetition, yet evading review."  As noted below, however, these doctrines could apply in determining whether Individual Plaintiffs raise moot claims.  The Court observes that Defendants object to MPP purely as a policy matter and appear to defend its legality in all respects.  In Defendants' view, therefore, a subsequent Administration generally aligned with the immigration policies of former President Trump would be free to reverse President Biden's decisions and reimplement (a version of) MPP, as would President Biden if he decided to take a different approach than he did early on in his Administration.

8 U.S.C. § 1252(f)(1).

In their opposition to the Motion to Dismiss, Plaintiffs noted that "[t]his Court has already rejected Defendants' argument that 8 U.S.C. § 1252(f)(1) bars Plaintiffs' claims for injunctive relief." (Opp. to MTD at 16.)  In its June 2, 2021 Order, this Court ruled, "where a litigant 'seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of [any covered provision], and § 1252(f)(1) therefore is not implicated." (June 2, 2021 Order at *6) (quoting Rodriguez v. Hayes, 591 F.3d 1105, 1120 (9th Cir. 2009) (quoting Ali v. Ashcroft, 346 F.3d 873, 886 (9th Cir. 2003), vacated on other grounds sub nom. Ali v. Gonzales, 421 F.3d 795 (9th Cir. 2005)).  As the Court already ruled on this issue, Plaintiffs argued that it was generally precluded from reconsidering it.  (Opp. to MTD at 16) (citing United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000)).  However, Plaintiffs acknowledged that the Court "may depart from the law of the case" if an intervening change in the law has occurred.  (Id.) (citing United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998)).

To say that an intervening change in the law has occurred understates the point; the Supreme Court's Aleman Gonzalez, 142 S. Ct. 2057 decision radically departs from the precedent under which this Court previously was bound.  When the Court issued its June 2, 2021 Order, the Ninth Circuit had held that Section 1252(f)(1)'s reach was rather limited: it certainly did not "categorically insulate immigration enforcement authorities from 'judicial classwide injunctions.'" Gonzalez v. United States Immigr. & Customs Enf't, 975 F.3d 788, 812 (9th Cir. 2020).  To the contrary, the provision "prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes." Rodriguez, 591 F.3d at 1120.  While Section 1252(f)(1) "limits the district court's authority to enjoin the [Government] from carrying out legitimate removal orders," "where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of [8 U.S.C. §§ 1221-1232], and 8 U.S.C. § 1252(f)(1) therefore is not implicated." Ali v. Ashcroft, 346 F.3d at 886.

While Aleman Gonzalez does not explicitly reference this line of Ninth Circuit cases, it is clear beyond cavil that the Supreme Court rejects Rodriguez's and Ali's statutory interpretation.  There, noncitizens detained by the Government pursuant to 8 U.S.C. § 1231(a)(6) argued that the statute required the Government to provide them with bond hearings. Aleman Gonzalez, 142 S. Ct. at 2062.  The noncitizens sued in two Federal District Courts, both of which certified classes, agreed with their claims on the merits, and entered class-wide injunctive relief. Id.  The Ninth Circuit affirmed. Id.  The Supreme Court granted certiorari to address whether 8 U.S.C. § 1252(f)(1) "deprived the District Courts of jurisdiction to entertain respondents' requests for class-wide injunctive relief." Id. at 2062-63.  The Court held "that the statute has that effect" and reversed. Id. at 2063.  It reasoned that "the critical language in this provision strips lower courts of 'jurisdiction or authority' to 'enjoin or restrain the operation of' the relevant statutory provisions." Id.  The opinion's interpretation of the "ordinary meaning" of these terms concludes, "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order

federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." Id. at 2065.  The one exception to this "general prohibition" is that lower courts "retain the authority to 'enjoin or restrain the operation of' the relevant statutory provisions 'with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.'" Id.  The Court then ruled that this exception "'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" Id. (citing Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471 (1999)).

In the months that followed the Supreme Court's ruling, District Courts began to acknowledge the dramatic reduction in their jurisdictional authority announced in Aleman Gonzalez.  See, e.g., Al Otro Lado, Inc. v. Mayorkas, 2022 WL 3135914 (S.D. Cal. Aug. 5, 2022), judgment entered, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022).  In an opinion excoriating the high court ("the logical extension of Aleman Gonzalez appears to bestow immigration enforcement agencies *carte blanche* to implement immigration enforcement policies that clearly are unauthorized by the statutes under which they operate because the Government need only claim authority to implement to immunize itself from the federal judiciary's oversight"; "With acknowledgement that its decision will further contribute to the human suffering of asylum seekers enduring squalid and dangerous conditions in Mexican border communities as they await entry to [Ports of Entry]"), the Al Otro Lado court summarized the irreconcilability of Aleman Gonzalez with Ninth Circuit precedent.  Id. at *2.  The court explained:

> [T]he Supreme Court in Aleman Gonzalez poured cold water on
> the premise for which Ali and Rodriguez stand—that § 1252(f)(1)
> is inapplicable to injunctions that merely seek to force immigration
> enforcement agencies to implement the statute consistent with its
> terms—by concluding even injunctions that "enjoin or restrain"
> the "unlawful" or "improper operation," i.e., violations, of §
> 1252(f)(1)'s covered provisions clash with that statute's remedy
> bar.  Aleman Gonzalez, 142 S. Ct. at 2066.  Thus, following
> Aleman Gonzalez, this Court no longer can enter injunctive relief
> under Ali and Rodriguez that enjoins or restrains Defendants'
> unauthorized implementation of their mandatory ministerial
> inspection and referral duties on the ground that the practice of
> turning back arriving asylum seekers constitutes a violation, as
> opposed to the 'operation,' of § 1225.

Id. at *9.

Meanwhile, in Biden v. Texas, the Supreme Court rejected the argument that Section 1252(f)(1) concerns subject matter jurisdiction.  Biden v. Texas, 142 S. Ct. at 2540.  The Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims."  Id. While the provision may "withdraw[] a district court's 'jurisdiction or authority' to grant a

particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." Id. at 2539.

The parties agree that, regardless of what relief this Court has the authority to grant Plaintiffs, Section 1252(f)(1) does not deprive this Court of subject matter jurisdiction. (Plaintiffs' Supplemental at 6; Defendants' Supplemental at 4.) They disagree about what relief remains available. Plaintiffs believe that "the Supreme Court affirmed that declaratory relief remains appropriate, notwithstanding § 1251(f)(1)." (Plaintiffs' Supplemental at 6.) Moreover, they "do not concede that declaratory relief is the only available remedy." (Id. at 6, n. 7.) Defendants argue, "Aleman Gonzalez [] precludes Plaintiffs' requested class-wide injunction to return the proposed class to the United States, as it would enjoin the initial decision to return them to Mexico pursuant to 8 U.S.C. § 1225(b)(2)(C)," one of the covered provisions of Section 1252(f)(1). (Defendants' Supplemental at 3.) They correctly note that "Plaintiffs do not argue otherwise in their supplemental brief." (Id.) According to Defendants, it "remains an open question whether Section 1252(f)(1) bars class-wide declaratory relief." (Id. at 3-4.) That said, "Defendants maintain that [it] *does* bar class-wide declaratory relief, particularly in this case." (Id. at 4.) That is because the "practical effect" of a declaratory judgment that MPP 1.0 was unlawful would be a class-wide injunction against the operation of Section 1225(b)(2)(C). (Id.) (citing Hamama v. Adducci, 912 F.3d 869, 880 n.8 (6th Cir. 2018), cert. denied, 141 S. Ct. 188 (2020)). In their view, Plaintiffs and members of the proposed class would "immediately seek an injunction grounded on the authority of the declaratory judgment." (Id.) (quoting Alli v. Decker, 650 F.3d 1007, 1020 n.2 (3d Cir. 2011) (Fuentes, J., dissenting)). "In other words, if there is no bar to class-wide declaratory relief under Section 1252(f)(1), Plaintiffs and the proposed class would be permitted to obtain indirectly what they are clearly barred under Section 1252(f)(1) from seeking directly." (Id.)

The Court finds that its ruling concerning the meaning of Section 1252(f)(1) in the June 2, 2021 Order is no longer tenable in light of intervening Supreme Court precedent. The Court disagrees with Defendants, though, that declaratory relief is unavailable.

The best reading of Biden v. Texas and Aleman Gonzalez is that district courts like this one retain jurisdiction to award declaratory relief in immigration class actions. The Supreme Court noted in Biden v. Texas,

> Most relevantly, the Court previously encountered a virtually identical situation in Nielsen v. Preap, 139 S. Ct. 954 (2019). There, as here, the plaintiffs sought declaratory as well as injunctive relief in their complaint, and there, as here, the District Court awarded only the latter. Yet this Court proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief." Id. at

962 (Alito, J., joined by Roberts, C. J., and Kavanaugh, J.); see also
Jennings v. Rodriguez, 138 S. Ct. 830, 875 (2018) (Breyer, J., joined
by Ginsburg and Sotomayor, JJ., dissenting) (concluding that "a
court could order declaratory relief" notwithstanding section
1252(f)(1)).

Biden v. Texas, 142 S. Ct. at 2540 (internal citations modified).  Justice Sotomayor, highlighting
the Aleman Gonzalez majority's interpretative errors and the decision's "grave" repercussions
in dissent, notes the limitations of the Court's holding:

> In fairness, the Court's decision is not without limits.  For
> instance, the Court does not purport to hold that § 1252(f)(1)
> affects courts' ability to "hold unlawful and set aside agency
> action, findings, and conclusions" under the Administrative
> Procedure Act.  5 U.S.C. § 706(2). No such claim is raised here. In
> addition, the Court rightly does not embrace the Government's
> eleventh-hour suggestion at oral argument to hold that § 1252(f)(1)
> bars even classwide declaratory relief, a suggestion that would (if
> accepted) leave many noncitizens with no practical remedy
> whatsoever against clear violations by the Executive Branch.

Aleman Gonzalez, 142 S. Ct. at 2077–78 (Sotomayor, J., joined by Kagan and Breyer, JJ.,
concurring in the judgment and dissenting in part).  In other opinions, the Supreme Court has
suggested that declaratory relief would be available even if injunctive relief is not.  See Reno, 525
U.S. at 481–82 (1999) ("By its plain terms, and even by its title, [Section 1252(f)] is nothing
more or less than a limit on *injunctive relief*." (emphasis added)); Jennings,
138 S. Ct. at 875 (2018) (Breyer, J., dissenting) (declaratory relief remains available
notwithstanding section 1252(f)(1)).  Moreover, following the recent Supreme Court decisions,
the court in Al Otro Lado, 2022 WL 3135914, at *15, granted declaratory relief to a class of
asylum-seeking individuals.  There, "the parties agree[d] that [the] [c]ourt ha[d] both
constitutional and statutory jurisdiction to issue a declaratory judgment[.]"  Id.  It is not clear to
the Court why Defendants appear to disavow that position now.

Having found that district courts are not barred from awarding declaratory relief in
actions like this one, the Court declines Defendants' invitation to venture further beyond the
Supreme Court's decision in Aleman Gonzalez.  At this stage of the proceedings, the Court must
accept Plaintiffs' allegations as true.  And if true, the Government's acute and sweeping
violations of bedrock rights alleged by Plaintiffs would indeed be as Orwellian as the Migrant
Protection Protocols' name.  (See SAC ¶ 1.)  Effectively, Defendants argue that, even if they did
engage in a cruel, unprecedented scheme to deprive nearly 70,000 asylum seekers of their rights,
there is nothing this Court could do about it.  The Court cannot accept such logic, which
contradicts centuries of precedent at the core of our modern understanding of the separation of
powers.  Aleman Gonzalez may limit this Court's authority to exercise its equitable powers in
awarding injunctive relief to Plaintiffs whose rights have been violated by the Government.

While it is absurd to imagine that, in lieu of <u>Brown v. Board of Education</u>, 349 U.S. 294 (1955) and its progeny, lower courts might have been "restrained to issue injunctive relief, schoolchild-by-schoolchild," <u>Al Otro Lado</u>, 2022 WL 3135914, at *10, that may be the practical effect of the Supreme Court's <u>Aleman Gonzalez</u> decision.  But it is altogether different to argue that this Court should declare itself powerless to award *any* relief by virtue of an opinion that clearly held no such thing.  Until further notice, it remains true that, "[g]enerally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."  <u>Harmon v. Brucker</u>, 355 U.S. 579, 581–82 (1958).  While some suggest that no precedent is safe after the most recent Supreme Court term, no one can reasonably doubt that <u>Marbury v. Madison</u>, 5 U.S. 137 (1803) is—and thus it remains "emphatically the province and duty of the judicial department to say what the law is."  <u>Id.</u> at 177.  If Defendants have violated the law, this Court retains the authority to say so.

The Court agrees with Plaintiffs that it need not decide the precise remedies available to Plaintiffs in the case's current procedural posture.  "It is sufficient to proceed with the case knowing that, per <u>Biden v. Texas</u> and <u>Garland v. Aleman Gonzalez</u>, this Court has subject matter jurisdiction and, at a minimum, classwide declaratory relief remains available."  (Plaintiffs' Supplemental at 7.)  Plaintiffs do not concede that declaratory relief is the only available remedy (<u>id.</u>); it is also not clear to this Court that <u>Aleman Gonzalez</u> completely extinguishes the prospect of all other relief in this case.  <u>See</u> <u>Aleman Gonzalez</u>, 142 S. Ct. at 2077–78 (Sotomayor, J., joined by Kagan and Breyer, JJ., concurring in the judgment and dissenting in part) ("[T]he Court does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act.  5 U.S.C. § 706(2).  No such claim is raised here."; <u>id.</u> at 2562 (Barrett, J., joined by Thomas, Alito and Gorsuch, JJ., dissenting) ("[The Court] avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act.").  Moreover, following <u>Aleman Gonzalez</u>, the Fifth Circuit held in an APA challenge raised under 5 U.S.C. § 706(2) to an immigration policy, the Deferred Action for Childhood Arrivals (DACA) program, that Section 1252(f)(1) "does not apply to vacatur."  <u>Texas v. United States</u>, 50 F.4th 498, 528 (5th Cir. 2022).  Because vacatur is a "less drastic remedy" and does not "compel[] nor restrain[] further agency decision-making," the Fifth Circuit reasoned that Section 1252(f)(1) did not bar the remedy of vacatur because that provision is "nothing more or less than a limit on injunctive relief."  <u>Id.</u> (citations omitted).

<u>Aleman Gonzalez</u> and <u>Biden v. Texas</u> also raise as many questions as answers concerning the § 1252(f)(1)'s exemption of the Supreme Court from its jurisdictional bar.  As Justice Barrett notes in her <u>Biden v. Texas</u> dissent,

> The Court does not explain how [the exemption] would work.  Does it mean that the restriction on remedial authority is subject to waiver or forfeiture, so that a lower court can sometimes properly enter non-individual injunctive relief that this Court can then review?  That a district court has the authority to enter some kinds of non-individual relief (for example, a classwide declaratory

judgment) and that this Court can enter different relief (for
example, a classwide injunction) on review of that judgment?  Or
that this Court can enter an injunction on appeal if the district
court could have entered at least one form of relief, even if it
actually entered only relief that exceeded its authority?  Or perhaps
the parenthetical serves the very different purpose of clarifying that
§ 1252(f)(1) does not disturb any pre-existing authority this Court
has under the All Writs Act or other sources.  These are difficult
questions, yet the Court does not address any of them.

<u>Biden v. Texas,</u> 142 S. Ct. at 2562 (Barrett, J., joined by Thomas, Alito and Gorsuch, JJ.,
dissenting).

The Court has not yet asked the parties to brief the precise contours of the relief that
remains available to Plaintiffs in light of intervening authority, let alone how this Court should
understand its role in relation to the Supreme Court's authority to potentially award further relief
on appeal.  As such, it would be inappropriate to hold at this time that all injunctive relief is
barred, or other forms of meaningful relief.  The Court will not award any relief that binding
authority establishes it cannot.  Should Plaintiffs ask this Court to do so at a later juncture, the
Court agrees with Defendants that such claims for relief would be barred.  To the extent
Defendants ask the Court to dismiss the entire SAC under Section 1252(f)(1), or even to hold
now that the provision bars any meaningful relief that Plaintiffs seek, the Court likewise declines
to do so.

## D.  Whether Plaintiffs' Claims are Barred by 8 U.S.C. § 1252(d)

Defendants next argue that most of the SAC is barred by 8 U.S.C. § 1252(d).  It is not.

Defendants contend that the provision requires that noncitizens raise challenges to their
removal orders to the Board of Immigration Appeals ("BIA") before filing any challenge in
federal court.  (Motion to Dismiss at 9.)  Therefore, federal courts lack jurisdiction to review any
issue not first presented to the BIA; moreover, if claims could have been raised to the BIA
through a motion to reopen, but were not, those claims are not exhausted.  (<u>Id.</u>)  In Defendants'
view, all but three Plaintiffs' claims are barred because they "challenge the effect of their
physical location and circumstances in Mexico on their removal orders, whether <i>in absentia</i> or in
person."  (<u>Id.</u> at 10.)  None of them allege that they filed a motion to reopen or a petition for
review after receiving their final orders of removal.  (<u>Id.</u>)  "Accordingly, Plaintiffs have either
failed to exhaust their claims in the correct forum or have failed to file an appeal in the correct
forum.  Either way, this Court lacks jurisdiction over those claims."  (<u>Id.</u>)  Finally, "even if some
exception to exhaustion applied," Plaintiffs might be allowed to bring suit in the court of appeals,
but a district court has no authority to provide the relief that Plaintiffs seek.  (<u>Id.</u>)

There is a fundamental flaw in this logic: 8 U.S.C. § 1252(d), as its title suggests, restricts
a court's review of a <i>final order of removal</i>.  But Plaintiffs "do not ask this Court to review their

final orders of removal or reopen their proceedings." (Opp. to MTD at 9.) They do not "challenge the outcomes of their underlying immigration proceedings; instead, they seek relief from the harms that continue to impede their ability to access the U.S. asylum system." (Id.) More precisely, Plaintiffs seek declaratory relief (concerning the unlawful implementation of MPP) and injunctive relief that will allow them to enter the United States to access the asylum system. (SAC ¶ 96.)

As Plaintiffs note, many of the cases cited by Defendants involve petitions for review of final orders of removal, in which the courts held that 8 U.S.C. § 1252(d)'s administrative exhaustion requirement applied. (See Motion to Dismiss at 8-10) (citing Vasquez-Rodriguez v. Garland, 7 F.4th 888, 893–96 (9th Cir. 2021); Sola v. Holder, 720 F.3d 1134, 1136 (9th Cir. 2013)). Such authority is inapposite here. Defendants protest that "exhaustion is required in more than just cases seeking review of removal orders. It is also required in cases seeking review of the alleged fairness associated with removal proceedings or reopening immigration proceedings—which all of Plaintiffs' claims squarely do." (MTD Reply at 4.) But the line of cases cited by Defendants for that proposition, involving noncitizens' ineffective assistance of counsel claims, are similarly inapplicable. See, e.g., Singh v. Holder, 538 F. App'x 784, 785 (9th Cir. 2013); Singh v. Napolitano, 649 F.3d 899, 903 (9th Cir. 2011). Ineffective assistance of counsel claims are properly before the BIA in the first instance and should be subject to exhaustion. In contrast, the BIA does not have jurisdiction to award the relief Plaintiffs seek here.

Moreover, 8 U.S.C. § 1252(d)(1) clearly states that it requires only exhaustion of administrative remedies available to the noncitizen "as of right." Under Ninth Circuit precedent, motions to reopen are not "remedies available . . . as of right within the meaning of [the provision]." Noriega-Lopez v. Ashcroft, 335 F.3d 874, 881 (9th Cir. 2003). Defendants' argument that motions to reopen are available to many Plaintiffs, and thus administrative exhaustion applies, is thus unavailing.

Finally, the Court is unpersuaded by authority cited by Defendants requiring prudential exhaustion, which is discretionary. Defendants never explain why prudential exhaustion should apply, other than the presence of alternative "avenues available, such as appeals to the BIA, motions to reopen, and petitions to review." (MTD Reply at 5.)

The Court thus finds that 8 U.S.C. § 1252(d) is not a bar to any claims asserted in the SAC.

**E. Whether Plaintiffs' Claims are Barred by 8 U.S.C. § 1252(b)(9)**

Defendants argue that Plaintiffs' claims are also barred by 8 U.S.C. § 1252(b)(9). Although a close call, the provision does not deprive this Court of jurisdiction.

Subsection (b)(9) is typically read together with subsection (a)(5).  J.E.F.M. v. Lynch, 837 F.3d 1026, 1031 (9th Cir. 2016); see also Cancino-Castellar v. Nielsen, 338 F. Supp. 3d 1107, 1111 (S.D. Cal. 2018) ("Section 1252(a)(5) is central to Section 1252(b)(9)'s scope.").

Subsection (a)(5) states in pertinent part:

> [A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

Subsection (b)(9), entitled "[c]onsolidation of questions for judicial review," states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

Under these provisions, claims that arise from the removal process must bypass the district court and instead be heard through the administrative process.  Judicial review is only by the Court of Appeals via a petition for review ("PFR").  Courts refer to this effect as jurisdictional "channel[ing]," and have dubbed § 1252(b)(9) a "zipper clause."  Reno, 525 U.S. at 482–83.

Defendants argue that the claims brought by Chepo Doe, Yesenia Doe, Sofia Doe, Ariana Doe, Francisco Doe, Gabriela Doe, Reina Doe, Carlos Doe, and Dania Doe ("Removal Order Plaintiffs") are barred by 8 U.S.C. § 1252(b)(9).  (See Motion to Dismiss at 12.)  As Plaintiffs allege "that their being enrolled in MPP impacted their removal proceedings, including their ability to apply for asylum, to access counsel, and to receive a fair hearing[,]" their claims are inextricably linked to the administrative removal process.  (Id. at 12-13.)  In Defendants' view, "Plaintiffs' allegation [] that their right to counsel is being infringed because their final removal orders were impacted by their inability to retain counsel and they are not permitted to return to the United States to move to reopen their cases to then pursue their claims for asylum" clearly presents questions of "law and fact" that "aris[e] from any action taken or proceeding brought to remove an alien from the United States" within the meaning of subsection (b)(9).  (Id. at 13.)

Defendants rely in large part on a Ninth Circuit decision, J.E.F.M. v. Lynch, for a sweeping interpretation of the provisions that would be "breathtaking in scope and vise-like in grip . . . swallow[ing] up virtually all claims that are tied to removal proceedings."  837 F.3d at 1031 (citing Aguilar v. Imm. and Customs Enforcement, 510 F.3d 1, 9 (1st Cir. 2007)).  In J.E.F.M., the court held that 8 U.S.C. § 1252(b)(9) presented a jurisdictional bar to claims that noncitizens were denied the right to counsel at removal proceedings.  Id. at 1032-33.  J.E.F.M.

also notes that the INA does not channel "claims that are independent of or collateral to the removal process." 837 F.3d at 1032 (citing Aguilar, 510 F.3d at 11). Sections 1252(a)(5) and (b)(9) do not deprive district courts of jurisdiction over claims that are "independent or ancillary" and not "bound up in and an inextricable part" of the administrative process. Id. (citing Martinez v. Napolitano, 704 F.3d 620, 623 (9th Cir. 2012)).

Both parties rely on Singh v. Gonzales, 499 F.3d 969 (9th Cir. 2007) (Amarjeet Singh) for its interpretation of subsection (b)(9). There, the Ninth Circuit held that Section 1252(b)(9) "applies '*only* with respect to review of an *order of removal* under 8 U.S.C. § 1252(a)(1).' " Id. (emphasis in original, internal brackets omitted) (quoting INS v. St. Cyr, 533 U.S. 289, 313 (2001)). The Ninth Circuit's review of the statutory text, legislative history and precedent indicated that subsection 1252(a)(5)'s and (b)(9)'s "jurisdiction-stripping provisions do[ ] not apply if the claim is not a *direct challenge to an order of removal.*" Id. (emphasis in original, internal brackets and ellipsis omitted) (quoting Puri v. Gonzales, 464 F.3d 1038, 1041 (9th Cir. 2006)).

The Supreme Court held in Jennings v. Rodriguez that (b)(9) does not present a jurisdictional bar where noncitizens "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined." 138 S. Ct. 830, 841 (2018) (plurality opinion); id. at 876 (Breyer, J., joined by Ginsburg and Sotomayor, JJ., dissenting) ("Jurisdiction also is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only with respect to review of an order of removal") (internal quotations and brackets omitted). Justice Alito, writing for the plurality, rejected Justice Thomas's expansive reading of § 1252(b)(9) that would require channeling of any and all claims about removal-related detention, for such an "expansive interpretation of § 1252(b)(9) would lead to staggering results." Id. at 840. For some issues, "cramming judicial review of those questions into the review of final removal orders would be absurd." Id.

Plaintiffs present a narrower interpretation of subsection (b)(9), raising three primary arguments. First, in their view, "[b]ecause Removal Order Plaintiffs challenge how the implementation of MPP 1.0 has prevented them from meaningfully accessing the removal process itself, rather than the processes by which their removability was determined, § 1252(b)(9) does not bar their claims." (Opp. to MTD at 11.) Removal Order Plaintiffs "seek only to enter the United States so they can meaningfully access the asylum system through their removal proceedings, the very process of direct review Defendants insist they must use under 8 U.S.C. § 1252(b)(9)." (Id.) Second, "Plaintiffs' inability to reopen removal proceedings arises from a broadly applicable DHS policy, rather than the conduct of any specific removal proceeding." (Id. at 13.) Third, "the relief Plaintiffs seek is unavailable in removal proceedings, which illustrates that Plaintiffs' claims are independent of the removal process." (Id.)

The Court is ultimately persuaded that Plaintiffs' claims are sufficiently "independent of or collateral to the removal process" such that they are not barred by 8 U.S.C. § 1252(b)(9). Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 810 (9th Cir. 2020). It is, of course, true that "[f]undamentally, Plaintiffs complain that their removal proceedings were unfair

because they were not sufficiently able to pursue asylum claims during their removal proceedings and were, instead, ordered removed." (MTD Reply at 6.) The Court is mindful that certain legal questions raised by Plaintiffs thus veer close to "the process by which . . . removability will be determined." Jennings, 138 S. Ct. at 841. However, the allegations raised in the SAC differ in meaningful ways from those in which courts have found that subsection 1252(b)(9) presents a jurisdictional bar.

J.E.F.M. concerned a class of immigrant children placed in administrative removal proceedings who claimed a due process and statutory right to appointed counsel at government expense in immigration proceedings. 837 F.3d at 1029. At the time the Ninth Circuit considered their appeal, the children were "at various stages of the removal process: some [were] waiting to have their first removal hearing, some ha[d] already had a hearing, and some ha[d] been ordered removed in absentia." Id. In finding that subsection 1252(b)(9) barred their claims, the Ninth Circuit reasoned in large part that the minors' claims could have, and should have, been raised through the petition for review process in the first instance. See id. at 1032-35. After examining the practicalities of the petition for review process, the court found that the plaintiffs' right-to-counsel claims would be adequately "teed up for appellate review" at a later date, affording them "meaningful judicial review." Id. at 1035, 1038.

In contrast, Plaintiffs allege that MPP 1.0 has prevented them from "forming an[] attorney-client relationship to begin with," Torres v. DHS, 411 F. Supp. 3d 1036, 1049 (C.D. Cal. 2019), in part because it made confidential communication with (potential) legal representation almost impossible. In their view, it is precisely because Defendants imposed barriers to participation in their removal proceedings that the Removal Order Plaintiffs have been prevented from accessing the PFR and motion to reopen processes; the harms they allege "transcend the removal process." (Opp. to MTD at 11-12.) Defendants' arguments rest on the premise that Plaintiffs, and the proposed class, have the PFR process available to them; indeed, they cite some PFR petitions by individuals who have been affected by MPP. (See Motion to Dismiss at 14.) As Plaintiffs note, however, the proposed class explicitly *excludes* individuals with final orders of removal with currently pending motions for review. (See SAC ¶¶ 314-316.) "Thus, the proposed classes include only those individuals who have been fully shut out of the normal appellate process contemplated by 8 U.S.C. § 1252(b)(9)." (Opp. to MTD at 12 n.14.)

The court finds support for this position in Chhoeun v. Marin, 306 F. Supp. 3d 1147 (C.D. Cal. 2018). In Chhoeun, ICE suddenly commenced a series of raids in October 2017 targeting Cambodian citizens who had "dormant" orders of removal based on criminal convictions from many years prior. Id. at 1150. Because Cambodia had initially refused to accept their repatriation and ICE had determined that they were not flight risks or a danger to the community, the petitioners had been released from immigration custody many years prior and had "served as peaceable and productive members of our society." Id. The petitioners asked the district court for "limited relief—a brief stay of deportations during which Petitioners may reopen their immigration proceedings and challenge their removal orders." Id. at 1151. The Chhoeun court rejected the Government's argument that § 1252(b)(9) deprived the court of jurisdiction, reasoning:

> Contrary to the Government's assertion, the Court has jurisdiction to hear Petitioners' claims regarding due process violations and to order adequate injunctive relief.  As in [Singh v. Gonzales, 499 F.3d 969 (9th Cir. 2007)] and [Walters v. Reno, 145 F.3d 1032 (9th Cir. 1998),] Petitioners do not seek review of the viability of their removal orders in the district court.  In other words, Petitioners do not directly challenge the bases for their orders of removal. Instead, Petitioners seek an opportunity to challenge the removal orders.  Petitioners merely request that their deportations be delayed until they can file motions to reopen and until they can avail themselves of the administrative system that exists to litigate meritorious motions to reopen.  The relief Petitioners request will not entitle them to any substantive benefits; it is limited to "a day in court" to comport with due process.  See Singh, 499 F.3d at 979.

Id. at 1159.  There, as here, Plaintiffs "do not directly challenge the bases for their orders of removal" but merely seek to "avail themselves of the administrative system that exists to litigate meritorious motions to reopen."  Id.  The relief Plaintiffs seek—entry into the United States and time to meaningfully access the asylum system—is akin to that sought by the petitioners in Chhoeun, although almost all those individuals were being held in ICE custody, rather than "legally in the custody of the United States while in Mexico."  (June 2, 2021 Order at *10.)

The cases the Chhoeun court relied upon are also useful here.  In Singh v. Gonzales, the Ninth Circuit held that § 1252(b)(9) did not strip the district court of jurisdiction over petitioner's ineffective assistance of counsel claim in a habeas petition.  499 F.3d at 979.  The petitioner was not challenging the merits of the immigration judge's decision, but simply sought to restart the thirty-day period to file a petition for review because his counsel had missed the deadline.  Id.  The court held that the petition "cannot be construed as seeking judicial review of his final order of removal, notwithstanding his ultimate goal or desire to overturn that final order of removal."  Id.  In Walters, immigrants accused of committing civil document fraud were ordered removed; they argued the documents they received did not adequately advise them of their rights, a violation of due process, and sought injunctive relief to reopen their removal proceedings.  145 F.3d at 10367.  The Ninth Circuit rejected the argument that a similar § 1252 provision, subsection (g), stripped the district court of jurisdiction.  Id. at 1052.  The court concluded that the plaintiffs' claims involved "general collateral challenges to unconstitutional practices and policies[.]"  Id.  Their "objective was not to obtain judicial review of the merits of their proceedings, but rather to enforce their constitutional rights to due process in the context of those proceedings."  Id.  "Moreover, if the plaintiffs prevail on their claims, they will not be entitled to any substantive benefits; rather, they will only be entitled to reopen their proceedings."  Id.  Again, like in Singh v. Gonzales and Walters, Plaintiffs assert due process challenges that ultimately seek a meaningful opportunity to participate in their removal proceedings; they do not come to a district court asking for immediate relief on the merits of their proceedings.

District courts within the Ninth Circuit have held that § 1252(b)(9) does not bar challenges to barriers to filing appeals or motions to reopen. In <u>Poghosyan v. Wolf</u>, an Armenian immigrant sought a stay of removal pending his appeal and motion to reopen. 2020 WL 7347858, at *2 (C.D. Cal. Nov. 6, 2020). The Government argued that § 1252(b)(9) barred the district court's jurisdiction. The court determined that Poghoysan's petition and request to stay removal did not directly challenge the removal order and the grounds upon which he brought them were not "wholly intertwined" with the merits of the removal order. <u>Id.</u> at *3. The court went on to consider his claims regarding due process violations, finding that "[g]ranting relief here 'will lead to nothing more than 'a day in court.'"" <u>Id.</u> (citing <u>Singh v. Gonzales</u>, 499 F.3d at 979). In <u>Sied v. Nielsen</u>, an Eritrean petitioner sought to reopen his immigration case and apply for asylum and withholding of removal; while "on paper" he had a statutory right to file a motion to reopen (which the Government conceded), the Government maintained that it could deport him to Eritrea before an immigration judge actually heard his motion. 2018 WL 1142202, at *2 (N.D. Cal. Mar. 2, 2018). The district court found that the jurisdiction-stripping provision of § 1252(b)(9) did not apply because Sied did not directly challenge his underlying order of removal. <u>Id.</u> at *13-15; <u>see also</u> <u>Gbotoe v. Jennings</u>, 2017 WL 6039713 (N.D. Cal. Dec. 6, 2017).

The parties analogize and distinguish two of this Court's own immigration class action opinions, <u>Arroyo v. United States Dep't of Homeland Sec.</u>, 2019 WL 2912848 (C.D. Cal. June 20, 2019) and <u>Torres</u>, 411 F. Supp. 3d 1036. In <u>Arroyo</u>, the plaintiffs challenged transfer decisions made by ICE, alleging violations of the INA, Due Process Clause of the Fifth Amendment, First Amendment, and APA. 2019 WL 2912848 at *1-2. Among other arguments, the plaintiffs alleged that transfer decisions interfered with their right to effective assistance of counsel under the Due Process Clause and the INA. <u>Id.</u> at 4. This Court ruled that § 1252(b)(9) deprived it of jurisdiction to hear the Due Process and INA claims of unrepresented plaintiffs but not those individuals with legal representation. <u>Id.</u> at *12. In <u>Torres</u>, immigrant detainees and legal organizations challenged their conditions of confinement in detention facilities operated by DHS, ICE and a private corporation, GEO Group. 411 F. Supp. 3d at 1044-45. They alleged violations of the INA, Fifth Amendment, First Amendment, and APA. <u>Id.</u> at 1044. This Court rejected the argument that § 1252(b)(9) prevented it from hearing the immigration detainees' claims because it found them "ancillary to the removal process." <u>Id.</u> at 1047-48. The holding in <u>Torres</u> applied to both represented and unrepresented plaintiffs. <u>Id.</u> at 1049.

Neither case is on point; in certain respects, the issues presented here as they relate to § 1252(b)(9) fall in between <u>Arroyo</u> and <u>Torres</u>. In meaningful ways, however, the Court is persuaded that <u>Torres</u>'s analysis provides the better framework for application here. While <u>Arroyo</u> concerned right-to-counsel claims, it did so in a narrow factual context: plaintiffs alleged that transfers imposing geographic separation from their counsel and/or family members violated their rights to counsel and a full and fair hearing. 2019 WL 2912848 at *12. This Court found that the "represented Immigrant Plaintiffs assert harm that accrues by conduct imposing significant burden [sic] on the attorney-client relationship without looking to the effect of that burden on the underlying removal proceedings." <u>Id.</u> at *13. Thus, "[f]or purposes of the jurisdictional inquiry, it is enough that represented Immigrant Plaintiffs assert harm which accrues at the moment of geographic separation, rather than in reference to the fairness of their

underlying removal proceedings." Id. In contrast, the unrepresented plaintiffs argued that transfers burdened their "rights to present evidence on their behalf" and that separation from family members made it more difficult for them to obtain counsel. Id. at *14. At no point did the unrepresented plaintiffs provide an argument "that these rights can be violated without reference to the underlying fairness of the removal process." Id. However, for those unrepresented plaintiffs who already had final orders of removal, like the Removal Order Plaintiffs, this Court found that "immigrants in such a procedural posture are beyond the reach of the zipper clause." Id. at *16 (citing Singh v. Gonzales, 499 F.3d at 979)).

Arroyo does not stand for the proposition that the distinction between represented and unrepresented immigrants is dispositive of whether claims fall within § 1252(b)(9) in every case, however. As some courts have acknowledged, "[i]f an established attorney-client relationship carries rights unrelated to removal proceedings, it seems that would be true of *prospective* attorney-client relationships as well." Avilez v. Barr, 2020 WL 570987, at *3 (N.D. Cal. Feb. 5, 2020) (emphasis in original) (declining to follow Arroyo). Indeed, this Court acknowledged as much in Torres. That case "presents distinguishing features that permit the Court to review all claims: unrepresented Plaintiffs here make extensive allegations regarding conditions so restrictive as to prevent them from forming any attorney-client relationship to begin with." 411 F. Supp. 3d at 1049. "As a result, both represented and unrepresented Plaintiffs assert INA and Due Process claims arising solely from the conditions of their detention and assert rights that can be violated without reference to the effect on their underlying removal proceedings." Id.

Torres made two other observations that this Court again finds relevant here. In Torres, the plaintiffs' INA and procedural due process claims did not "hinge on events at any particular removal proceeding." Id. at 1048. Because the plaintiffs challenged the detention conditions "set by Defendants' global policies," the questions of law and fact did not "hinge on case-by-case determinations[.]" Id. The Court is persuaded that, as in Torres, "Plaintiffs' inability to reopen removal proceedings arises from a broadly applicable DHS policy, rather than the conduct of any specific removal proceeding." (Opp. to MTD at 13.) Of course, the harms flowing from detention in an ICE facility are distinguishable from the harms flowing from MPP, but their common denominator is that each may impose collateral burdens on the underlying constitutional and statutory rights of immigrant plaintiffs. Torres also noted that the limited jurisdiction of immigration judges supported this Court's retention of jurisdiction, "since an IJ is powerless to remedy the conditions alleged." 411 F. Supp. 3d at 1049. Plaintiffs argue that "adjudicators in removal proceedings do not have the authority to declare MPP 1.0 unlawful as implemented or order Plaintiffs' return to the United States" (Opp. at MTD at 13.); Defendants do not appear to dispute that assertion. Subject to the limitations to its jurisdiction concerning injunctive relief that this Court has already acknowledged, district courts are not powerless to award such relief. See, e.g., E.O.H.C. v. DHS, 950 F.3d 177, 195 (3d Cir. 2020); Turcios v. Wolf, 2020 WL 10788713, at *5 (S.D. Tex. Oct. 16, 2020). While "nonreviewability of a claim by an IJ is 'not the standard' permitting district court jurisdiction by itself . . . nonreviewability may still be a factor indicating that Plaintiffs' claims are independent or ancillary to removal proceedings." Torres, 411 F. Supp. 3d at 1049 (citing Cancino-Castellar v. Nielsen, 338 F. Supp. 3d 1107, 1114 (noting that Justice Alito's analysis in Jennings did not end with the fact that claims

of prolonged detention were effectively unreviewable, but went further to look at whether the issues were "cognizable in the PRF process"). The relief Plaintiffs seek from this Court will not affect the outcome of their underlying removal proceedings; if they were to enter the United States to pursue their claims, "their applications for relief will be decided solely on the merits of those claims." (Opp. to MTD at 14.)

In finding that § 1252(b)(9) does not bar Plaintiffs' claims, the Court acknowledges that Defendants have raised compelling arguments to the contrary. Indeed, other courts may have analyzed this difficult question and arrived at a different result. Ultimately, though, the unique nature of Plaintiffs' claims persuades this Court that retention of jurisdiction is the proper course of action.

## F.   Whether Plaintiffs' Claims are Barred by 8 U.S.C. § 1252(a)(2)(B)(ii)

Defendants argue that this Court lacks jurisdiction to review "Plaintiffs' claims for which they seek an order requiring that they be permitted to enter the United States to pursue reopening of their removal proceedings or otherwise pursue asylum claims" because 8 U.S.C. § 1252(a)(2)(B)(ii) presents a bar. The Court rejects the argument.

Section 1252(a)(2)(B)(ii) states in relevant part, "[n]otwithstanding any other provision of law (statutory or nonstatutory), . . . no court shall have jurisdiction to review . . . any . . . decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the . . . Secretary of Homeland Security . . . ." Put simply, the provision "restricts jurisdiction only with respect to the executive's exercise of discretion." Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011). It does not deprive the district courts of jurisdiction over "questions of law" or "'application of law to undisputed facts, sometimes referred to as mixed questions of law and fact.'" Id. (quoting Ramadan v. Gonzales, 479 F.3d 646, 648 (9th Cir. 2007) (per curiam).

In Defendants' view, "[b]oth the decision to initially return an individual to Mexico in the first place and the decision to permit an individual to enter the United States are subject to this provision." (Motion to Dismiss at 15.) Their logic is as follows. First, 8 U.S.C. § 1225(b)(2)(C) provides that DHS "*may* return" a noncitizen to a contiguous country. (Emphasis added.) Second, the word "may" "clearly connotes discretion." (Motion to Dismiss at 15) (quoting Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93, 103 (2016)). Third, the provision does not appear to provide a specific statutory standard to apply, which means it calls for "unfettered" discretion to return decisions or determinations of who is subject to MPP. (Id.) "Therefore, return decisions pursuant to Section 1225(b)(2)(C)—and the procedures or process by which the agencies choose to implement those decisions—are squarely in the discretion of the Secretary and therefore unreviewable." (Id.)

The Court is unpersuaded. The Ninth Circuit has "recognized that the § 1252(a)(2)(B) jurisdictional bar is not to be expanded beyond its precise language." Wong v. United States, 373 F.3d 952, 963 (9th Cir. 2004). The provision does not bar federal courts from deciding questions

of law.  Id.; Hernandez v. Sessions, 872 F.3d 976, 988 (9th Cir. 2017); Singh v. Holder, 638 F.3d
at 1202.  Because the extent of the Executive Branch's authority is "not a matter of discretion,"
"even if a statute gives the [Executive Branch] discretion, therefore, the courts retain jurisdiction
to review whether a particular decision is *ultra vires* the statute in question."  Spencer
Enterprises, Inc. v. United States, 345 F.3d 683, 689 (9th Cir. 2003) (quoting Zadvydas v. Davis,
533 U.S. 678 (2001)).  "Moreover, decisions that violate the Constitution cannot be
'discretionary,' so claims of constitutional violations are not barred by § 1252(a)(2)(B)."  Wong,
373 F.3d at 963.

　　　　The Court understands that Plaintiffs do not challenge individual, discretionary decisions
to return them to Mexico.  Rather, they claim that Defendants' implementation of MPP violated
their rights under the INA, the APA, and the Constitution, which "raise[s] the threshold legal
issue" of whether Defendants had the legal authority to apply Section 1225(b)(2)(C) in such a
way that violated their rights.  (Opp. to MTD at 14.)  That argument is akin to the one raised in
Zadvydas, wherein petitioners challenged the Attorney General's authority to detain a removable
noncitizen indefinitely.  Zadvydas, 533 U.S. at 682.  The Supreme Court rejected the §
1252(a)(2)(B) bar, noting, "The [noncitizens] here, however, do not seek review of the Attorney
General's exercise of discretion; rather, they challenge the extent of the Attorney General's
authority under the post-removal-period detention statute. And the extent of that authority is not
a matter of discretion."  Id. at 688.  The parties agree that the immigration statutes must be read
as a "harmonious whole" and that the Government's "authority to return certain noncitizens to
Mexico pending removal proceedings must be read to cohere with, not conflict with, the general
right to apply for asylum."  (Motion to Dismiss at 24; Opp. to MTD at 15.)  As Plaintiffs
succinctly put it, "Defendants have no discretion to adopt a policy under § 1225(b)(2)(C) that
violates other provisions of the INA, the APA, or the Constitution."  (Opp. to MTD at 15.)
Whether Plaintiffs prevail on the merits of that argument is not for the Court to decide in a
jurisdictional ruling.  It is enough to say here that whether Defendants exceeded their authority in
returning Plaintiffs to Mexico is a question of law properly before a district court.

　　　　The same is true of Plaintiffs' claim regarding Defendants' cessation of the wind-down.
It does not challenge the (discretionary) use of parole power, but argues that the act of halting the
wind-down was arbitrary and capricious and exceeded statutory authority in violation of 5 U.S.C.
§§ 706(2)(A) & (C).  (See SAC ¶¶ 362-372.)  Federal courts retain jurisdiction over such
questions of law.  See Hernandez, 872 F.3d at 988; Spencer, 345 F.3d at 689.

　　　　Finally, the Court rejects Defendants' argument that 8 U.S.C. § 1252(a)(2)(B)(ii), which
by its plain language limits judicial review of a "*decision or action* of the Attorney General or the
Secretary of Homeland Security" (emphasis added), also presents a bar to this Court's authority
to award the *relief* Plaintiffs seek.  Other provisions may very well do that.  See 8 U.S.C. §
1252(f)(1).  The Court understands that the Executive Branch enjoys broad discretion to
implement the parole authority delegated to it by Congress.  (See Motion to Dismiss at 16-17)
(collecting cases).  To the extent this Court may fashion an equitable remedy, it must be mindful
of that discretion.  Defendants do not cite any authority that squarely decides Section
1252(a)(2)(B) deprives a district court from awarding relief akin to a grant of parole, allowing

Plaintiffs to return to the United States in some limited form. In the absence of such authority, the Court declines to find at this juncture that its hands are so tied. Exactly what, if any, relief Plaintiffs are entitled to is a question for another day. 8 U.S.C. § 1252(a)(2)(B)(ii) does not deprive this Court of jurisdiction to decide the questions of law presented by Plaintiffs and to consider awarding appropriate relief if their claims merit it.

**G. Standing of Organizational Plaintiffs**

Defendants argue that the Organizational Plaintiffs' claims fail because they lack standing. (Motion to Dismiss at 19.) The Court finds that both Organizational Plaintiffs demonstrate standing to assert each of their claims.

To establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). A plaintiff's standing is assessed as of the time an action was initiated and is unaffected by subsequent developments. See D'Lil v. Best W. Encina Lodge & Suites, 538 F.3d 1031, 1036 (9th Cir. 2008). A Plaintiff must establish standing with respect to each claim and form of relief. See, e.g., Wildearth Guardians v. United States EPA, 759 F.3d 1064, 1070–1072 (9th Cir. 2014) (organization had standing to challenge only certain EPA decisions); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000) (requiring plaintiff to show standing separately for injunctive relief and civil penalties).

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (1982). In order to establish standing, an organization, like an individual, must establish: "(1) injury in fact; (2) causation; and (3) redressability." La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010). Direct organization standing can be satisfied if the organization alleges "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [issue] in question." Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1105 (9th Cir. 2004); Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002). A setback to the organization's abstract social interest without a discussion of resources would not be sufficient to constitute standing. Serv. Women's Action Network v. Mattis, 2018 WL 2021220, at *14 (N.D. Cal. May 1, 2018).

As "courts have recognized that immigration statutes are directed at noncitizens, not the organizations advocating for them," Defendants argue that the provisions cited by Organizational Plaintiffs do not seek to protect the interests of legal service providers, neither regulating their conduct nor creating any benefits for which the organizations are eligible. (Motion to Dismiss at 20.) Defendants note, "Organizational Plaintiffs are not applying for asylum; they seek to help others do so." (Id. at 21.) In Defendants' view, that Organizational Plaintiffs do not allege that they focused on asylum applications "or engaged in any significant legal services to assist noncitizens in Mexico" *before* MPP is fatal to their claim of frustration of organizational mission.

**CIVIL MINUTES—GENERAL**

(Id. at 22.)  "Because both entities made decisions to change their activities following the implementation of MPP, they do not and cannot allege that their existing missions were perceptibly impaired, and their daily operations inhibited, by the implementation of MPP."  (Id.)  For that proposition, Defendants rely on the recognition in E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 663 (9th Cir. 2021) ("EBSC III") that an organization cannot "manufacture the injury."  (Id.)

An alleged resource diversion must go beyond litigation costs and beyond "fixing a problem that otherwise would not affect the organization at all."  City of Lake Forest, 624 F.3d at 1088 (9th Cir. 2010).  An organization can establish standing by alleging that it "expended additional resources that they would not otherwise have expended, and in ways that they would have not expended them."  Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1040 (9th Cir. 2015).  The SAC alleges sufficient facts for ImmDef and JFS to meet the resource diversion test.

The two organizations are nonprofit organizations that were established to provide legal and other services to detained and non-detained immigrants in California.  (SAC ¶ 269.)  "ImmDef is a nonprofit organization committed to creating a public defender system for immigrants facing deportation."  (Id. ¶ 271.)  Before MPP, "ImmDef's primary focus was on detained and non-detained individuals in immigration court proceedings in the Greater Los Angeles and Orange County areas (including the Inland Empire), but not generally focused on the San Diego border area."  (Id. ¶ 272.)  "In response to Defendants' implementation of the Protocols in January 2019, ImmDef established its Cross Border Initiative ('CBI'), which focuses on providing direct representation, pro se assistance, and advocacy to individuals subjected to MPP."  (Id. ¶ 273.)  ImmDef has represented individuals subjected to MPP in immigration court, BIA appeals, non-refoulement interviews, parole requests, and motions to reopen.  (Id.)  By December 2021, ImmDef had provided legal assistance to 98 individuals in MPP.  (Id.)  "To represent individuals subjected to the Protocols, ImmDef was required to undertake two new ventures: first, to begin representing individuals in the San Diego immigration court and, second, to engage in cross-border travel and communication."  (Id. ¶ 274.)  As part of these new ventures, ImmDef diverted resources to projects established to provide representation to individuals subjected to MPP 1.0, devoted increased staff time to meeting the needs of these individuals, and responded to inquiries to individuals denied processing during the MPP 1.0 wind-down.  (See id. ¶¶ 273-87.)  ImmDef has spent at least $400,000 on costs associated with representation of MPP clients.  (Id. ¶ 277.)  Even after the wind-down, "ImmDef continues to divert organizational and staff resources to support individuals outside the United States who were or will be subjected to [MPP.]"  (Id. ¶ 283.)

JFS is a nonprofit dedicated to providing legal and other supportive services to immigrants in San Diego and Imperial Counties.  (Id. ¶ 288.)  "Before the implementation of [MPP], [JFS] provided consultations, limited- and full-scope legal representation for both detained and non-detained individuals in immigration court proceedings in the Otay Mesa and San Diego immigration courts, and limited- and full-scope legal representation before the BIA and the Ninth Circuit Court of Appeals."  (Id. ¶ 289.)  In January 2019, JFS shifted its focus to respond to individuals subjected to MPP; before this time, JFS "had rarely engaged in cross-

border legal work." (Id. ¶ 290.)  Between January 2019 and August 2021, JFS reallocated
"significant portions" of six staff members' time and hired three new employees to provide legal
services to those subjected to MPP.  (Id. ¶ 291.)  As of December 2021, JFS employed four staff
members who exclusively performed cross-border work, including dealing with the repercussions
of MPP, and three senior leadership team members who "spend substantial amounts of time on
cross-border cases and issues."  (Id.)  Because of its diversion of resources toward MPP clients,
JFS had to suspend its volunteer attorney program because of a lack of capacity to "supervise and
oversee it following the implementation of MPP."  (Id. ¶ 292.)

        The Court finds that these allegations establish that both organizations' missions were
frustrated and that they diverted resources toward addressing the harms caused by MPP.  As a
threshold matter, while Defendants repeatedly claim that various details are "unspecified," the
Court finds that both ImmDef and JFS have plead their allegations with remarkable specificity.
(See Motion to Dismiss at 23, 26.)  Defendants' argument that Organizational Plaintiffs' decision
to reorient their focus after MPP fails to establish frustration of mission has little support in the
case law.  In EBSC III, the Ninth Circuit recognized that "organizations cannot 'manufacture the
injury by incurring litigation costs or simply choosing to spend money fixing a problem that
otherwise would not affect the organization at all,' but they can show they 'would have suffered
some other injury' had they 'not diverted resources to counteracting the problem.'"  993 F.3d at
663 (internal quotations and citations omitted.)  There, four legal service providers alleged that
an interim final rule stripping asylum eligibility from every migrant who crossed into the United
States between designated ports of entry frustrated their mission.  Id. at 658-663.  The Ninth
Circuit found standing in large part because "[e]ach organization would have lost clients seeking
refuge in the United States had it not diverted resources toward countering the effects of the
[interim final rule.]"  Id. at 664.  The EBSC III court noted, "[t]he Organizations are not
required to demonstrate some threshold magnitude of their injuries; one less client that they may
have had but-for the [rule's] issuance is enough.  In other words, plaintiffs who suffer concrete,
redressable harms that amount to pennies are still entitled to relief."  Id.  Far more than pennies,
ImmDef and JFS allege concrete harms arising out of MPP, which "'perceptibly impaired their
ability to perform the services they were formed to provide."  Id. (citing E. Bay Sanctuary
Covenant v. Trump, 932 F.3d 742, 765 (9th Cir. 2018) (EBSC II)).

        Defendants also argue that the Organizational Plaintiffs fall outside the INA's zone of
interests.  Whether the Organizational Plaintiffs' claims fall within the "zone of interests" "is a
'prudential' inquiry that asks 'whether the statute grants the plaintiff the cause of action that he
asserts.'"  E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 767 (9th Cir. 2018) (EBSC I)
(internal quotations and citations omitted).  The EBSC I court squarely rejected a nearly identical
argument to the one made by Defendants here.  There, the Ninth Circuit held, "[a]lthough the
Organizations are neither directly regulated nor benefitted by the INA, we nevertheless conclude
that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls
within the zone of interests protected by the INA."  Id. at 768 (internal quotations and citations
omitted).  That is because, "[w]ithin the asylum statute, Congress took steps to ensure that pro
bono legal services of the type that the Organizations provide are available to asylum seekers,"
while "other provisions in the INA give institutions like the Organizations a role in helping

immigrants navigate the immigration process." Id. at 768-69.  For purposes of standing, there is no meaningful difference between the organizations and issues in EBSC I and those here.  The zone of interests test is not difficult to pass: it "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."  Id. at 768 (internal quotations and citations omitted.)  Both ImmDef and JFS easily meet that bar.

## H.  Adequacy of Plaintiffs' Pleadings

Defendants next challenge each of the Plaintiffs' causes of actions.  The Court addresses their arguments in turn.

### 1.  First Claim: APA — Right to Apply for Asylum

Defendants argue that Plaintiffs' first cause of action, a violation of the APA predicated on the right to apply for asylum, fails.  (Motion to Dismiss at 24.)  The Court finds that Plaintiffs have adequately plead the claim.

The APA provides for judicial review of final agency actions.  5 U.S.C. §§ 702, 706.  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The INA provides that any noncitizen who is "physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section, or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).  Section 1225(b) states that DHS "may return" certain noncitizens to a contiguous country "pending a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(C).  Section 1229a, in turn, refers to "removal proceedings," in which a noncitizen's asylum application is adjudicated.  8 U.S.C. § 1229a.

Defendants argue that "Section 1158 does not state or guarantee that any person who indicates an intention to apply for asylum or who applies for asylum must be allowed to remain in—or allowed to return to—the United States pending adjudication of that application." (Motion to Dismiss at 24.)  In their view, § 1225(b)(2)(C) "explicitly provides" that the Secretary "may return" certain noncitizens to a contiguous country pending their asylum proceedings.  (Id.)  Thus, "Plaintiffs' return to a contiguous foreign territory in compliance with Section 1225(b)(2)(C) cannot violate a statutory right to asylum, when it is a statute that

expressly authorized their return to Mexico." (Id.)  Since courts interpret statutes as a "harmonious whole rather than at war with one another," Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1619 (2018), Defendants argue the specific authority authorizing Plaintiffs' return to Mexico pending removal proceedings must be read to cohere with, not conflict with, the general right to apply for asylum. (Id.)

Plaintiffs agree that "any authority granted by § 1225(b)(2)(C) 'must be read to cohere with, not conflict with, the general right to apply for asylum.'" (Opp. to MTD 21.)  They concede that they "do not challenge the authority conveyed by Congress in § 1225(b)(2)(C) or the possibility of *lawful* contiguous-territory return[.]" (Id.) (emphasis added.)  Rather, "they challenge the implementation of Defendants' policies that have exceeded that authority in violation of law." (Id.)  Fundamentally, "[n]othing in the INA suggests that Congress, through § 1225(b)(2)(C), intended to authorize violations of the right to apply for asylum or to undermine the principle of uniform treatment of asylum applications.  But Defendants' implementation of MPP 1.0 did both." (Id. at 21-22.)

The Refugee Act requires the Government to "establish a uniform procedure for passing upon an asylum application." S. Rep. No. 96-256, at 9 (1980), reprinted in 1980 U.S.C.C.A.N. 141, 149.  In doing so, Congress placed "emphasis on the need for a uniform, nondiscriminatory treatment of refugees." Orantes-Hernandez v. Smith, 541 F. Supp. 351, 375 (C.D. Cal. 1982).

In the SAC, Plaintiffs allege that MPP "subverted and violated the right to apply for asylum by trapping Individual Plaintiffs and similarly situated individuals in a foreign country under dangerous conditions in a manner that obstructed access to all components of the U.S. asylum system." (SAC ¶ 333.)  MPP also "subverted and violated the right to apply for asylum by irrationally treating asylum seekers at the southern border in a discriminatory and non-uniform way." (Id. ¶ 334.)  MPP violated the APA because "Defendants failed to consider how leaving individuals stranded outside the United States in life-threatening conditions and without access to legal representation would obstruct these individuals' access to the U.S. asylum system, including, where relevant, by impeding their ability to restart or reopen their asylum proceedings or appeal an unfavorable decision." (Id. ¶ 335.)  Defendants also failed to consider the obstacles that Organizational Plaintiffs would face in meeting and communicating with their clients. (Id.)

The Court is persuaded that Plaintiffs have plead a plausible violation of the APA based on a violation of the right to apply for asylum.  Defendants have conceded publicly and in papers filed during this litigation that MPP is indefensible as a matter of policy, in large part because of the burdens it imposed on the right to apply for asylum. (See Motion to Dismiss at 3; Termination Memo; Explanation Memo.)  MPP was terminated because of its "endemic flaws" and its conflict with "other high-priority administration goals." (Motion to Dismiss at 3.)  Defendant Secretary Mayorkas has recognized numerous structural flaws with MPP, not least concerns about the *non-refoulement* process, fairness and reliability of proceedings, notice of hearings, and disparate impact on court appearance rates and outcomes. (See Explanation Memo at 11-21.)  For example, noncitizens who were subjected to MPP were two and a half times more

likely than noncitizens not subjected to MPP to receive *in absentia* removal orders.  (Id. at 18-19.) Plaintiffs have pleaded these allegations in the SAC.  (See, e.g., SAC ¶¶ 4, 62.)  While the Court acknowledges the complex ethical and political dynamics at play in Defendants' *legal* defense of a prior Administration's *policy*, it cannot help but observe the tension between their positions. Their refusal to defend a policy on its merits does not, of course, automatically render it arbitrary and capricious.  It does, however, lend considerable support for many of Plaintiffs' arguments, augmenting the plausibility that the decisionmakers behind MPP 1.0 failed to consider or inadequately weighed the considerable problems Defendants now recognize, or that they used their authority in such a way that conflicted with the legal rights bestowed upon asylum seekers by Congress.  See State Farm, 463 U.S. 29.

While Defendants' authority pursuant to § 1225(b)(2)(C) must be read within the context of a broader statutory scheme, it does not follow that the provision affords nearly limitless discretion to return noncitizens to a contiguous country *even if* doing so would violate the rights enacted by other statutes.  By its plain language, Section 1225(b)(2)(C) does not mention asylum at all.  Defendants argue, in essence, that by such silence, Congress afforded them "specific" (and limitless) authority to return noncitizens to Mexico regardless of the consequences to the "general right to apply for asylum."  (See Motion to Dismiss at 24.)  The argument seems to flip the burden of demonstrating that one statute "displaces another," Epic, 138 S. Ct. at 1612, on its head.  Nothing about § 1225(b)(2)(C), or any other provision cited by Defendants, suggests that Congress intended to undermine or modify the right to apply for asylum.  It is difficult to believe that, if Congress so intended, it would silently amend a core function of the Refugee Act without any reference to the asylum statute.  It is particularly difficult to believe that Congress would do *sixteen years* after passage of the Refugee Act.  See Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 (1980); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 302, 110 Stat. 3009-1, 583 (1996) (adding § 1225(b)(2)(C)).  Congress clearly authorized Defendants to implement § 1225(b)(2)(C).  What it did not do was authorize Defendants to implement the provision in such a way that undermined the asylum rights and standards codified elsewhere.  A violation of those rights and standards is precisely what Plaintiffs allege in their first cause of action.  Plaintiffs have thus plausibly plead their theory of subversion of the right to apply for asylum.

The Court also declines to give the uniformity principle the narrow reading Defendants propose.  Defendants note that Plaintiffs do not "challenge the manner in which asylum applications are adjudicated."  (Motion to Dismiss at 25.)  Those applications are, of course, adjudicated by Immigration Judges in immigration courts, who apply the same substantive standards to all applicants.  In Defendants' view, therefore, because IJs applied the same standards to the applications of MPP enrollees as those not enrolled in MPP, Plaintiffs' claims regarding a violation of the right to a "uniform method" fail.  (Id. at 25.)  Notably, Defendants provide no authority for the proposition that the uniformity principle is delimited to the "substantive law" (id.) applied in immigration courts.  The only case Defendants cite on the subject is Cazun v. Att'y Gen. United States, 856 F.3d 249 (3d Cir. 2017).  There, the Third Circuit noted that Congress intended to require a uniform procedure for a noncitizen to apply for asylum "irrespective of" his or her status, specifically rejecting the notion that Congress would

"allow one procedure for stowaways and another for other [noncitizens.]" Id. at 258. That Congress sought to apply the same standards to all asylum applications does not indicate a lack of concern for other forms of discriminatory treatment; if anything, the opposite inference is more likely. Plaintiffs have carefully plead how individuals subjected to MPP were treated differently from similarly situated asylum seekers who were not enrolled in the program. (See SAC ¶¶ 58, 60, 94, 103-05, 116, 118, 129, 144, 162-64, 172-74, 190-93, 210, 219-22.) In sum, such individuals "were prevented from understanding, preparing for, and in many cases even attending their asylum proceedings." (Opp. to MTD at 22.) Defendants cannot claim that the *results* were the same; as noted above, they concede the disparate impact of the policy in multiple meaningful ways, not least the percentage of applicants who received *in abstentia* removal orders. (See Explanation Memo at 18-19.) Plaintiffs thus allege a valid theory of discrimination even if IJs applied the same substantive standards to their applications as all others. The differential treatment of individuals subjected to MPP is a plausible theory to allege a violation of the uniformity principle.

Finally, the Court rejects Defendants' argument that Organizational Plaintiffs lack standing to bring the first cause of action, as they "do not allege any existing attorney-client relationship with the Individual Plaintiffs or proposed class or even any specific plans to represent them." (Motion to Dismiss at 26.) The Court previously found that both ImmDef and JFS have standing to bring all their claims. Defendants' argument rests on a misreading of the SAC. The SAC describes ImmDef's representation of Plaintiff Chepo Doe. (See SAC ¶ 159.) It alleges that ImmDef has "provided legal assistance to 98 individuals in MPP" as of December 2021" and maintains its Cross Border Initiative, focused on direct representation of individuals subjected to MPP. (Id. ¶ 273.) Likewise, JFS "has continued to represent and advise individuals subjected to MPP" since the cessation of the wind-down. (Id. ¶ 305.) The Organizational Plaintiffs allege ongoing or potential relationships with the Individual Plaintiffs and/or proposed class and thus have standing to bring the claim.

For the reasons stated above, Defendants' motion to dismiss the first cause of action is DENIED.

### 2. Second Claim: APA — Right to Access Counsel

Defendants' argument to dismiss the second cause of action consists of nine sentences, beginning with the following two:

> As stated above, the Secretary of Homeland Security has expressed concerns that MPP, as previously implemented, hindered access to counsel, given among other considerations, the limited opportunities to meet with counsel. And as a matter of policy, he has significant concerns about the practical obstacles to interacting with counsel across an international boundary. (See Explanation Memo at 16-18.)

(Motion to Dismiss at 26.)  Despite this substantial concession, Defendants argue that "the underlying statutory provision, 8 U.S.C. § 1158(d)(4), merely provides that at the time that noncitizens file applications for asylum, they are to be advised of the privilege of being represented by counsel and provided a list of persons who have indicated their availability to represent noncitizens in asylum proceedings on a pro bono basis." (Id. at 26-27.)  Moreover, Sections 1229a(b)(4)(A) and 1362 simply provide that noncitizens have "the privilege of being represented, at no expense to the Government, by counsel" and thus do not create a private right of action.  (Id. at 27.)  Therefore, while Defendants acknowledge "there are good reasons to be concerned about the prior implementation of MPP," they claim Plaintiffs' APA suit alleging a violation of the statutory right to counsel fails.  (Id.)

The Court rejects the notion that the statutory right to counsel consists merely of the right to be advised of the right to counsel and provided a list of pro bono lawyers.  At a minimum, "[t]o infuse the critical right to counsel with meaning, . . . IJs must provide [noncitizens] with reasonable time to locate counsel and permit counsel to prepare for the hearing."  Biwot v. Gonzales, 403 F.3d 1094, 1098–99 (9th Cir. 2005).  If a noncitizen is able to retain counsel, he is entitled to the effective assistance of it, and is denied the right when a proceeding becomes so "fundamentally unfair that he is prevented from reasonably presenting his case."  Lopez v. INS, 775 F.2d 1015, 1017 (9th Cir. 1985).  In Torres, this Court found that unrepresented noncitizens' restrictions on telephone access, difficulty with legal mail, in-person meetings and other obstacles were "tantamount to the denial of counsel."  411 F. Supp. 3d at 1060.  It found that restrictions on confidential communications impeded represented noncitizens' "established, on-going attorney-client relationships."  Id. at 1061.  In Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir. 1990), the Government made nearly the same argument Defendants do here.  Id. at 565. The Ninth Circuit rejected it, finding that errors in the lists of lawyers provided to Salvadoran noncitizens, detention of noncitizens "far from where potential counsel or existing counsel were located," restrictions on consultation with counsel before signing voluntary departure documents, failures to notify attorneys of client location transfers, limited attorney visitation hours, and inadequate efforts to ensure the privacy of attorney-client interviews cumulatively deprived the noncitizens of their right to "consult with counsel."  Id. at 564-67.

The Court thus agrees with Plaintiffs that "the INA mandates that asylum seekers have meaningful access to counsel, including the right to contact counsel and the time, space, and ability to consult with counsel safely and confidentially."  (Opp. to MTD at 23.)  Plaintiffs have plead with great specificity the ways in which MPP "obstructed legal representation for all individuals subjected to [it], blocking it entirely for over 90 percent of impacted individuals." (SAC ¶ 61.)  Among their allegations, Plaintiffs identify deficiencies in the lists of legal service providers akin to those in Thornburgh, 919 F.2d 549; attorney-client consultations limited to an "illusory one-hour window before a scheduled hearing"; lawyers who were forced to meet with their clients in nonconfidential settings; and unrepresented noncitizens who "were prohibited even from approaching legal representatives present in the immigration court to discuss possible representation."  (SAC ¶¶ 61-63; see also ¶¶ 156-57.)  Defendants do not contest these allegations and their impact in "hinder[ing] access to counsel."  (Motion to Dismiss at 26.)

Plaintiffs need not rely on a private right of action supplied by Section 1158 because they bring suit under the APA, alleging that MPP violated the right to counsel codified within the INA.  See Torres, 411 F. Supp. 3d at 1058 n.8.  The Court also rejects Defendants' renewed objection to Organizational Plaintiffs' standing to bring the claim, for the same reasons stated above: both ImmDef and JFS properly allege ongoing or potential attorney-client relationships with Individual Plaintiffs and/or the proposed class.

Defendants' motion to dismiss the second cause of action is DENIED.

### 3.  Third Claim: Fifth Amendment — Right to Full and Fair Hearing

Defendants challenge Plaintiffs' Due Process cause of action on three primary grounds.  First, individuals "who have never entered the United States [] cannot assert constitutional claims from abroad alleging constitutional violations occurring abroad."  (Motion to Dismiss at 27.)  Second, the claim is duplicative of Plaintiffs' second cause of action.  (Id. at 29.)  Third, Plaintiffs cannot bring the claim because they must exhaust their administrative remedies and pursue a constitutional challenge through the petition for review process.  (Id.)

At the outset, the Court acknowledges that many of Plaintiffs' allegations do involve conduct that occurred inside the United States, including numerous alleged violations of their rights to apply for asylum and right to counsel.  (See SAC ¶¶ 63, 125-26, 156-57, 168, 186-87, 202, 217, 221, 241, 249.)  Defendants rely on Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953) and its progeny for their argument that the Fifth Amendment does not apply to Plaintiffs.  Those cases created the "entry fiction," in which inadmissible noncitizens are treated as if they have not entered the country and generally have no right to procedural due process.  (See Motion to Dismiss at 27-29 (collecting cases.)  The Court finds that these cases, involving the procedures for the admission or exclusion of noncitizens (and any procedural rights afforded them), are inapposite here.

In Al Otro Lado, Inc. v. Mayorkas, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021), the court considered analogous allegations advanced by a class of immigrant plaintiffs and rejected the Fifth Amendment argument Defendants make here.  There, plaintiffs challenged the "lawfulness of the Government's practice of systematically denying asylum seekers access to the asylum process at ports of entry ('POEs') along the U.S.-Mexico border" through its "metering" policy.  Id. at *1.  Pursuant to the policy, CBP officers did not inspect asylum seekers and refer them for asylum interviews when they presented themselves at POEs, but instead turned them back to Mexico on the basis that the ports were "at capacity."  Id. at *1.  The plaintiffs argued that the act of turning back asylum seekers when they presented themselves at POEs violated the Due Process Clause of the Fifth Amendment.  Id. at *18.  After canvassing relevant precedent, including the same cases Defendants rely on here, the court concluded that the functional approach articulated in Boumediene v. Bush, 553 U.S. 723 (2008) applied to the extraterritorial application of due process.  Id. at *19.  Boumediene requires courts look to the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it and, in particular, whether judicial enforcement of the provision would be impracticable and

anomalous." 553 U.S. at 759 (citation and internal quotation marks omitted). The <u>Al Otro Lado</u>
court held that, "under the functional approach in <u>Boumediene</u>, the Fifth Amendment applies to
conduct that occurs on American soil and therefore applies here[.]" 2021 WL 3931890 at *20.
In doing so, it rejected the argument made (at least obliquely) by Defendants here, that class
members outside the country must allege they developed "substantial connections with this
country." <u>Id.</u> at *19 (citing <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 275 (1990)). That
is because the "substantial connection" test "does not constitute a ceiling on the application of
the Constitution to [noncitizens.]" <u>Id.</u>

 Likewise, in <u>Lucas R. v. Azar</u>, 2018 WL 7200716 (C.D. Cal. Dec. 27, 2018), the district
court rejected the argument that a class of undocumented children were not entitled to any
constitutional procedural protections "beyond those explicitly provided by Congress." <u>Id.</u> at *8.
That case considered the claims of a class of unaccompanied Central American children,
including a Due Process Clause challenge to certain policies and practices related to their
detention. <u>Id.</u> at *1. The <u>Lucas</u> court rejected the applicability of cases relying on the "entry
fiction," finding that the class were entitled to additional procedures that limited the
government's authority to detain them and "block their access to counsel." <u>Id.</u> at *10. It relied
in turn on <u>Hernandez</u>, 872 F.3d at 990, which found that Due Process protections "apply to all
'persons' within the United States, including [noncitizens], whether their presence is lawful,
unlawful, temporary or permanent" (quoting <u>Zadvydas</u>, 533 U.S. at 690). As the Ninth Circuit
observed in <u>Hernandez</u>, "[a]lthough the Supreme Court has described Congress's power over
the 'policies and rules for exclusion of aliens' as 'plenary,' . . . it is well-established that the Due
Process Clause stands as a significant constraint on the manner in which the political branches
may exercise their plenary authority." <u>Id.</u> at 990 n.17 (internal citation omitted).

 Defendants rely on <u>Dep't of Homeland Sec. v. Thuraissigiam</u>, 140 S. Ct. 1959 (2020) for
the proposition that, "for those noncitizens who have neither acquired domicile or residence in
the United States nor been lawfully admitted, '[w]hatever the procedure authorized by
Congress is, it is due process as far as [a noncitizen] denied entry is concerned.'" (Motion to
Dismiss at 28 (quoting <u>Thuraissigiam</u>, 140 S. Ct. at 1982 (quoting <u>United States ex rel. Knauff v.
Shaughnessy</u>, 338 U.S. 537, 544 (1950)). <u>Thuraissigiam</u> concerned the expedited removal
process, authorizing the rapid removal of a limited group of "applicants for admission." 140 S.
Ct. at 1964 (summarizing applicable provisions within 8 U.S.C. §§ 1225(a)(1) and (b)(1).) The
Supreme Court held that the petitioner was only entitled to those rights that Congress had
provided by statute, despite the fact that "he succeeded in making it 25 yards into U.S. territory
before he was caught." <u>Id.</u> at 1982. Critically, <u>Thuraissigiam</u> did not address the regular removal
process that people like Individual Plaintiffs were placed into when subjected to MPP. (<u>See</u> Opp.
to MTD at 26.) Individuals in regular removal proceedings enjoy far more robust due process
protections because Congress has conferred additional statutory rights on them. <u>See</u> 8 U.S.C. §§
1158(a)(1), (d)(4), 1229a(b)(4), 1362 (right to apply for asylum, right to counsel, and other
procedural rights); <u>Colmenar v. INS</u>, 210 F.3d 967, 971 (9th Cir. 2000) ("[A noncitizen] who
faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to
present evidence on his behalf.") Such individuals may therefore state a claim for a violation of
constitutional process predicated in turn on a violation of the panoply of statutory rights afforded

asylum seekers.  Following <u>Thuraissigiam</u>, the <u>Al Otro Lado</u> court held, "[b]ecause Defendants' turning back of asylum seekers unlawfully withholds their duties under statute, it violates the process due to class members."  2021 WL 3931890, at *20.  While Defendants renew their argument that Plaintiffs fail to plausibly allege any violations of the INA (in turn undermining their Due Process challenge), the Court has already rejected the contention.  Applying the same reasoning as <u>Al Otro Lado</u>, Plaintiffs state a plausible theory of constitutional deprivation.

Having rejected Defendants' argument that the "entry fiction" cases guide the analysis here, the Court finds that application of <u>Boumediene</u>'s functional approach merits application of the Due Process Clause.  It would not be "impracticable and anomalous" to apply fundamental procedural protections to Plaintiffs, whose claims "concern adoption of a [] policy that aims to impede access to the statutory-mandated asylum procedure."  <u>Al Otro Lado, Inc. v. McAleenan</u>, 394 F. Supp. 3d 1168, 1221 (S.D. Cal. 2019).  "The lesson of <u>Boumediene</u> is that the political branches do not enjoy the prerogative to 'switch the Constitution on or off at will[.]'"  <u>Id.</u> (quoting <u>Boumediene</u>, 553 U.S. at 765.)  The conduct alleged here does not occur "wholly in foreign territory"; critically, the allegedly unconstitutional policy was not "developed in Mexican border towns" but was formed by "high-level federal officials" operating from the United States.  <u>Id.</u> at 1220.  Moreover, "practical necessities" warrant the Fifth Amendment's application, for the claims concern "alleged denials of procedural due process by U.S. immigration officers upon whom Congress has placed certain statutory obligations, all in furtherance of the asylum protections Congress has also chosen to extend to certain 'arriving aliens' that express an intent to apply for asylum or fear of persecution."  <u>Id.</u> at 1221.

The Court rejects Defendants' argument that the Due Process challenge "merely duplicates Plaintiffs' Second Claim (access to counsel), and it fails for the same reasons." (Motion to Dismiss 29.)  That Defendants' argument consists solely of the single sentence just quoted suggests how little they believe in it.  As previously noted, Plaintiffs have stated a claim for denial of access to counsel.  It is entirely appropriate for Plaintiffs to bring an independent constitutional claim that overlaps with their APA claim.  <u>See</u> <u>Sierra Club v. Trump</u>, 929 F.3d 670, 699 (9th Cir. 2019) ("claims challenging agency actions—particularly constitutional claims— may exist wholly apart from the APA").

Finally, the Court rejects Defendants' arguments that the Due Process challenge is technically deficient because it should have been brought via petition for review and litigated from abroad, rather than from inside the United States, as Plaintiffs request.  (<u>See</u> Motion to Dismiss at 29.)  The arguments here are largely duplicative of those the Court already rejected in assessing Defendants' many challenges to jurisdiction.  The Court also finds the authority Defendants rely upon in support of their claim that Plaintiffs are "required to pursue their immigration cases from abroad" inapplicable.  (Motion to Dismiss at 29.)  Those cases provide that noncitizens may be allowed to challenge their removal orders from abroad (such as through a motion to reconsider or reopen) under certain conditions; they do not hold that noncitizens are *required* to pursue their cases from abroad.  <u>See</u> <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009); <u>Toor v. Lynch</u>, 789 F.3d 1055, 1057 (9th Cir. 2015); <u>Reyes-Torres v. Holder</u>, 645 F.3d 1073, 1077 (9th Cir. 2011).  As Plaintiffs note, those cases are also distinguishable because they involve

immigrants who accessed the asylum system from inside the United States; here, Plaintiffs allege they "were forced to remain outside the United States as a result of a policy that fundamentally undermined their ability to prepare and present their claims for relief." (Opp. to MTD at 23.)

Defendants' motion to dismiss the third cause of action is DENIED.

### 4. Fourth Claim: APA — Unlawful Cessation of MPP Wind-Down

Plaintiffs' fourth cause of action challenges Defendants' decision to halt the MPP wind-down under a "mistaken belief that the <u>Texas v. Biden</u> injunction required cessation of processing" of Individual Plaintiffs and similarly situated individuals. (SAC ¶ 364.) For the reasons stated below, the Court finds that this claim is moot. Even if it were not, the Court agrees with Defendants that Plaintiffs fail to allege a "final agency action" and the claim is therefore also subject to dismissal. (Motion to Dismiss at 30.)

A brief review of the legal and policy decisions affecting MPP's termination illustrates these points. On January 20, 2021, the day of President Biden's inauguration, DHS announced the suspension of new enrollments into MPP, effective the next day. (SAC ¶ 70.) On February 2, 2021, President Biden issued an executive order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify" MPP. (<u>Id.</u>) On April 13, 2021, the States of Texas and Missouri filed a lawsuit in the Northern District of Texas, initially challenging the January 20, 2021 suspension of new enrollments in MPP. <u>Biden v. Texas</u>, 142 S. Ct. at 2536. On June 2, 2021, Defendant Secretary Mayorkas announced the termination of MPP ("First Termination Memo"). (<u>Id.</u> ¶ 71). Following the First Termination Memo, Texas and Missouri amended their complaint to challenge the rescission of the entire MPP program. 142 S. Ct. at 2536. On August 13, 2021, the U.S. District Court for the Northern District of Texas enjoined the First Termination Memo and ordered the Government:

> to enforce and implement MPP in good faith until such a time as it
> has been lawfully rescinded in compliance with the APA and until
> such a time as the federal government has sufficient detention
> capacity to detain all aliens subject to mandatory detention under
> [INA] Section 1255 [sic] without releasing any aliens because of a
> lack of detention resources.

(<u>Id.</u> ¶ 74; <u>Texas v. Biden</u>, 554 F. Supp. 3d 818, 857 (N.D. Tex.)) The Government appealed and sought a stay of the injunction, which the District Court, Fifth Circuit and Supreme Court all denied. 142 S. Ct. at 2537. While the parties proceeded to briefing in the Court of Appeals, Mayorkas "considered anew whether to maintain, terminate, or modify MPP in various ways." <u>Id.</u> On September 29, 2021, Mayorkas publicly announced his "intent[ion] to issue in the coming weeks a new memorandum terminating [MPP]." <u>Id.</u> The Government moved to hold the appeal in abeyance, but the Fifth Circuit denied the motion. <u>Id.</u>

On October 29, 2021, Mayorkas issued the Termination Memo and Explanation Memo. (Termination Memo; Explanation Memo; SAC ¶¶ 67-77.)  The October 29 Memoranda again terminated MPP and purported to examine considerations that the District Court found were insufficiently addressed in the First Termination Memo. (Id.; 142 S. Ct. at 2537.)  Mayorkas explained that DHS would "continue complying with the injunction requiring good-faith implementation and enforcement of MPP." Id.  He also noted that the termination of MPP would be "implemented as soon as practicable after a final judicial decision to vacate" the injunction. Id.  The Government moved to vacate the injunction, arguing that the October 29 Memoranda superseded the First Termination Memo, but the Fifth Circuit denied the motion. Id.

In December 2021, Defendants issued "Guidance regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols," which Plaintiffs allege initiated a new version of MPP, referred to as MPP 2.0. (Plaintiffs' Supplemental at 2; Ex. B.)  Meanwhile, the Government appealed, ultimately prevailing before the Supreme Court on June 30, 2022 in Biden v. Texas, 142 S. Ct. 2528.  On August 8, 2022, the U.S. District Court for the Northern District of Texas lifted the nationwide injunction. Texas v. Biden, Case No. 21-cv-00067 (N.D. Tex.), Dkt. No. 147.  The same day, DHS issued a statement "welcome[ing]" the District Court's decision to lift the injunction and noting its commitment to "ending the court-ordered implementation of MPP in a quick, and orderly, manner.  Individuals are no longer being newly enrolled into MPP, and individuals currently in MPP in Mexico will be disenrolled when they return for their next scheduled court date.  Individuals disenrolled from MPP will continue their removal proceedings in the United States." (Plaintiffs' Supplemental, Ex. C.)

In light of these developments, Plaintiffs characterize their ongoing injuries as follows. While seemingly pleased with Defendants' decision to promptly terminate MPP 2.0 as soon as the Texas v. Biden injunction was vacated, they note, "Defendants have announced no plans to provide relief in any form to the putative class in this case, all of whom were *previously* enrolled in MPP 1.0, never enrolled in MPP 2.0, and now have no scheduled court dates." (Plaintiffs' Supplemental at 5.)  The putative class members in this case "remain in legal limbo, deprived of their rights to legal representation, to a full and fair hearing, and to petition the courts." (Id.)  Those with final orders of removal "must move to reopen their immigration proceedings— something that is nearly impossible to do from outside the United States and without the assistance of immigration counsel." (Id.)  Accordingly, "even after the Texas injunction has been vacated, Defendants continue to ignore the ongoing harms to putative class members." (Id. at 6.)  They assert that "putative class members, who were subjected to MPP 1.0 and remain outside the United States with inactive cases, have no other avenue to relief" other than this lawsuit. (Id. at 7.)  Most notably for purposes of their fourth cause of action, Plaintiffs assert the following:

> Vacatur of the Texas v. Biden injunction enabled Defendants to
> end MPP 2.0 and take steps to permit those subjected to the
> second iteration of the policy to pursue their asylum claims inside
> the United States.  But these steps by Defendants have provided

> no redress to Individual Plaintiffs or the putative class, whose injuries flow from MPP 1.0, not MPP 2.0, and who continue to languish in legal purgatory without meaningful access to the U.S. asylum system.

(Id. at 3.)

As the Court understands the situation, at the time the SAC was filed and the parties briefed the Motion to Dismiss, Plaintiffs challenged Defendants' decision to halt the wind-down, alleging it failed to consider the "reliance interests" of Individual Plaintiffs, Organizational Plaintiffs and members of the proposed class and caused them "ongoing harm." (See SAC ¶¶ 361-372; Opp. to MTD at 27-29.) Now, following the vacatur of the injunction and the termination of MPP 2.0, Plaintiffs acknowledge their ongoing "injuries flow from MPP 1.0, not MPP 2.0[.]" (Plaintiffs' Supplemental at 3.) In that light, the fourth cause of action appears to challenge a *past policy* that does not cause them *ongoing harm*.

As the Court previously stated, a challenge may become moot when the issue present is no longer "live" or the parties lack a "legally cognizable interest in the outcome." Am. Diabetes Ass'n, 938 F.3d at 1152. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." O'Shea, 414 U.S. at 495–96. A claim is moot when "it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party.'" Knox, 567 U.S. at 307. The Court previously found that Plaintiffs' other causes of action were not moot because, even though they challenged a *past* policy, MPP 1.0, the ongoing injuries they allege to suffer as a result of the policy present a legally cognizable interest in the outcome and potential grounds for redress through an order of this Court. Here, however, they do not allege ongoing harms flowing from Defendants' cessation of the wind-down. Clearly, the Court cannot award injunctive relief ordering Defendants to restart the wind-down, as Defendants already appear to be moving as expeditiously as possible to end MPP (subject to the legal authority to do so pending related litigation in the Northern District of Texas). A declaration that the cessation of the wind-down was unlawful does not appear capable of remedying Plaintiffs' injuries. Accordingly, the Court finds the claim moot.

Even if the claim were not moot, the Court would be inclined to agree with Defendants' argument that the claim fails for failure to allege a "final agency action." (Motion to Dismiss at 30.) "[T]wo conditions must be satisfied for an agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations omitted). Plaintiffs argue that "Defendants' termination of the wind-down represents a deliberate response to the Texas injunction based on their erroneous interpretation of its terms" and "the termination of the wind-down represents the 'consummation' of DHS's flawed response to the Texas injunction." (Opp. to MTD at 28.) Further, "[t]he legal consequences of Defendants' termination of the wind-down [were] both

profound and immediate: people previously eligible for processing into the United States under the wind-down now have no viable avenue to vindicate their rights to access counsel and seek asylum." (Id.)  As they argued at the time, Defendants' speculative assertion that the wind-down will be re-implemented after a judicial decision vacating the Texas injunction does not transform the agency's final decision to terminate the wind-down into a temporary, inconsequential action, [] nor does the possibility that DHS might reverse its termination of the winddown at some future point alter its finality." (Id. at 29.)

Subsequent to the parties' briefing, the Supreme Court held that the First Termination Memo and the October 29 Memoranda were final agency actions. Biden v. Texas, 142 S. Ct. 2528, 2544–45 (2022).  "That is, both the June 1 Memorandum and the October 29 Memoranda, when they were issued, 'mark[ed] the 'consummation' of the agency's decisionmaking process' and resulted in 'rights and obligations [being] determined.'" Id. at 2545.  In contrast, and as a threshold matter, it is not entirely clear to the Court what Plaintiffs specifically allege was the "final agency action" at issue, other than simply complying with a court order "to enforce and implement MPP in good faith."  Without authority in support of the contention, the Court is not inclined to rule that the mere act of following a court's lawful order constitutes a final agency action.  Moreover, immediately following the U.S. District Court for the Northern District of Texas's order, the Government moved swiftly on parallel legal and policy tracks to avoid that order's mandate.  Defendants challenged the ruling in court, losing repeatedly before ultimately prevailing before the Supreme Court.  Simultaneously, Defendants endeavored to terminate MPP anew, restating their reasons for doing so—a decision that earned them blistering accusations of "agency closemindedness," post hoc rationalization and bad faith from the states suing the Government and the Fifth Circuit, which largely agreed with those assessments.  See id. at 2545-48.  The October 29 Memoranda also stated unequivocally that "the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction." Id. at 2537.  The Court concludes from these developments that Defendants' decision on June 2, 2021, and again on October 29, 2021, to terminate MPP constituted "final agency action."  The decisions reflect Defendants' consummation of their longstanding intention to terminate MPP.  The intervening decision to follow a court order, in contrast, was a "tentative or interlocutory," Bennett, 520 U.S. at 177-78, step Defendants undertook until they had the legal authority to do what they seemingly wanted to do since the day President Biden took office.  As such, it did not constitute "final agency action."

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' fourth cause of action is GRANTED.  The Court dismisses the claim WITHOUT LEAVE TO AMEND.

### 5. Fifth Claim: First Amendment — Individual Plaintiffs

The SAC's fifth cause of action alleges that MPP "interfered with and obstructed the First Amendment rights of Individual Plaintiffs and similarly situated individuals to hire and consult an attorney and petition the courts."  (SAC ¶ 374.)  Defendants raise various arguments why Plaintiffs fail to state a claim for relief, none of them persuasive.

As an initial matter, Defendants renew their arguments that the claim fails because this Court lacks jurisdiction, that "constitutional rights generally do not extend territorially" and it is moot. (Motion to Dismiss at 31; Reply at 20.) The Court rejects these arguments for the reasons stated above.

Defendants' primary argument is that Plaintiffs fail to allege "Government interference with Individual Plaintiffs' communications with their attorneys or potential attorneys—aside from the fact that they are currently outside of the United States." (Motion to Dismiss at 31.) In their view, MPP is a "generally applicable" policy that at most imposed an "incidental burden" on speech. (Id.) (citing Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011) and IMDb.com Inc. v. Becerra, 962 F.3d 1111, 1120 (9th Cir. 2020)). Moreover, "limitations on consideration for parole into the United States are not even restrictions on conduct" and do not constitute speech regulation. (Id.) (citing Arroyo, 2019 WL 2912848, at *21).

Defendants' argument mischaracterizes the level of generality at which Plaintiffs state their claim ("essentially a challenge to their current presence outside the United States") (Motion to Dismiss at 31) and ignores substantive allegations in the SAC in order to reach their desired conclusion. Plaintiffs do not simply argue that Defendants returned them to Mexico, which happened to make it more difficult to find and talk to lawyers located in the United States. They also allege that "Defendants placed specific and direct restrictions on their speech that impeded their communication with retained and prospective counsel." (Opp. to MTD at 29.) Plaintiffs summarize their First Amendment allegations as follows, which the Court finds to be an accurate distillation of the SAC. (See id. at 29-30.)

Defendants restricted individuals enrolled in MPP 1.0 to a maximum of one hour to consult with counsel while physically located in the United States for their hearings; lawyers were forced to conduct those consultations in non-confidential settings. (See SAC ¶¶ 62–63, 156–57, 279-81, 299.) Only individuals with previously retained counsel were allowed to use that hour; others were unable to find and consult with lawyers in the courtrooms. (See id.) As a result, Defendants restricted represented individuals' consultation with counsel to one hour (or less) in a non-confidential setting and "effectively prohibited unrepresented people from consulting with potential counsel or trying to secure counsel at all while they were in the United States." (Opp. to MTD at 30.)

Those restrictions forced Individual Plaintiffs to communicate with counsel or potential counsel virtually from Mexico. Because Defendants' implementation of MPP stranded them in dangerous and precarious conditions in Mexico, Individual Plaintiffs lacked the resources and technology to meaningfully communicate with counsel or potential counsel located in the United States. (See SAC ¶¶ 60, 104–08, 130, 178, 194, 251, 282, 295, 300, 302, 307.) Most of the legal service providers on the list of potential counsel Defendants gave to Individual Plaintiffs were unwilling to take MPP cases, placing a premium on whatever limited time Individual Plaintiffs had within the United States to secure counsel; since unrepresented individuals were barred from speaking with counsel when inside the United States, they were functionally prevented

from consulting with or retaining counsel.  (See SAC ¶¶ 62, 63, 113–14, 125, 128, 139–40, 154, 156–57, 190–92, 204–05, 219–20, 222, 229–30, 244–46, 259–60.)

Plaintiffs argue, and Defendants do not appear to dispute, that the First Amendment protects the right to hire and consult with counsel.  (Opp. to MTD at 30) (citing Mothershed v. Justices of Supreme Court, 410 F.3d 602, 611 (9th Cir, 2005), as amended on denial of reh'g (9th Cir. July 21, 2005) ("the 'right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.'") (quoting Denius v. Dunlap, 209 F.3d 944, 953 (7th Cir. 2000)); Eng v. Cooley, 552 F.3d 1062, 1069 (9th Cir. 2009) (courts have "long-recognized [the] First Amendment right to hire and consult an attorney")). The Court agrees with Plaintiffs that the allegations outlined above do not impose a mere "incidental effect" on speech.  If their allegations are true, MPP, as implemented by Defendants, afforded individuals only a nominal right to hire and consult with an attorney: a list of lawyers to call, most of whom probably could not help them.  Individuals were deprived of any meaningful way to communicate with (potential) counsel, let alone to divulge the painful, intimate and fact-intensive details that necessarily form the basis of an asylum claim in a private, unhurried setting. Such alleged deprivations strike at the fundamental nature of what it means to practice immigration law, to speak nothing of higher notions such as the importance of trust and rapport in the attorney-client relationship.

Plaintiffs contend that "Defendants' prohibition on unrepresented people communicating with counsel during their time in the United States is a classic content-based restriction, which targets a certain form of speech on a specific subject: immigration-related legal advice to unrepresented noncitizens in removal proceedings."  (Opp. to MTD at 31.)  In their view, such a restriction triggers (and fails) strict scrutiny.  See Reed v. Town of Gilbert, Arizona, 576 U.S. 155, 164 (2015).  In the alternative, Plaintiffs argue that, even if viewed as content-neutral, Defendants' restrictions on communications with counsel were unreasonable time, place and manner restrictions.  (Opp. to MTD at 31.)  They would therefore also fail intermediate scrutiny, in that they were not narrowly tailored, lack a significant government interest, and (presumably) also fail to leave open alternative channels for communication of information.  (See id.) (citing Mothershed, 410 F.3d at 611; Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989); and Lim v. City of Long Beach, 217 F.3d 1050, 1054 (9th Cir. 2000)).  Defendants do not address these arguments, choosing to contend that they did not place any restrictions on speech at all. (See Reply at 21.)  The Court declines to decide what level of scrutiny may apply to Plaintiffs' claim at this juncture; such arguments are better left for a motion for summary judgement.  It is enough to say here that the First Amendment applies to Individual Plaintiffs and they have adequately alleged its violation.

The Court is not persuaded by Defendants' selective, decontextualized reading of this Court's order in Arroyo, 2019 WL 2912848, in support of their claim that the First Amendment does not apply.  They claim the one-hour limitation "is not a restriction on speech at all, but rather, an alleged failure of the Government to sufficiently accommodate or facilitate the speech of unadmitted noncitizens, who were in custody while in the United States for the limited purpose of appearing for immigration court hearings."  (Reply at 21.)  In Arroyo and here,

Defendants claim that the plaintiffs "merely allege that a custody arrangement affected [their] ability to consult with their attorneys: there, custody transfers, and here, a limited amount of time in a room before hearings where [they] could use that time to consult with attorneys." (Id.) As an initial matter, Defendants fail to note that the portions of Arroyo they cite reference arguments made by *attorney plaintiffs*, not immigrant (potential) clients, like those here. (See Motion to Dismiss at 32; Reply at 21) (citing Arroyo, 2019 WL 2912848, at *20). Moreover, the particular First Amendment issues in Arroyo arose out of the unique context of how administrative decisions affect an "attorney's right to speak with and advise her clients, including incarcerated clients." Arroyo, 2019 WL 2912848, at *20. This Court, in its preliminary injunction order assessing a likelihood of success on the merits, found that "Plaintiffs offer no argument as to how the prospective transfers constitute speech regulation, either content-based or content-neutral." (Id. at *21.) As the Court notes below in its consideration of Organizational Plaintiffs' First Amendment claim—one more analogous to the claim asserted by the legal service providers that this Court analyzed in Arroyo—Plaintiffs present far more compelling arguments that the restrictions regulate their ability to engage in protected First Amendment activity, not least the right to engage in pro bono legal advocacy for an "unpopular minority," Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 434 (1963). Moreover, as Plaintiffs explain, here Defendants' restrictions are explicit restrictions on protected expressive conduct: "they regulate who may seek a particular kind of speech—legal advice for noncitizens—when, where, and for how long." (Opp. to MTD at 32.) The cumulative impact of MPP's implementation also plainly imposes a greater burden on attorney-client communications than the transfers considered in Arroyo.

Finally, the Court rejects Defendants' admittedly understated contention that it is "unclear whether [the] right of access [to the courts] extends to immigration proceedings such as a claim for asylum." (Motion to Dismiss at 32) (quoting United States v. Heredia-Oliva, 2008 WL 205574, at *2 (D. Ariz. Jan. 23, 2008). Quite clearly, "the First Amendment extends to the right to petition an administrative agency." Nat'l Ass'n of Radiation Survivors v. Derwinski, 994 F.2d 583, 595 (9th Cir. 1992), as amended on denial of reh'g (June 18, 1993) (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)). In a class action case involving ICE detainees challenging restrictions on telephone access, the court in Lyon v. U.S. Immigr. & Customs Enf't, 171 F. Supp. 3d 961 (N.D. Cal. 2016) found that the petition clause extended to immigration proceedings. Id. at 994. In doing so, it rejected the argument that "an application for immigrant status is not a lawsuit or airing of a political grievance, but is an affirmative application for a discretionary benefit from the government, which should not be considered a petition for redress of grievances." Id. at 993. The Court finds that Plaintiffs have alleged in numerous specific ways restrictions that denied them "meaningful access" to the courts. (See Opp. to MTD at 33) (citing a litany of allegations from the SAC and Silva v. Di Vittorio, 658 F.3d 1090, 1101–02 (9th Cir. 2011), abrogated on other grounds as stated in Richey v. Dahne, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). The precise contours of how the right of access to the courts may apply in the immigration context would benefit from further briefing should the Court be called upon to render a decision on the merits. For now, though, the Court finds that Plaintiffs have stated a claim for relief.

Accordingly, Defendants' motion to dismiss the fifth cause of action is DENIED.

### 6.  Sixth Claim: First Amendment — Organizational Plaintiffs

Plaintiffs' sixth claim for relief alleges that the implementation of MPP "interfere with
and obstruct Organizational Plaintiffs' First Amendment rights to advise potential and existing
clients." (SAC ¶ 382.)  Defendants raise multiple arguments in support of dismissal of the claim,
most of which the Court has already addressed.  The Court rejects Defendants' argument that
the claim is moot (Reply at 22) and that Organizational Plaintiffs fail to allege an existing
attorney-client relationship with the Individual Plaintiffs or proposed class or plans to represent
them (Motion to Dismiss at 32) for reasons previously stated.

The Court rejects the argument that Organizational Plaintiffs fail to allege "any
restrictions on speech" (Motion to Dismiss at 32) for the same reasons it rejected the parallel
argument regarding Individual Plaintiff's First Amendment claim.  The Court finds that
Defendants "placed explicit restrictions on Organizational Plaintiffs' protected speech in the
United States."  (Opp. to MTD at 34.)  Plaintiffs allege Defendants did so in at least three
meaningful ways: (1) imposing strict limitations on the time and conditions in which they could
provide legal services to existing clients; (2) prevented them from communicating with or
advising potential clients; and (3) forbidding them from conducting "know your rights"
presentations for individuals subjected to MPP.  (See SAC ¶¶ 62–63, 156–57, 279–81, 297–99,
387–88.)

As Defendants note, some of the seminal Supreme Court cases in this arena are factually
distinguishable.  Organizational Plaintiffs do not challenge a law making it a crime to advise an
individual that his legal rights have been violated and refer him to a (civil rights) attorney.  See
Button, 371 U.S. 415 (1963).  They do not challenge state bar disciplinary rules forbidding an
attorney from advising an individual of her legal rights and notifying her that free legal assistance
was available from his organization, a branch of the ACLU.  See In re Primus, 436 U.S. 412
(1978).  It is misleading to suggest, though, that there is no "general right 'to advise potential
clients'" because the Supreme Court has never so precisely held.  (Motion to Dismiss at 32.)
Button warned against government interference "smothering all discussion looking to the
eventual institution of litigation on behalf of the rights of members of an unpopular minority."
371 U.S. at 434.  It placed its holding in the context of other cases upholding the rights of
individuals "advocating lawful means of vindicating legal rights."  Id. at 437.  "Subsequent
decisions have interpreted Button as establishing the principle that 'collective activity
undertaken to obtain meaningful access to the courts is a fundamental right within the protection
of the First Amendment.'" Primus, 436 U.S. at 426 (quoting United Transportation Union v.
Michigan Bar, 401 U.S. 576 (1971)).  As Primus observes, "the efficacy of litigation as a means of
advancing the cause of civil liberties often depends on the ability to make legal assistance
available to suitable litigants."  436 U.S. at 431.  It teaches that "'Free trade in ideas' means free
trade in the opportunity to persuade to action, not merely to describe facts." Id. at 432 (quoting
Thomas v. Collins, 323 U.S. 516 (1945)).  And it declares that the "First and Fourteenth
Amendments require a measure of protection for 'advocating lawful means of vindicating legal

rights,' including 'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance.'" Id. (internal citations omitted).

It is not surprising, then, that the claims of organizations offering pro bono legal assistance to immigrants subject to removal proceedings may "fall[] neatly within the precedent set by the Supreme Court in Button and its progeny." Nw. Immigrant Rts. Project v. Sessions, 2017 WL 3189032, at *3 (W.D. Wash. July 27, 2017). Again, as Defendants note (Reply at 23), Northwest Immigrant Rights Project is factually distinguishable; it involved a regulation requiring immigration lawyers to submit a "Notice of Entry of Appearance" form when representing clients (or helping individuals file *pro se* motions.) Id. at *2. But it is not at all clear how that case is distinguishable in a way that meaningfully supports Defendants' position; the Court is inclined to conclude that the restrictions alleged here may very well have placed a greater burden on Plaintiffs' First Amendment rights than those of the plaintiffs in Northwest Immigrant Rights Project.

The bottom line is that "the creation and dissemination of information are speech within the meaning of the First Amendment." Sorrell, 564 U.S. at 570 (2011). Organizational Plaintiffs sought to engage in such speech by "advising, assisting, and consulting with existing and potential clients." (Opp. to MTD at 35.) They did so because their missions include "advocating lawful means of vindicating legal rights" for an "unpopular minority," Button, 371 U.S. at 435, 437, immigrants seeking asylum at the southern border. (See SAC ¶¶ 271-73, 278, 288-90, 294, 297-98.) "By specifically restricting Organizational Plaintiffs' ability to conduct know-your-rights sessions and to consult with potential and existing clients, Defendants' implementation of MPP 1.0 has limited Organizational Plaintiffs' ability to engage in such advocacy, and thereby infringed on their First Amendment rights." (Opp. to MTD at 35) (citing SAC ¶¶ 62–63, 156–57, 279–81, 297–300, 302, 307, 387–88). The Court thus finds that Organizational Plaintiffs have plausibly pleaded a violation of the First Amendment.

For the reasons stated above, Defendants' motion to dismiss the sixth cause of action is DENIED.

## V.        CLASS CERTIFICATION

Plaintiffs move to certify the following class of individuals (the "Inactive MPP 1.0 Class"): "All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose cases are not currently active due to termination of proceedings or a final removal order." (Certification Motion at 3.) Within the Inactive MPP 1.0 Class, Plaintiffs move to certify three subclasses:

**1.   The "Terminated Case Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose MPP proceedings were terminated and remain inactive.

  **2. The "*In Absentia* Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021,
who remain outside the United States, received an *in absentia*
order of removal in MPP proceedings, and whose cases have
not been reopened and are not currently pending review
before a federal circuit court of appeals.

  **3. The "Final Order Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021,
who remain outside the United States, received a final order
of removal for reasons other than failure to appear for an
immigration court hearing, and whose cases have not been
reopened and are not currently pending review before a
federal circuit court of appeals.

(Id.)

  Defendants challenge the Certification Motion on numerous grounds: classwide relief is
barred by jurisdiction-stripping provisions; classwide relief would conflict with the <u>Texas v.
Biden</u> injunction; Plaintiffs' requests for relief and claims are moot; the proposed classes are
"overbroad and not ascertainable"; Plaintiffs fail to establish commonality; the named Plaintiffs
are not typical class representatives; Individual Plaintiffs are not adequate representatives; and
Plaintiffs do not meet the requirements of Rule 23(b)(2). (<u>See</u> Opp. to Cert.) The Court
addresses these issues in turn.

**A. Jurisdiction and Potential Conflict with <u>Texas v. Biden</u> Injunction**

  Defendants argue that 8 U.S.C. §§ 1252(f)(1), 1252(d), 1252(b)(9), and 1252(a)(2)(B)(ii)
bar classwide relief. (<u>Id.</u> at 1-4.) The Court addressed, and (largely) rejected these arguments
above, and does not analyze them again here. As previously noted, the Court need not decide at
this juncture the precise avenues for relief that remain available to Plaintiffs; it is enough to say
now that the Court has jurisdiction to award Plaintiffs and the putative class some meaningful
relief.

  Defendants argued in their opposition to the Certification Motion that classwide relief
would conflict with the <u>Texas v. Biden</u> injunction. (<u>Id.</u> at 4.) As noted above, Defendants
acknowledge that the vacatur of the injunction moots the argument. (Defendants' Supplemental
at 2.) Accordingly, the Court does not consider the argument.

**B. Whether Individual Plaintiffs Assert Moot Claims**

  Defendants raise various mootness arguments in their challenge to certification of the
putative class. They renew their arguments raised in the Motion to Dismiss that claims 1-3 and 5,
and Plaintiffs' request for a declaration that the original MPP is unlawful, are moot. (Opp. to

Cert. at 5.)  The Court rejected these arguments above and does not consider them again. Defendants also argue that the Individual Plaintiffs who have been paroled into the United States assert moot claims. (Id. at 19-20, 23-24).  While Defendants raise this argument as part of the typicality and adequacy analysis, the Court determines it is better decided as a threshold matter.

### 1.   Current Status of Individual Plaintiffs

When the SAC was filed on December 22, 2021, all Individual Plaintiffs remained outside the United States.  (Certification Motion at 2; SAC ¶¶ 13-23, 110-268.)  By the time Plaintiffs filed the Certification Motion, DHS had exercised its discretionary authority to grant temporary humanitarian parole to Plaintiffs Arianna Doe, Dania Doe, Reina Doe, Carlos Doe and Yesenia Doe.  (Certification Motion at 2.)  As of September 9, 2022, Plaintiffs provided the following explanation of the Individual Plaintiffs' current status:

> Ten Individual Plaintiffs ["Paroled Plaintiffs"] have entered the United States under grants of humanitarian parole and/or Title 42 exemptions.  Title 42 is a separate policy that has effectively closed the U.S.-Mexico border to all asylum seekers since March 2020. These ten Individual Plaintiffs were able to secure the limited assistance of immigration counsel (for purposes of humanitarian parole and/or Title 42 exemption requests only) by virtue of their participation in this lawsuit.  Another Individual Plaintiff is currently being detained by ICE and has been placed in immigration court proceedings.  The other Individual Plaintiff, Chepo Doe—who was among those covered by Plaintiffs' November 2021 TRO []—remains stranded outside the United States with no ability to meaningfully access the U.S. asylum process.  Both Chepo Doe and his teenage daughter, who was also subjected to MPP 1.0, had to return to El Salvador during their proceedings to access life-saving emergency medical care for the daughter.  See SAC ¶¶ 16, 152–64.  They continue to shelter in a church under precarious conditions in El Salvador.  See id. ¶ 165.

(Id.)

### 2.   Defendants' Arguments that Mootness and the Relief Already Afforded the Named Plaintiffs Defeat Certification

One of Defendants' primary arguments against certification of the proposed class is that Plaintiffs' claims are moot, for the same reasons as addressed above in the Motion to Dismiss and the additional reason that ten of them have been paroled into the United States.  (Opp. to Cert. at 5).  Defendants also argue that the Paroled Plaintiffs fail to meet the requirements of class representatives under Rule 23 because their current status differs from members of the proposed class located outside the United States.  (See id. at 8-23.)

Plaintiffs dispute Defendants' contention that the Paroled Plaintiffs' claims are necessarily moot. (Certification Motion at 2.) In their view, discretionary grants of parole and/or Title 42 exemptions do not "fully satisf[y]" their requests for relief. (Id.) All Individual Plaintiffs, including those paroled into the United States, seek an order of this Court requiring Defendants to allow them to remain inside the United States "for a period sufficient to enable them to seek legal representation, and pursue their asylum proceedings from inside the United States[.]" (See SAC, Prayer for Relief, ¶ (e).) Plaintiffs seek an order requiring Defendants "to provide an adequate facility in the United States for legal visitation with no less than 20 confidential meeting spaces (adequate under all appropriate precautionary public health measures), accessible by legal representatives, interpreters and individuals subjected to MPP" available seven days a week, with access to an international telephone line, third-party interpretation, and videoconferencing. (Id. ¶ (f).) They also seek a declaration that "MPP as implemented violates federal statutes and the United States Constitution." (Id. ¶ (c).) Plaintiffs thus argue that grants of humanitarian parole and Title 42 exemptions fall short of a court order allowing Individual Plaintiffs to remain in the United States while they pursue their asylum claims because "Defendants have discretion to remove paroled Plaintiffs from the United States at any time." (Certification Motion at 2.) Moreover, the limited relief afforded Individual Plaintiffs located in the United States does not address the other forms of relief they seek, including a declaratory judgment. (Id.)

The Court is not persuaded that Defendants are necessarily correct that the Paroled Plaintiffs' individual claims are moot, for the Individual Plaintiffs located in the United States arguably retain some interest in the outcome of the litigation. According to Plaintiffs, grants of humanitarian parole or Title 42 exemptions have afforded them most of what they want, or could reasonably hope to receive, through this case. But ["a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Chafin, 58 U.S. at 172. "[A] lawsuit—or an individual claim—becomes moot when a plaintiff actually receives *all of the relief* he or she could receive on the claim through further litigation." Chen v. Allstate Ins. Co., 819 F.3d 1136, 1144 (9th Cir. 2016) (emphasis added). Assuming that it would not be "impossible" for this Court to grant some form of "effectual relief," even if that relief were relatively marginal in aiding the Individual Plaintiffs located in the United States, their claims would likely not be moot. See Knox, 567 U.S. at 307.

The Court is also not persuaded by Defendants' related argument that the Paroled Plaintiffs are not proper class representatives because they enjoy a different current status than members of the proposed class. As Plaintiffs explain, because their claims could be characterized as "inherently transitory" and "capable of repetition yet evading review," Individual Plaintiffs could serve as class representatives even if Defendants were correct that their individual claims were moot. (Certification Motion at 2.) Second, because the "relation back" doctrine provides that the Rule 23(a) elements are analyzed based on the facts existing at the time the complaint was filed, their change in circumstances does not make them improper class representatives. (Id.) While some of the facts presented here are atypical of the seminal cases underpinning these doctrines, the Court finds that Plaintiffs' argument is sufficiently rooted in precedent to provide a useful framework in the instant analysis.

CIVIL MINUTES—GENERAL

At the outset, the Court observes that arguments concerning mootness may not carry the same weight as other challenges to Article III jurisdiction over "cases and controversies," such as standing.  The Ninth Circuit recognized this point in <u>Pitts v. Terrible Herbst, Inc.</u>, 653 F.3d 1081 (9th Cir. 2011):

> Although the Supreme Court has described mootness as a constitutional impediment to the exercise of Article III jurisdiction, the Court has applied the doctrine flexibly, particularly where the issues remain alive, even if "the plaintiff's personal stake in the outcome has become moot."  The distinction between issues that have become moot and parties whose interest in the issue may have become moot is especially visible in the context of class actions.

<u>Id.</u> at 1087 (internal citation omitted).  <u>Pitts</u> traces the trajectory of Supreme Court mootness jurisprudence in the class action context.  <u>See id.</u> at 1087-92.  The Court reviews the central teachings of five Supreme Court cases that advance the "inherently transitory" and "capable of repetition yet evading review" rationales before turning to their application.

In 1975, the Supreme Court decided <u>Sosna v. Iowa</u>, 419 U.S. 393 (1975) and <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975).  In <u>Sosna</u>, Carol Sosna sought to represent a class challenging Iowa's one-year residency requirement to invoke the state's divorce court jurisdiction.  <u>Sosna</u>, 419 U.S. at 396-97.  The district court approved a stipulation that the action could proceed as a class action with Sosna as a representative.  <u>Id.</u> at 397-398.  It then ruled against the plaintiffs, upholding the constitutionality of the statute.  <u>Id.</u> at 398.  By the time Sosna's appeal came before the Supreme Court, she had obtained a divorce in another state and met Iowa's one-year residency requirement.  <u>Id.</u> at 398-99.  The Supreme Court explained that had Sosna's case not been a class action, it would have been moot.  <u>Id.</u> at 399.  In the Court's view, however, "[w]hen the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant."  <u>Id.</u>  It reasoned, "[a]lthough the controversy is no longer alive as to appellant Sosna, it remains very much alive for the class of persons she has been certified to represent."  <u>Id.</u> at 401.  Accordingly, where "the issue sought to be litigated escapes full appellate review at the behest of any single challenger . . . [it] does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs."  <u>Id.</u>  The Court held that the case was not moot and proceeded to the merits.  <u>Id.</u> at 402.  In a footnote, the Court also anticipated a situation in which a putative class representative's claim would be rendered moot before a district court could certify the class:

> There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the

> circumstances of the particular case and especially the reality of the
> claim that otherwise the issue would evade review.

Id. at 402 n.11.

A month later, the Court extended Sosna in Gerstein, 420 U.S. 103. The issue in
Gerstein was, "whether a person arrested and held for trial under a prosecutor's information is
constitutionally entitled to a judicial determination of probable cause for pretrial restraint of
liberty." Gerstein, 420 U.S. at 105. By the time the named plaintiffs' constitutional challenge
reached the Supreme Court, they had been convicted and their pretrial detention had thus ended.
Id. at 110 n.11. Citing Sosna, the Court held that the "case belongs, however, to that narrow class
of cases in which the termination of a class representative's claim does not moot the claims of the
unnamed members of the class." Id. The Court reasoned as follows:

> Pretrial detention is by nature temporary, and it is most unlikely
> that any given individual could have his constitutional claim
> decided on appeal before he is either released or convicted. The
> individual could nonetheless suffer repeated deprivations, and it is
> certain that other persons similarly situated will be detained under
> the allegedly unconstitutional procedures. The claim, in short, is
> one that is distinctly 'capable of repetition, yet evading review.'

Id. Gerstein noted that the record was silent as to whether the named respondents were still in
custody awaiting trial when the district court certified the class. Id. While "such a showing
ordinary would be required to avoid mootness," the Court found that the case was "a suitable
exception to that requirement." Id. That was because:

> The length of pretrial custody cannot be ascertained at the outset,
> and it may be ended at any time by release on recognizance,
> dismissal of the charges, or a guilty plea, as well as by acquittal or
> conviction after trial. It is by no means certain that any given
> individual, named as plaintiff, would be in pretrial custody long
> enough for a district judge to certify the class. Moreover, in this
> case the constant existence of a class of persons suffering the
> deprivation is certain. The attorney representing the named
> respondents is a public defender, and we can safely assume that he
> has other clients with a continuing live interest in the case.

Id.

Five years later, the Court decided two additional cases that built upon Sosna and
Gerstein. In Deposit Guaranty National Bank v. Roper, 445 U.S. 326 (1980), the named plaintiffs
sought to represent a class challenging the defendant's allegedly usurious finance fees. Id. at 328.
The district court denied class certification and the court of appeals denied interlocutory appeal.

Id. at 329.  Afterwards, the bank "tendered to each named plaintiff . . . the maximum amount that
each could have recovered."  Id.  While the named plaintiffs rejected the offer, the district
court entered judgment in the plaintiffs' favor over their objection and dismissed the action; the bank
deposited the amount into the registry of the court, where it remained as of the date the Supreme
Court decided the appeal.  Id. at 330.  The Fifth Circuit then reversed the denial of class
certification, and the Supreme Court granted certiorari to decide whether the case was moot and
thus had terminated the plaintiffs' right to appeal the denial of class certification.  Id. at 327.  The
Supreme Court held that the case was not moot because the named plaintiffs' rejection of the
offer meant they "retained an economic interest in class certification."  Id. at 333.  They also
"retain[ed] a continuing individual interest in the resolution of the class certification question in
their desire to shift part of the costs of litigation to those who will share in its benefits if the class
is certified and ultimately prevails."  Id. at 336.  Finally, the Court reasoned,

> To deny the right to appeal simply because the defendant has
> sought to "buy off" the individual private claims of the named
> plaintiffs would be contrary to sound judicial administration.
> Requiring multiple plaintiffs to bring separate actions, which
> effectively could be "picked off" by a defendant's tender of
> judgment before an affirmative ruling on class certification could be
> obtained, obviously would frustrate the objectives of class actions;
> moreover it would invite waste of judicial resources by stimulating
> successive suits brought by others claiming aggrievement.  It would
> be in the interests of a class-action defendant to forestall any appeal
> of denial of class certification if that could be accomplished by
> tendering the individual damages claimed by the named plaintiffs.

Id. at 339.

Like Roper, Geraghty also held that a putative class representative may appeal a denial of
class certification even if his individual claim becomes moot, extending this principle beyond
economic interests.  In Geraghty, a federal prisoner sought to represent "a class of all federal
prisoners who are or will become eligible for release on parole" in challenging the
constitutionality of various parole release guidelines.  445 U.S. at 393 (internal quotation marks
omitted).  The district court denied class certification and ruled against Geraghty on the merits;
he appealed.  Id. at 393-94.  Before the appeal reached the Supreme Court, the named plaintiff
completed his sentence and was released from prison, which mooted his individual claim.  Id.
Citing Sosna, the Court first reasoned that, if the class had been certified by the district court,
mootness of Geraghty's individual claim would not have rendered the controversy moot.  Id. at
394.  The Supreme Court granted certiorari to determine whether the court of appeals, which
reversed and remanded, was correct in determining that an erroneous (in its view) *denial* of class
certification should, by the same logic, preserve jurisdiction.  Id.  Geraghty distinguished between
two separate issues presented by a class representative: a claim that he is entitled to represent a
class and a claim on the merits.  Id. at 402.  Reviewing the underlying purposes of the case-or-
controversy requirement, class action litigation and the Federal Rules of Civil Procedure, the

Court determined that the right to represent a class if the requirements of the Rules are met is more akin to a private attorney general concept than "to the type of interest traditionally thought to satisfy the 'personal stake requirement." Id. at 403. Even if a named plaintiff's claim on the merits expires, the Court found that the key features of a dispute capable of judicial resolution, including "sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions," may still exist. Id. Beginning with Sosna, the Court found that its precedents recognized that "vigorous advocacy can be assured through means other than the traditional requirement of a 'personal stake in the outcome.'" Id. at 404. The Court then held that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied." Id. If denial of class certification is reversed on appeal, "the corrected ruling 'relates back' to the date of the original denial." Id. at 404 n. 11.

Finally, in 1991, the Supreme Court decided a case most analogous to the procedural posture at issue here, one appropriately arising out of this Court's backyard. In County of Riverside v. McLaughlin, 500 U.S. 44 (1991), Donald Lee McLaughlin filed suit in the Central District of California seeking to represent a class of individuals subjected to the County of Riverside's policy of combining probable cause determinations with its arraignment procedures. Id. at 47-48. At the time an amended complaint was filed with three additional individuals named individually and as class representatives, all the plaintiffs were incarcerated in the Riverside County Jail and had not received a probable cause determination. Id. at 48-9. By the time the case reached the Supreme Court, the named plaintiffs' individual claims were moot because they had either received probable cause determinations or had been released. Id. at 51. Relying on Sosna and Gerstein, the Court found that the termination of the class representatives' claims did not moot the claims of the remaining class members. Id. at 51-52. It then held the following:

> We recognized in Gerstein that "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." In such cases, the "relation back" doctrine is properly invoked to preserve the merits of the case for judicial resolution. Accordingly, we proceed to the merits.

Id. at 52 (internal citations omitted).

Summarizing these cases, the Ninth Circuit found in Pitts that the following principles applied in situations in which a class had yet to be certified:

> [E]ven if the district court has not yet addressed the class certification issue, mooting the putative class representative's claims will not necessarily moot the class action. "[S]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the

proposed representative's individual interest expires." McLaughlin, 500 U.S. at 52 (internal quotation marks omitted). An inherently transitory claim will certainly repeat as to the class, either because "[t]he individual could nonetheless suffer repeated [harm]" or because "it is certain that other persons similarly situated" will have the same complaint. Gerstein, 420 U.S. at 110 n. 11. In such cases, the named plaintiff's claim is "capable of repetition, yet evading review," id., and "the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution," McLaughlin, 500 U.S. at 52; see also Geraghty, 445 U.S. at 398; Sosna, 419 U.S. at 402 n. 11. Application of the relation back doctrine in this context thus avoids the spectre of plaintiffs filing lawsuit after lawsuit, only to see their claims mooted before they can be resolved.

653 F.3d at 1090. Applying such principles, Pitts held that a rejected offer of judgment for the full amount of a putative class representative's individual claim does not moot a class action complaint when the offer precedes the filing of a motion for class certification. Id. at 1084. It reasoned that Pitts' claim was "transitory in nature and may otherwise evade review." Id. at 190-91. If the district court were to certify a class, "certification would relate back to the filing of the complaint." Id. at 1091. Pitts "recognize[d] that the canonical relation-back case—such as Gerstein or McLaughlin—involves an 'inherently transitory' claim and, correspondingly, 'a constantly changing putative class." Id. (quoting Wade v. Kirkland, 118 F.3d 667, 670 (9th Cir. 1997)).[5] But it found that the relation-back doctrine need not be restricted to inherently transitory claims, reasoning, "where, as here, a defendant seeks to 'buy off' the small individual claims of the named plaintiffs, the analogous claims of the class—though not inherently transitory—become no less transitory than inherently transitory claims." Id. While Pitts' claims were not inherently transitory because they were time sensitive, they were susceptible to mootness because of defendant's tactic of "picking off" lead plaintiffs; since the result was the same, a transitory claim that would otherwise evade review, the Ninth Circuit held that the claim was not moot. Id.

District Courts in California have applied these precedents in the context of immigration class actions, consistently finding that the mootness of named plaintiffs' claims did not moot the controversy. In Fraihat v. U.S. Immigr. & Customs Enf't, 2020 WL 2759848 (C.D. Cal. Apr. 15, 2020), this Court considered the claims of a putative class of immigration detainees who challenged the conditions of confinement at immigration detention facilities across the country. Id. at *1. The defendants argued that the release of three named plaintiffs from custody mooted their claims for injunctive relief. Id. at *9. This Court rejected the argument, relying on the doctrines referenced above. Id. at *10. Fraihat observed, "where a plaintiff's claim becomes

---

[5] In Wade, Wade "purported to represent short-term inmates in a county jail, presenting a classic example of a transitory claim that cries out for a ruling on certification as rapidly as possible." 118 F.3d at 670.

moot while he seeks to certify a class, his action will not be rendered moot if his claims are 'inherently transitory' (such that the trial court could not have ruled on the motion for class certification before his or her claim expired), as similarly-situated class members would have the same complaint." Id. Similarly, in Torres, the defendants argued that individual plaintiffs' injunctive claims were moot because they had either received some form of relief and release or had obtained counsel. 411 F. Supp. 3d at 1056. This Court held that individual plaintiffs could maintain their claims as putative class representatives under the mootness exception for "inherently transitory" claims. Id. Torres analogized their claims to plaintiffs incarcerated in jail, such as those in Wade, 118 F.3d 667, and found that their change in circumstances did not moot any claim for relief. Id. at 1056-57.

In Doe v. Wolf, 424 F. Supp. 3d 1028 (S.D. Cal. 2020), petitioners Cristian and Diana Doe brought a class action suit challenging the defendants' practice or policy of prohibiting asylum seekers from access to their retained counsel prior to and during non-*refoulement* interviews. Id. at 1034. The petitioners and their five children were subjected to MPP, survived a shoot-out while forced to wait in Tijuana, and expressed a fear of returning to Mexico during an immigration court proceeding. Id. They filed a motion for a TRO, which the court granted, enjoining the defendants from prohibiting petitioners access to retained counsel prior to and during their non-*refoulement* interview. Id. With counsel present, they passed their second non-*refoulement* interview. Id. As of the date the motion for class certification was heard, the petitioners were awaiting the outcome of their asylum case but were no longer subject to MPP. Id. Petitioners sought certification of a class of "[a]ll individuals who are detained in CBP custody in California awaiting or undergoing non-refoulement interviews pursuant to what the government calls the 'Migrant Protection Protocols' program and who have retained lawyers." Id. at 1035. They challenged the policy under the APA, INA, and First and Fifth Amendments. Id. Defendants argued that the "inherently transitory" exception to mootness did not apply because "(1) that exception is limited to cases in which there is a reasonable expectation that the plaintiff will be subjected to the same action again, (2) the Court had enough time to rule on Petitioners' motion for TRO, (3) Respondents do not have a litigation strategy in mooting class members' claims, and (4) Petitioners are not members of the class they are seeking to certify." Id. at 1038. The Court rejected all of these arguments, finding that the petitioners' claims fell within the doctrine. Id. at 1039-40. The Court also rejected three arguments nearly identical to the ones Defendants advance here: first, that typicality and adequacy were not satisfied because petitioners' claims were moot; second, that they were atypical because they were paroled into the United States, while the proposed class included individuals who were not; and third, the petitioners were not adequate plaintiffs because they would not benefit from the injunctive relief sought. Id. at 1042-43. It found the parole distinction one "without a discernable or material difference in the context of typicality," reasoning that "[a]ll putative class members' claims—that the Respondents' policy of prohibiting access to retained counsel prior to and during non-refoulement interviews violates the APA—are the same." Id. at 1042-43. It found the argument that the mootness of petitioners' individual claims made them atypical or inadequate class representatives "misplaced" in light of the inherently transitory doctrine. Id. In doing so, it "invoke[d] the relation back doctrine" and considered whether typicality and adequacy were

satisfied as of the filing of the complaint.  Id. at 1043 (citing various authorities).  The Doe court
went on to grant certification of the class.  Id. at 1045.

Defendants' primary objection to the application of the "inherently transitory" and
"relation back" doctrines is that they do not apply when there is a "constantly shrinking class."
(Opp. to Cert. at 19-20.)  For that proposition, Defendants cite Sze v. I.N.S., 153 F.3d 1005 (9th
Cir. 1998), abrogated by United States v. Hovsepian, 359 F.3d 1144 (9th Cir. 2004) (en banc).  In
Sze, plaintiffs sought certification of a class of applicants for naturalization and a writ of
mandamus ordering the INS to grant or deny their naturalization applications.  Id. at 1007.  The
district court granted summary judgment in favor of the defendants and did not decide the
motion for class certification.  Id. at 1008.  By the time the Ninth Circuit heard the appeal, all the
named plaintiffs had been naturalized, and defendants argued that the case had been mooted,
because none of the plaintiffs alleged "past or present injury from the INS's purported illegal
action."  Id. at 1008.  Since the named plaintiffs had initially applied for naturalization, the INS
had also changed some of the procedures at issue.  Id. at 1007-08.  The court rejected plaintiffs'
argument that their claims were "inherently transitory" because the "putative class is not
constantly changing in the sense that some members leave the class while others come in.
Rather, this is a constantly shrinking class."  Id. at 1010.  The Sze court then held the appeal was
moot and dismissed the case.  Id.  Defendants argue that this case is like Sze in that "[t]here will
be no new class members (because original MPP no longer exists), while proposed class
members, like Paroled Plaintiffs, will continue to leave the class."  (Opp. to Cert. at 20.)  In
response, Plaintiffs argue that Paroled Plaintiffs' ability to remain in the United States is subject
to the Government's sole discretion, and that they "'could . . . suffer repeated deprivations' if
the government opted to return them to Mexico."  (Cert. Reply at 11) (quoting Gerstein, 420
U.S. at 110 n.11).  In their view, that makes Sze's reasoning inapplicable: there, "the government
changed the challenged naturalization policies in a way that definitively altered the named
plaintiffs' status by granting them permanent relief—ensuring that they would not be subjected
to the same harm again."  (Id.)  Here, however, "there is no systemic policy that has similarly
changed the paroled Plaintiffs' status."  (Id.)

As Defendants note, at least for the time being, MPP is not an active policy.  For that
reason, it is fair to say that, like in Sze, some class members' claims may become moot over time
without others immediately replacing them.  But in the Court's view, Sze is inapposite in
multiple respects.  As Plaintiffs note, the Sze plaintiffs who had become naturalized citizens
could not muster any argument that they suffered "past or present injury from the INS's
purported illegal action."  Id. at 1008.  Naturalization served as both irrevocable and complete
government action, wholly encompassing the relief the plaintiffs had sought.  Here, a grant of
parole is a partial and volatile form of relief; it grants Plaintiffs only some of what they want and
may be revoked with little or no notice.  Plaintiffs thus have little guarantee they may remain in
the United States while President Biden remains in office and hardly any assurances if there is a
change in Administration in less than two years.  (Indeed, they have no guarantee that President
Biden will not soon resort to immigration policies more akin to his predecessor's.)  Moreover,
Sze concerned practices and policies that no one argued might be revived.  As noted below, MPP,
or a version of it, may return as official policy within the timescale of the adjudication of an

asylum petition.  The <u>Sze</u> plaintiffs' chief grievance was the delay in adjudicating their
naturalization application, and "[m]ost of the delays were caused by a combination of fingerprint
processing overloads at the Federal Bureau of Investigation ("FBI") and loss of applicant files by
the INS."  <u>Id.</u> at 1007.  As such, the court, finding that "INS ha[d] changed its procedures" and
the claims of the named plaintiffs and putative class members "have been and are continuing to
be resolved," <u>id.</u> at 1010, was not presented with any genuine argument that the claims were
"capable of repetition, yet evading review."  "An inherently transitory claim will certainly repeat
as to the class, either because '[t]he individual could nonetheless suffer repeated [harm]' or
because 'it is certain that other persons similarly situated' will have the same complaint." <u>Pitts</u>,
653 F.3d at 1090 (citation omitted).  In <u>Sze</u>, neither of these rationales applied.  Here, both do.

        The Court acknowledges that certain features of this case are distinct from the
archetypical "inherently transitory" precedents, such as <u>McLaughlin</u>, in which a class of pretrial
detainees challenged an ongoing policy on constitutional grounds.  Plaintiffs' claims are not as
time sensitive as, say, a constitutional challenge to a probable cause determination, which
necessarily must be made early in a criminal defendants' case.  The dynamics at work here are
thus more partisan and slower-moving than some of the seminal cases referenced above.  Unlike
the then-ongoing parole release guidelines challenged in <u>Geraghty</u> or the probable cause
procedures of a county district attorney's office challenged in <u>McLaughlin</u>, here an allegedly
unconstitutional policy was implemented by a previous Presidential Administration and
terminated by a subsequent Administration with a different ideological orientation.  Like those
cases, however, Defendants vigorously defend the constitutionality (and broader legality) of the
policy.  It clearly follows from their position that, should the next Administration wish to proceed
in President Trump's footsteps rather than President Biden's and reenact MPP, Defendants
believe it would be entitled to do so.  Moreover, should President Biden's Administration change
course in the coming months and reimplement immigration policies that resemble his
predecessor's, the same logic would apply.  Indeed, the clear import of Defendants' position is
that MPP was terminated solely as a voluntary, policy-driven decision; should they suddenly have
a change of heart, Defendants could reinstate MPP as soon as a policy reversal could withstand
an APA challenge.  The practical effect of this argument is that MPP could be instated and
terminated every four (or fewer) years, mooting any class actions winding their way through the
federal courts each time the Government (temporarily) ended it, citing *policy*, rather than *legal*,
grounds.  Given the typical duration of immigration class action proceedings at the district court
and appellate levels, Defendants' position poses significant potential for systematic evasion of
judicial review.  By similar logic, while an asylum seeker's legal challenges might not be quite as
evanescent as some criminal defendants', the nature of the immigration appeals process,
involving numerous decisionmakers at various levels and branches of government, inherently
places the putative class's claims in flux.  In the months (or years) in between the filing of an
operative complaint and a district court's ruling on a motion for class certification, it is almost
inevitable that some or all of the named plaintiffs' claims will have a different procedural posture
or there will be meaningful changed circumstances with regard to their location, detention status
or any host of variables that could affect the merits of their allegations.

In that light, the Court finds that Plaintiffs' claims would fall within the "inherently transitory" exception to mootness. Assume, *arguendo*, that Defendants are correct that a grant of parole would moot Individual Plaintiffs' claims. If, hypothetically, all Individual Plaintiffs were paroled into the United States the day after this Court granted certification of the class, mooting their individual claims, that result would not moot the class action. See Pitts, 653 F.3d at 1090. Similarly, if this Court were to deny class certification and the Ninth Circuit were to reverse, on remand, Paroled Plaintiffs could still represent the class even if their individual claims were moot. See id. As evidenced by McLaughlin, the Supreme Court's "flexible" approach to mootness, id. at 1087, does not place a formalistic emphasis on the precise timing of when a district court decides a class certification motion in relation to when a named plaintiff's individual claim allegedly becomes moot. Rather, the Court has looked to the underlying purposes of the "case or controversy" requirement and Rule 23 to assess whether a class action remains appropriate for judicial resolution. See Geraghty, 445 U.S. at 393. The cases referenced above, applying these rationales, seek to allow plaintiffs to challenge allegedly illegal government policies; to provide flexibility to courts dealing with fluid and vulnerable populations; to prevent defendants from "buying off" named plaintiffs and mooting their claims;[6] to ensure that there will be at least some individuals with ongoing injuries to whom the court may award meaningful relief, even if not to the named plaintiffs; and to require that the advocates will not be disincentivized from zealously advancing the litigation. The Court has no trouble finding that these core attributes are present here. Regardless of whether Individual Plaintiffs have been paroled into the United States, there is little doubt that this case will continue to be defined by "sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions." Id. at 403.

Accordingly, the Court rejects Defendants' mootness arguments. The Court applies the relation back doctrine and will assess whether typicality was satisfied as of the filing of the SAC. Doe v. Wolf, 425 F. Supp. 3d at 1043; see also Pitts, 653 F.3d at 1092; Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs., 325 F.R.D. 671, 696 (W.D. Wash. 2016) (analyzing typicality "as of the filing of the complaint" for an inherently transitory class claim); Rivera v. Holder, 307 F.R.D. 539, 550 (W.D. Wash. 2015); Lyon v. U.S. Immigration & Customs Enf't, 300 F.R.D. 628, 640 (N.D. Cal. 2014). The same analysis applies for adequacy. Doe v. Wolf, 425 F. Supp. 3d at 1043-44; Padilla v. U.S. Immigration & Customs Enf't, 2019 WL 1056466, at *4 (W.D. Wash. March 6, 2019) (finding class representatives adequate despite their claim being moot because their claim was inherently transitory); McLaughlin v. Wells Fargo Bank, NA, 2016 WL 3418337, at *6 (N.D. Cal. June 22, 2016) (same); Lyon, 300 F.R.D. at 636–39 (same); Franco-Gonzales v. Napolitano, 2011 WL 11705815, at *14 (C.D. Cal. Nov. 21, 2011). The Court will not belabor these points below.

//
//

---

[6] Here, the risk is not that Defendants would "buy off" Individual Plaintiffs in financial terms; they do not seek money damages. Rather, "by virtue of their participation in this lawsuit" (Plaintiffs' Supplemental at 8), named plaintiffs might be paroled into the United States before a class has been certified and/or withstood scrutiny on appeal.

## C. Ascertainability and Overbreadth

Defendants argue that Plaintiffs must demonstrate as a threshold matter that the class is ascertainable and not overbroad, which they assert Plaintiffs cannot. (See Opp. to Cert. at 6-7.) That is wrong. The Ninth Circuit does not impose a threshold "ascertainability" requirement. Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1125 n.4 (9th Cir. 2017). As Briseno explains, the Ninth Circuit instead "address[es] the type of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements." Id. Indeed, the case Defendants rely on for the proposition that ascertainability is a threshold requirement, Alvarado v. Wal-Mart Assoc., Inc., 2021 WL 6104234, *7 (C.D. Cal. Nov. 3, 2021), contains a single sentence purporting to apply this requirement, which simply reads, "[h]ere, the Court finds the class definition [quotes proposed class definition] is ascertainable." Id.

Even if there were such a threshold requirement, the Court finds that an identifiable, definite, ascertainable class exists. Defendants raise three arguments regarding ascertainability and overbreadth. First, Defendants assert the proposed class is overbroad because it "include[s] individuals who were enrolled in original MPP who never sought asylum." (Opp. to Cert. at 6.) Second, given the passage of time, "the proposed class likely includes a large percentage of individuals who are no longer seeking asylum within the United States, and instead have (a) resettled in their native countries, (b) settled in Mexico, or (c) settled somewhere else in the world." (Id. at 6-7.) Third, the class is not ascertainable because "the present whereabouts of thousands of individuals cannot be ascertained." (Id.)

The Court does not find these arguments compelling. As Plaintiffs note, Defendants' argument that those who did not seek asylum should be excluded from the proposed class begs the question. Plaintiffs observe, "Defendants' implementation of MPP 1.0 may well have violated such individuals' rights to apply for asylum, access counsel, and other related rights." (Cert. Reply at 4) (quoting Explanation Memo) ("concluding that "[t]he difficulties that MPP enrollees faced in Mexico . . . likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit"). Defendants also overstate Plaintiffs' burden at this stage of the proceedings: Rule 23 does not require that a proposed class prove its case on the merits prospectively or show that every class member has been injured; indeed, it contemplates that a class may be properly certified even if it includes individuals who have not been injured. See, e.g., Patel v. Trans Union, LLC, 2016 WL 6143191, at *9 (N.D. Cal. Oct. 21, 2016); Rodman v. Safeway, Inc., 2014 WL 988992, at *16 (N.D. Cal. Mar. 10, 2014), aff'd, 694 F. App'x 612 (9th Cir. 2017); Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct ... [but] [s]uch a possibility or indeed inevitability does not preclude class certification"). The Court is also not persuaded that changed circumstances in proposed class members' future intentions or present whereabouts, or a lack of clear records regarding how putative class members responded to the implementation of MPP, prevents class certification. For one, accepting Defendants' argument would effectively reward them for implementing a policy allegedly so brutal and chaotic that it presents additional difficulties in locating or

providing notice to the putative class members who would potentially be awarded relief for the injuries Defendants caused them.  By analogy, Defendants may never be able to reunite all the children separated from their families by another Trump Administration policy because it, too, was implemented in such chaotic fashion, but the Justice Department does not disclaim its duty to try.  See Ms. L, et al. v. U.S. Immigration & Customs Enf't, Case No. 18-cv-428 DMS MDD (S.D. Cal.), Dkt. No. 585 (joint status report filed April 7, 2021 indicating 445 children remained separated from their parents, down from roughly 2,700).  Moreover, as Plaintiffs note, it is unclear (and never explained) why Defendants think it may be impossible (or even unreasonably difficult) to locate putative class members outside the United States when they managed to implement the wind-down process, which applied to many individuals subjected to MPP who remained outside the country.  (See Cert. Reply at 5.)  The same is true for identifying individuals outside the United States subjected to MPP 1.0 whose cases resulted in termination or removal orders.

Doubtless, class certification would impose some administrative costs on Defendants. However, "[t]hat some administrative effort is required does not preclude certification" or mean it is not "administratively feasible" to ascertain whether an individual is a proposed member of a class.  Inland Empire-Immigrant Youth Collective v. Nielsen, 2018 WL 1061408, at *13 (C.D. Cal. Feb. 26, 2018).  While Defendants may raise valid concerns about individual notice to proposed class members, Rule 23 simply requires the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "In other words, the rule does not insist on actual notice to all class members in all cases and recognizes it might be *impossible* to identify some class members for purposes of actual notice."  Briseno, 844 F.3d at 1129 (internal quotations and citation omitted) (emphasis in original).  Plaintiffs acknowledge, "as a practical matter, the relief sought in this case will be available only to those who come forward to seek processing into the U.S. for a period sufficient to seek counsel and pursue their claims."  (Cert. Reply at 5.)  The Court thus finds that the proposed class is "precise, objective and presently ascertainable."  O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998).

## D. Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable.  See Fed. R. Civ. P. 23(a)(1); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  To be impracticable, joinder must be difficult or inconvenient, but need not be impossible.  Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012).  There is no magic number which automatically satisfies the numerosity inquiry.  Id.  However, 40 or more members will generally satisfy the requirement.  Id.  A plaintiff has the burden to establish that this requirement is satisfied.  United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co., 593 F.3d 802, 806 (9th Cir. 2010).

Plaintiffs argue that the proposed class and subclasses easily satisfy the numerosity requirement.  Based on November 2021 data, Plaintiffs assert that more than 40,000 asylum seekers subjected to MPP currently have inactive cases due to termination of proceedings or a

final removal order, a significant number of whom remain outside the United States. (Certification Motion at 11; Hellgren Decl. ¶ 5; Woods Decl. ¶ 7.)  Plaintiffs believe that at least 27,652 individuals would be in the *In Absentia* Subclass, 4,574 individuals in the Final Order Subclass, and 10,562 individuals in the Terminated Case Subclass.  (Certification Motion at 11; Hellgren Decl. ¶¶ 6-8.)  Plaintiffs also argue that the putative class members' geographic dispersion, lack of financial resources and inability to file individual lawsuits supports the impracticability of joinder.  (See Certification Motion at 11-12) (citing precarious living situations and lack of resources of Individual Plaintiffs referenced throughout their declarations). Defendants do not contest Plaintiffs' numerosity argument.  (See Opp. to Cert.)  Accordingly, the Court finds that the proposed class and subclasses meet the Rule 23(a)(1) numerosity threshold.

## E.  Commonality

Rule 23(a) requires a showing that there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart, 564 U.S. at 350; see also id. ("What matters to class certification . . . is not the raising of common questions . . . but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (internal quotation marks and citations omitted).  Differences among putative class members can impede the generation of such common answers.  Id.  "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'"  Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013) (quoting Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012)) (emphasis in the original).  In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

"In the civil rights context, commonality is satisfied 'where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'"  Unknown Parties v. Johnson, 163 F. Supp. 3d 630, 635 (D. Ariz. 2016) (quoting Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) (abrogated on other grounds by Johnson v. California, 543 U.S. 499 (2005)). "In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality."  Armstrong, 275 F.3d at 868.

Plaintiffs argue that many questions of law and fact are common to class members and predominate over any question affecting only Individual Plaintiffs.  (Certification Motion at 15.) The questions include:

(1) whether Defendants' implementation of MPP 1.0 violated
putative class members' right to apply for asylum by obstructing
their access to the U.S. asylum system;

(2) whether Defendants' implementation of MPP 1.0 violated
putative class members' statutory or constitutional rights to access
counsel;

(3) whether Defendants' implementation of MPP 1.0 violated
putative class members' right to a full and fair hearing;

(4) whether Defendants' implementation of MPP 1.0 obstructed
putative class members' First Amendment rights to hire and
consult an attorney and petition the courts; and

(5) whether putative class members suffer continuing, present
adverse effects as a result of Defendants' unlawful conduct.

(Id. at 15-16.)  These legal claims "turn on a common core of facts and a common injury" in that
"[a]ll putative class members were subjected to MPP 1.0 before June 1, 2021; have cases that are
inactive due to termination or a final removal order in MPP 1.0 proceedings and have not been
restarted or reopened; and are outside the United States." (Id. at 16.)

        Defendants respond that these questions are stated at too high of a level of generality to
satisfy the commonality requirement. (Opp. to Cert. at 8.) In their view, a more rigorous (or
specific) analysis of their claims reveals disparate questions and answers. (Id. at 9.) First,
Defendants argue that "Plaintiffs' purported shared past experiences are not germane to their
request for an injunctive and declaratory relief class pursuant to Rule 23(b)(2), as such relief is
necessarily forward looking and cannot be used to remedy past harms." (Id.) Accordingly,
Defendants urge the Court to "disregard these purportedly past common questions and
purportedly shared past experiences in its commonality analysis." (Id.) Defendants cite no valid
authority for the argument that shared past experiences do not suffice in a commonality analysis.
The cases they cite concern issues such as standing and mootness, neither of which are applicable
here and both of which the Court has previously found do not defeat Plaintiffs' claims. (See id.)
(citing Guadalupe Police Officer's Ass'n v. City of Guadalupe, 2011 WL 13217671, at *4 (C.D.
Cal. Mar. 29, 2011); City of Los Angeles v. Lyons, 461 U.S. 95, 102, 111 (1983); McQuillion v.
Schwarzenegger, 369 F.3d 1091, 1095 (9th Cir. 2004); Bd. of Trustees of Glazing Health &
Welfare Tr. v. Chambers, 941 F.3d 1195, 1199 (9th Cir. 2019)). As Defendants anticipate, "the
Court concludes otherwise and deems questions pertaining to original MPP, Claims 1-3 & 5, and
Plaintiffs' request for declaratory relief germane to the class certification analysis[.]" (Opp. to
Cert. at 9.)

        Second, Defendants argue that the common questions referenced above cannot be
resolved on a class-wide basis. (Id. at 10.) In their view, because Plaintiffs do not challenge the

Government's authority to implement MPP, but rather argue that it is unlawful as applied to the class based on a variety of circumstances (such as dangers in Mexico, difficulties accessing counsel from abroad and at immigration hearings in the United States, etc.), "each of those circumstances must be analyzed as applied to each particular class member" and "only with those individual circumstances in mind can the ultimate legal questions posed by Plaintiffs be answered — not commonly, but separately as to each class member." (Id.)  With regard to claim 1, the statutory right to apply for asylum, Defendants argue that each of the Individual Plaintiffs presents unique circumstances with regard to their ability to "access" the asylum system. (Id. at 11.)  For example, Antonella Doe alleges she missed her hearing due to incorrect information provided to her by a shelter owner, while Chepo Doe, Sofia Doe, and Lidia Doe allege they missed their hearings for medical reasons.  (See id. at 11) (citing Antonella Decl. ¶¶ 11, 32; Chepo Decl. ¶¶ 25-26, 37; Sofia Decl. ¶ 24; Lidia Decl. ¶ 5.)  With regard to claim 2, the statutory right to access counsel, Defendants argue the inquiry is necessarily individualized, asking "whether each class member is represented at all, when the attorney-client relationship was formed, and what, if any, government interference occurred subsequent to the formation of the attorney-client relationship." (Id. at 13.)  As to claim 3, the Due Process rights to counsel and a fair hearing, Defendants argue that the Court would be forced to conduct a fact-intensive inquiry into what transpired in each of the class members' immigration hearings and whether any of them suffered prejudice.  (See id. at 13-14.)  In claim 5, the First Amendment right to hire and consult with an attorney, Defendants argue that the Court would need to determine individually for each plaintiff whether and how his or her communications with an attorney were restricted and what alternative channels were available to them.  (Id. at 14.)

Third, Defendants argue that "whether putative class members suffer continuing, present adverse effects as a result of Defendants' unlawful conduct" is too generalized to be a common one.  (Id.)  In their view, "[w]hile nearly impossible to formulate, the questions posed for each class member will necessarily vary once distilled from such a high level of generality." (Id.)  For example, geography may pose different questions and answers; Defendants claim, "Proposed class members near the U.S.-Mexico border would not suffer from the same 'continuing, present adverse effects' as, or be similarly situated with, proposed class members who have returned to their native countries or otherwise have found a more established domicile somewhere else in the world." (Id.)

The Court acknowledges that each of Individual Plaintiffs' claims and alleged injuries present different factual circumstances.  Indeed, one imagines that, if not for space limitations, Defendants could find a nearly endless series of distinguishable facts in the 100 pages of declarations submitted by Individual Plaintiffs.  From these disparate fact patterns, one could generate dozens of different relevant legal questions and answers that go to the merits of Plaintiffs' claims.  But it does not follow that these differences defeat commonality.  Defendants' arguments are effectively the inverse of what they accuse Plaintiffs of doing: characterizing questions and answers at such a *low* level of generality that differences invariably appear greater than similarities.  Moreover, Defendants overstate Plaintiffs' burden.  "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."  Parra v. Bashas', Inc., 536 F.3d 975, 978–79 (9th Cir.

2008).  Many, if not most, of Defendants' arguments suggest that Individual Plaintiffs differ from one another because they have better or worse arguments regarding each of their claims.  But the Ninth Circuit has repeatedly cautioned against applying such logic at the certification stage.  For example, in <u>Walters</u>, 145 F.3d 1032, the Ninth Circuit affirmed the district court's grant of summary judgment holding that the nationwide procedures by which the INS obtained waivers in document fraud cases violated immigrants' due process rights and affirmed certification of the class.  <u>Id.</u> at 1036.  On the class certification issue, the Ninth Circuit rejected Defendants' analogous argument:

> The government further argues that commonality is nonexistent on account of factual distinctions in the class members' underlying claims.  Differences among the class members with respect to the merits of their actual document fraud cases, however, are simply insufficient to defeat the propriety of class certification.  What makes the plaintiffs' claims suitable for a class action is the common allegation that the INS's procedures provide insufficient notice.  <u>See</u> <u>Forbush v. J.C. Penney Co., Inc.</u>, 994 F.2d 1101, 1106 (5th Cir. 1993) (noting that the need for subsequent individual proceedings, even complex ones, "does not supply a basis for concluding that [the named plaintiff] has not met the commonality requirement").

<u>Id.</u> at 1036.

District Courts in immigration class actions consistently follow this directive.  In <u>Arnott v. U.S. Citizenship & Immigr. Servs.</u>, 290 F.R.D. 579 (C.D. Cal. 2012), a putative class of immigrant investors seeking lawful permanent residence status through the EB-5 investor program challenged a government policy of denying petitions because the modified business plans that they submitted creating the requisite number of jobs were not named in an original petition.  <u>Id.</u> at 582.  Defendants argued that "'the wide factual variation that exists between the different EB–5 investment projects and business plans of each proposed class member' defeats commonality."  <u>Id.</u> at 586.  The court agreed with the plaintiffs that such factual differences were "beside the point," because "Plaintiffs and putative class members do not ask for individualized adjudications of their respective I–829 petitions, but rather for injunctive relief preventing Defendants from retroactively applying 'a particular legal policy' that has caused the same injury to each Plaintiff and every class member."  <u>Id.</u>

In <u>Hernandez v. Lynch</u>, 2016 WL 7116611 (C.D. Cal. Nov. 10, 2016), <u>aff'd sub nom.</u> <u>Hernandez</u>, 872 F.3d 976, this Court considered the statutory and constitutional challenges of a putative class of immigration detainees to four policies and practices concerning how the defendants' set bond.  <u>Id.</u> at *1.  Even though each of the putative class representatives presented distinct factual situations which would affect the outcome of their individual bond cases, this Court found it sufficient that they and the proposed class members were "subjected to the same bond determination policies and practices by Defendants" and thus their legal challenges "could

be disposed of in a 'single stroke.' " Id. at *17 (citation omitted).  This Court granted
certification of the class.  Id. at *30.

     In Lyon, 300 F.R.D. 628, immigration detainees filed a putative class action challenging
their conditions of confinement in three different detention facilities as it related to their ability to
retain and communicate with counsel.  Id. at 631.  Predictably, the Government argued against
commonality "because there is no common or overriding policy that governs the Yuba, Elk
Grove and Richmond facilities—rather there are various practices at the three different
facilities."  Id. at 641.  The court rejected the argument, reasoning, "[t]he fact that the precise
practices among the three facilities may vary does negate the application of a constitutional floor
equally applicable to all facilities."  Id. at 642.  It certified the class.  Id. at 643.

     The Court is persuaded that Individual Plaintiffs establish commonality even though they
do not allege they were harmed in uniform fashion.  Defendants construct purportedly
"individualized" legal inquiries for each of Plaintiffs' claims by misconstruing them.  True, for
claims 1 and 2, the Court might need to find some (individualized) facts with regard to how
Individual Plaintiffs claim they were denied access to the asylum system and to counsel.  But
Defendants conveniently ignore in their argument that these are *APA* claims, not fact-bound
challenges to how individual officials prevented Individual Plaintiffs from attending certain
hearings or communicating to certain lawyers.  Indeed, the merits of the claim may largely hinge
upon what *Defendants*, not Individual Plaintiffs, knew and did.  As Plaintiffs note, to prevail on
the first two claims, "Plaintiffs could prove that Defendants' implementation of MPP 1.0 was
arbitrary, capricious, or an abuse of discretion because Defendants failed to adequately consider
how trapping individuals in dangerous border towns in Mexico without sufficient protections
would obstruct their access to the U.S. asylum system and to counsel."  (Id. at 6.)  Similarly, for
their third claim, Plaintiffs seek to demonstrate systemic or structural deficiencies impacting Due
Process that fell beneath a "constitutional floor," Lyon, 300 F.R.D. at 642, regardless of the
specific impacts on the fairness of their individual processes.  As to Defendants' contention that
Plaintiffs fail to show prejudice on their Due Process claim, "whether prejudice is an element of a
due process claim is a merits question."  Torres, 411 F. Supp. 3d at 1057.  In claim 5, Plaintiffs
could demonstrate that the totality of restrictions imposed by Defendants placed such a burden
on their First Amendment rights to hire and consult with counsel that they would be entitled to
relief as a matter of law.  Similarly, despite differences in the degree of harm suffered or
contingent factors such as present geography, Plaintiffs could establish that the ways in which all
class members have faced enormous barriers to accessing the asylum system, and the ways in
which they continue to suffer ongoing harm, necessitates the shared relief they seek.

     The Court thus finds that Plaintiffs demonstrate "common contention[s]" for which a
determination of their "truth or falsity will resolve an issue that is central to the[ir] validity."
Wal-Mart, 564 U.S. at 350.  These common answers are "apt to drive the resolution of the
litigation."  Id.  Accordingly, the Court finds that commonality is satisfied.

//
//

---

       **CIVIL MINUTES—GENERAL**       Initials of Deputy Clerk mg

## F. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." Wolin v. Jaguar Land Rover No. Am., 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Hanon, 976 F.2d at 508). Because typicality is a permissive standard, the claims of the named plaintiff need only be "reasonably co-extensive with," not "substantially identical," to those of the other class members. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998), overruled on other grounds by Wal-Mart, 564 U.S. 338. The typicality inquiry focuses on the claims, not the specific facts underlying them. Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017). Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Armstrong, 275 F.3d at 868.

Defendants assert various ways in which they believe the putative class representatives are atypical. For one, Defendants claim that the named Plaintiffs' ability to communicate with class counsel and provide detailed information for the purpose of crafting the SAC and their declarations "fatally undermine Plaintiffs' central claims that class members remain unable to effectively communicate with counsel from abroad." (Opp. to Cert. at 18-19.) Of course, at numerous junctures, Defendants have complained of a *lack* of factual specificity provided by Plaintiffs, arguing this merits dismissal of various claims or rejection of certain arguments. The Court will not subject Plaintiffs to such a Catch-22 situation, in which their claims are somehow too imprecise to survive a 12(b)(6) motion and too precise to satisfy typicality scrutiny under Rule 23. Similarly, the Court rejects Defendants' argument that Individual Plaintiffs who obtained humanitarian parole with the assistance of an attorney are atypical because "Plaintiffs' central claim is that their presence outside the United States makes locating and communicating with an attorney unduly difficult—such that they claim 96% of the class never secured legal representation." (Id. at 20.) The Court accepts Plaintiffs' representation that the "ten Individual Plaintiffs were able to secure the limited assistance of immigration counsel (for purposes of humanitarian parole and/or Title 42 exemption requests only) by virtue of their participation in this lawsuit." (Plaintiffs' Supplemental at 8.) Defendants do not present any evidence contradicting this assertion or suggesting that counsel performed legal services beyond helping Individual Plaintiffs apply for parole or Title 42 exemptions. Like nearly any putative class representative, including those in the immigration context, Individual Plaintiffs have a different and likely greater degree of *general* involvement with lawyers; this is true almost by definition of serving as a class representative, and certainly so considering the practicalities involved in the role. But none of Individual Plaintiffs' interactions with counsel, either putative class counsel or the individual counsel who assisted with grants of parole or Title 42 exemptions, meaningfully affect their claims on the merits. Individual Plaintiffs were or were not able to

secure and communicate with counsel to the same extent as those they seek to represent. As such, they satisfy typicality.

The Court has already rejected above the applicability of Defendants' core objection to typicality: that "[s]everal of the Individual Plaintiffs present moot claims and are not a part of the class because they have been paroled into the United States." (<u>Id.</u> at 19.) Applying the relation back doctrine, given that (as noted below) these Individual Plaintiffs were typical as of the filing of the SAC, these changed circumstances do not require a different conclusion. <u>See Doe v. Wolf</u>, 425 F. Supp. 3d at 1043. Once again, the Court rejects Defendants' claim that "the ultimate relief [Paroled Plaintiffs] seek through this lawsuit is return to the United States, and they have received it already." (Opp. to Cert. at 20.)

Defendants argue at length that "unique defenses" applicable to certain Individual Plaintiffs establish a lack of typicality. (<u>See</u> Opp. to Cert at 20-23.) The argument begins with Defendants' misstatement of law. Defendants argue, "[t]he typicality requirement is not met if the proposed class representatives are subject to unique defenses." (<u>Id.</u> at 18.) For that proposition, Defendants cite <u>Hanon</u>, 967 F.2d at 508. <u>Hanon</u> observes the following. First, it notes, "[s]everal courts have held that 'class certification is inappropriate where a putative class representative is subject to unique defenses which *threaten to become the focus of the litigation*.'" <u>Id.</u> (citations omitted) (emphasis added). Second, <u>Hanon</u> "agree[s] that a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is *preoccupied* with defenses unique to it.'" <u>Id.</u> (quoting <u>Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir. 1990), <u>cert. denied</u>, 498 U.S. 1025 (1991) (emphasis added). In other words, that certain defenses may apply to some Individual Plaintiffs does not defeat typicality; those defenses must be so significant that they disproportionately bear on the litigation relative to the other central legal issues in the case. None of Defendants' proposed "unique defenses" fall into this category. Defendants argue, for example, that Francisco Doe is "atypical as a class representative because his appeal was dismissed because his attorney failed to include a proof of service with his appeal." (Opp. to Cert. at 21.) As such, he is "subject to the unique defense that his proper remedy is pursuing a legal malpractice or ineffective assistance claim—not class action claims against the Government." (<u>Id.</u> at 21-22.) The Court is unpersuaded that this is a valid defense at all, let alone one that "threaten[s] to become the focus of the litigation.'" <u>Hanon</u>, 967 F.2d at 508. Defendants do not explain why a malpractice or ineffective assistance claim would be mutually exclusive of the claims brought here; in other words, that Francisco Doe might have additional rights of action does not invalidate the ones he asserts in the SAC. Defendants argue that Rodrigo Doe is atypical because he alleges he was too scared to walk to the port of entry to attend a hearing; in Defendants' view, while "unfortunate," "such a subjective account of fear does not advance Plaintiffs' claims that their presence outside the United States impedes their ability to apply for asylum." (Opp. to Cert. at 22.)[7] To the contrary, the SAC is rife with

_____

[7] Though the argument is moot because Rodrigo Doe voluntarily dismissed his claims, it is nonetheless useful to highlight here as an example of why Defendants' broader "unique defense" argument fails.

**CIVIL MINUTES—GENERAL**

allegations that conditions in Mexico were so dangerous that they impeded the putative class's ability to access the asylum system.  The following is not a bad summary of Plaintiffs' theory of the case:

> By forcing Individual Plaintiffs and similarly situated individuals to return to Mexico to await their immigration proceedings in dangerous Mexican border towns, the Protocols functionally denied them access to the U.S. asylum system and left them to contend with assault, robbery, rape, kidnapping, and other harm at the hands of cartels, gang members, and Mexican officials.  The Protocols, as implemented, simultaneously deprived these individuals of access to their basic needs and obstructed their efforts to seek legal representation.

(SAC ¶ 2.)  The Court has read a dozen declarations narrating the experiences of the putative class, from Individual Plaintiffs; it does not have before it tens of thousands more, nor will it ever.  The Court thus does not know how many other putative class members had an experience exactly like Rodrigo Doe.  But from the picture the SAC paints, it hardly seems "unique" or even *unusual* that violence or the fear of it may have prevented some individuals from attending some hearings.  Again, it is unclear whether Defendants have asserted a valid defense at all; it certainly does not appear to be one that will "preoccupy" the Court.  <u>Gary Plastic</u>, 903 F.2d at 180.  The same is true of the other "unique defenses" Defendants assert.  Some are more valid than others.  The Court is unpersuaded that any have the potential to meaningfully distract from what should be the core issues in the case.

Once these arguments are rejected, it is clear that Individual Plaintiffs are typical of the class they seek to represent.  All Individual Plaintiffs were subjected to MPP before June 1, 2021.  (Certification Motion at 20; Lidia Decl. ¶¶ 6–8; Antonella Decl. ¶¶ 3, 11; Rodrigo Decl. ¶¶ 4–5; Chepo Decl. ¶¶ 3, 6–10; Yesenia Decl. ¶¶ 4–6; Sofia Decl. ¶¶ 4–7; Gabriela Decl. ¶¶ 7–8; Ariana Decl. ¶¶ 4, 8; Francisco Decl. ¶¶ 3, 5; Reina Decl. ¶¶ 4, 8; Carlos Decl. ¶¶ 4, 6; Dania Decl. ¶¶ 3, 5.)  All Individual Plaintiffs, like the putative class, allege they fled persecution in their home countries to seek asylum and were sent to Mexico pursuant to MPP 1.0 after entering the United States via the U.S.-Mexico border.  (Certification Motion at 21; Lidia Decl. ¶¶ 2–4; Antonella Decl. ¶¶ 2–3; Rodrigo Decl. ¶¶ 2, 4–5; Chepo Decl. ¶¶ 2–3; Yesenia Decl. ¶ 2; Sofia Decl. ¶¶ 2, 4–7; Gabriela Decl. ¶¶ 2–3; Ariana Decl. ¶¶ 2, 4, 8; Francisco Decl. ¶¶ 2, 3, 5; Reina Decl. ¶¶ 2–4, 7; Carlos Decl. ¶ 2; Dania Decl. ¶ 2.)  All Individual Plaintiffs, like the putative class, allege they were stranded outside the United States once their immigration cases were terminated or resulted in a final removal order.  (Certification Motion at 21; Lidia Decl. ¶ 24; Antonella Decl. ¶ 4; Rodrigo Decl. ¶¶ 3, 20; Chepo Decl. ¶ 5; Yesenia Decl. ¶ 22; Sofia Decl. ¶ 28; Gabriela Decl. ¶ 36; Ariana Decl. ¶ 32; Francisco Decl. ¶ 23; Reina Decl. ¶ 26; Carlos Decl. ¶ 14; Dania Decl. ¶¶ 23–25.)  All Individual Plaintiffs' cases are in inactive status.  (Certification Motion at 20.)  Lidia and Antonella Doe are typical of the Terminated Case Subclass because their immigration cases have been terminated.  (<u>Id.</u>; Lidia Decl. ¶ 21; Antonella Decl. ¶ 4.)  Chepo, Yesenia and Sofia Doe are typical of the *In Abstentia* Subclass because they received final removal orders due

to their failure to attend a hearing in the United States.  (Id.; Chepo Decl. ¶¶ 37–38; Yesenia Decl. ¶¶ 3, 12; Sofia Decl. ¶¶ 25–26.)  Gabriela, Ariana, Francisco, Reina, Carlos and Dania Doe are typical of the Final Order Subclass because they received final removal orders for reasons other than a failure to appear.  (Id.; Gabriela Decl. ¶¶ 28, 32; Ariana Decl. ¶¶ 14–16; Francisco Decl. ¶¶ 14, 16; Reina Decl. ¶¶ 22–23; Carlos Decl. ¶ 2; Dania Decl. ¶¶ 20, 22.)  Finally, all Individual Plaintiffs allege they suffered the same harms and bring the same causes of action. (See SAC ¶¶ 110–268; 329–60, 373–80.)

The Court is satisfied that Plaintiffs have met their burden to establish typicality.

## G. Adequacy

Rule 23 requires that the representative be able to "fairly and adequately to protect the interests" of all members in the class.  Fed. R. Civ. P. 23(a)(4).  If the members of a class are to be conclusively bound by the judgment in an action prosecuted by a "representative," they must have adequate representation.  See Richards v. Jefferson County, Alabama, 517 U.S. 793 (1996); see also Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1994).  Representation is adequate if: (1) the attorney representing the class is qualified and competent; and (2) the class representatives are not disqualified by interests antagonistic to the remainder of the class.  See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Defendants offer two related challenges to adequacy, asserted in a mere five sentences of analysis.  (See Opp. to Cert. at 23-24.)  They argue that Paroled Plaintiffs are inadequate (as well as atypical) because their interests conflict with the class in that they no longer have an incentive to vigorously prosecute the action.  (Opp. to Cert. at 23-24.)  For those named plaintiffs who have not been paroled, Defendants claim they have "every incentive to pursue humanitarian parole individually, rather than pursue it on a classwide basis."  (Id. at 24.)  While Defendants provide a single, convoluted sentence of explanation regarding this latter point, as far as the Court can discern, because Plaintiffs do not challenge a current policy, Defendants claim they may not have a strong interest in pursuing "comprehensive change" in Government policy.  (Id.)

The Court does not find these arguments persuasive.  Neither of these contentions present genuine "conflicts" with the putative class.  As the Court has already explained, grants of parole and/or Title 42 exemptions may not fully satisfy the relief Individual Plaintiffs seek. Their right to remain in the United States may be taken away from them at a moment's notice at the discretion of Defendants or whoever their successors will be.  Individual Plaintiffs seek the greater security of a court order allowing them to remain in the United States for a specified duration.  The Court finds that Paroled Plaintiffs retain sufficient interests such that they will "prosecute the action vigorously on behalf of the class[.]"  Hanlon, 150 F.3d at 1020. Defendants do not explain why the other Plaintiffs would have an incentive to pursue parole individually or why, even if they did, this would undermine their claim to adequacy as representatives.  Plaintiffs seek something greater than parole; the Court does not find that those who have not been granted parole would be disincentivized from pursuing superior relief through this class action.  As a practical matter, moreover, given their allegations outlined in the SAC and

**CIVIL MINUTES—GENERAL**

the declarations, it is extremely unlikely that these Plaintiffs will suddenly have the ability to retain individual counsel to pursue relief that would even arguably conflict with that sought by putative class counsel.  Besides, Defendants ignore that they already denied parole to at least one of these remaining Plaintiffs, Chepo Doe.  (Cert. Reply at 12; Supplemental Decl. of Tess Hellgren ¶¶ 2–3.)

Likely because the Court already rejected such arguments in its June 2, 2021 Order, Defendants do not renew their challenges to the adequacy of Plaintiffs' counsel.  (See June 2, 2021 Order.)  The Court has read each of the attorney declarations.  The individual attorneys and their organizations, the Southern Poverty Law Center, the National Immigration Project of the National Lawyers Guild, Innovation Law Lab, Arnold & Porter Kaye Scholer LLP, and the Center for Gender & Refugee Studies, have substantial experience in immigration class actions and have prevailed in many of them.  (See Certification Motion at 23; Shebaya Decl.; Manning Decl.; Heartney Decl.; Crow Decl.; Freedman Decl.; Olivares Decl.)  The Court finds putative class counsel do not have any conflicts of interest and exceed the requisite threshold of competence necessary to represent the class.

Accordingly, the Court concludes Individual Plaintiffs and their counsel are adequate to represent the class.

## H. Rule 23(b)(2)

Under Rule 23(b)(2), a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b).  "[T]he primary role of [Rule 23(b)(2)] has always been the certification of civil rights class actions."  Parsons v. Ryan, 754 F.3d 657, 686 (9th Cir. 2014).  In the Ninth Circuit, "[i]t is sufficient to meet the requirements of Rule 23(b)(2) [when] class members complain of a pattern or practice that is generally applicable to the class as a whole."  Rodriguez, 591 F.3d at 1125-26 (internal citation and quotation marks omitted) (finding certification under Rule 23(b)(2) proper where "proposed members of the class each challenge Respondents' practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond hearing with the burden placed on the government").  Thus, the critical inquiry is "whether class members seek uniform relief from a practice applicable to all of them."  Id. at 1125.  In other words, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  Wal-Mart, 564 U.S. at 360 (citation omitted).

Defendants first argue that they have not "refused to act on grounds that generally apply to the class."  (Opp. to Cert. at 24.)  Because Defendants have granted some Individual Plaintiffs humanitarian parole, Defendants assert, "the Government has, and is using, an alternative mechanism to provide members of the proposed class the relief they seek."  (Id.)  This argument fails for the reasons repeatedly stated above: Plaintiffs do not (merely) seek humanitarian parole.

Moreover, Defendants fail to explain how granting *some* relief to *some* putative class
representatives and members alters the central test, namely "whether class members seek
uniform relief from a practice applicable to all of them." Rodriguez, 591 F.3d at 1125.
Defendants cannot dispute, and indeed have conceded in multiple meaningful respects, that they
have "acted . . . on grounds that apply generally to the class," Fed. R. Civ. P. 23(b), in that they
implemented MPP in such a way that caused harm to asylum seekers.  It is of no moment that
some members of the class have been harmed in different ways, or even some not at all, or that
some members of the class have been granted partial relief.  "Plaintiffs do not seek any
individualized determination by this Court of whether they are entitled to" the ultimate relief
they seek, namely asylum, "and do not request a different injunction for each class member."
Fraihat v. U.S. Immigr. & Customs Enf't, 445 F. Supp. 3d 709, 741 (C.D. Cal. 2020), order
clarified, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020), rev'd on other grounds and remanded, 16
F.4th 613 (9th Cir. 2021).  "Rather, they ask the Court to determine whether [Defendants']
systematic actions, or failures to act . . . amount to violations of the class members' constitutional
or statutory rights.  As a result, the same injunction or declaratory judgment would provide relief
to all class members, or to none of them[.]" Id.

    Defendants next argue that Plaintiffs "gloss over the second portion of Rule 23(b)(2):
'that final injunctive relief or corresponding declaratory relief is *appropriate* respecting *the class as
a whole*.' Fed. R. Civ. P. 23(b)(2) (emphasis added)." (Opp. to Cert. at 24.)  Defendants'
argument "amounts to a parade of horribles that [they] believe will come to pass," Simmons v.
Himmelreich, 578 U.S. 621, 629 (2016), if the Court certifies the class and issues any form of
injunctive relief.  In their view, "in light of the numerous individualized determinations required
to adjudicate Plaintiffs' claims, neither Plaintiffs nor the Court could craft a single injunction that
would be appropriate for each class member." (Opp. to Cert. at 25.)  Any injunction the Court
could consider "would inevitably lead to endless disputes between the parties about what the
injunction requires with respect to individual class members, further demonstrating that class-
wide relief is impossible and thus improper here."  (Id.)  The Court is not so pessimistic.  It is
persuaded that Plaintiffs do not seek "individualized determinations" of whether they are
entitled to relief or forms of relief that must be uniquely crafted to each class member.  What, if
any, injunctive relief Plaintiffs are entitled to is a question for another day.  The Rule 23(b)(2)
"requirements are unquestionably satisfied when members of a putative class seek uniform
injunctive or declaratory relief from policies or practices that are generally applicable to the class
as a whole." Parsons, 754 F.3d at 688.  "That inquiry does not require an examination of the
viability or bases of the class members' claims for relief, does not require that the issues common
to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all
members of the class have suffered identical injuries."  Id.  The Court could declare unlawful one
or more aspects of Defendants' implementation of MPP as applied to the class.  It may retain the
jurisdiction to go further and award some form of injunctive relief applicable to the entire class.
That is enough to satisfy Rule 23(b)(2).

    Because Plaintiffs have established the requirements of both Rule 23(a) and Rule 23(b),
the Certification Motion is GRANTED.  The Court certifies the Inactive MPP 1.0 Class and the
Terminated Case Subclass, *In Abstentia* Subclass, and Final Order Subclass.  The Court appoints

all remaining Individual Plaintiffs as representatives of the Inactive MPP 1.0 Class.  It appoints Plaintiffs Lidia Doe and Antonella Doe as representatives of the Terminated Case Subclass; Chepo Doe, Yesenia Doe, and Sofia Doe as representatives of the *In Abstentia* Subclass; and Gabriela Doe, Ariana Doe, Francisco Doe, Reina Doe, Carlos Doe, and Dania Doe as representatives of the Final Order Subclass.  Finally, the Court appoints Plaintiffs' counsel as class counsel.

## VI.    CONCLUSION

For the reasons above, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss and **GRANTS** Plaintiff's Certification Motion.

**IT IS SO ORDERED.**