UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 20-9893 JGB (SHKx)** | Date | April 16, 2025 |
|---|---|---|---|

| Title | ***Immigrant Defenders Law Center, et al. v. Kristi Noem, et al.*** |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) GRANTING Plaintiff's Ex Parte Application for a Stay of Agency Action Under 5 U.S.C. § 705 (Dkt. No. 371)**

Before the Court is Plaintiff Immigrant Defenders Law Center's ("ImmDef") ex parte application for a stay of agency action under 5 U.S.C. § 705 ("Section 705"). ("Application," Dkt. No. 371.) On March 31, 2025, the Court heard argument on the Application. After considering the oral argument of the parties, and the papers filed in support of and in opposition to the Application, the Court now issues this Order setting forth the reasons for **GRANTING** the Application.

## I.    BACKGROUND

### A.  Procedural Posture

Because the parties are familiar with this case's extensive procedural history, the Court provides only the background necessary to understand the Application.

In 2019, the Department of Homeland Security ("DHS") adopted the Migrant Protection Protocols ("MPP" or "MPP 1.0") policy pursuant to 8 U.S.C. § 1225(b)(2)(C). Under 8 U.S.C. § 1225(b)(2)(C), noncitizens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," may be returned to "that territory pending a proceeding under [8 U.S.C.] section 1229a . . . ."

On October 28, 2020, Plaintiffs ImmDef, Jewish Family Service of San Diego ("JFS") (together, "Organizational Plaintiffs"), and eight individuals filed a Complaint for Injunctive and Declaratory Relief. ("Complaint," Dkt. No. 1.) Defendants included the Secretary of DHS, the

Chief of U.S. Border Patrol, U.S. Immigrations and Customs Enforcement ("ICE"), and others. (Id.)  As alleged in the Complaint, Organizational Plaintiffs are nonprofit organizations which exist to serve immigrant and refugee communities.  (Id. ¶¶ 21, 22.)  The eight individuals are asylum seekers subject to MPP 1.0 and required to wait in Mexico while their asylum applications are adjudicated.  (Id. ¶¶ 14-20.)  Plaintiffs sought to enjoin these defendants from continuing to implement policies affecting asylum seekers waiting at the U.S.-Mexico border.  (Id. ¶ 10.)

On November 9, 2020, Plaintiffs filed an emergency motion for provisional class certification (Dkt. No. 35) and an emergency motion for a preliminary injunction (Dkt. No. 36). On June 2, 2021, the Court issued an Order (1) denying Plaintiffs' emergency motion for provisional class certification; (2) denying Plaintiffs' emergency motion for a preliminary injunction; (3) denying defendants' motion to stay the case; and (4) granting defendants' ex parte application for an extension of time to answer.  (Dkt. No. 135.)

On August 13, 2021, Plaintiffs filed a First Amended Complaint.  ("FAC," Dkt. No. 143.) On December 1, 2021, defendants filed a motion to dismiss the FAC.  (Dkt. No. 167.)

On December 22, 2021, Plaintiffs filed a Second Amended Complaint.  ("SAC," Dkt. No. 175.)  In addition to the Organizational Plaintiffs, the SAC was filed on behalf of twelve individuals, and others similarly situated: Lidia Doe, Antonella Doe, Rodrigo Doe, Chepo Doe, Yesenia Doe, Sofia Doe, Gabriela Doe, Ariana Doe, Francisco Doe, Reina Doe, Carlos Doe, and Dania Doe (collectively, "Individual Plaintiffs").  (SAC ¶¶ 13-25.)  The SAC also names the DHS, DHS Secretary, the U.S. Customs and Border Protection ("CBP"), CBP Commissioner, the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"), Border Patrol Chief, ICE, and Acting Director of ICE as defendants (collectively, "Defendants" or the "Government").  (Id. ¶¶ 26-33.)  The SAC alleges harms arising from the initial implementation of MPP by the Trump Administration and certain actions by the Biden Administration in ceasing its wind-down of the policy.  (See id.)  Plaintiffs assert the following claims for relief: (1) violation of the Administrative Procedure Act ("APA") premised on the violation of the right to apply for asylum on behalf of Individual and Organizational Plaintiffs; (2) violation of the APA premised on the violation of the right to access counsel on behalf of Individual and Organizational Plaintiffs; (3) violation of the Fifth Amendment Due Process Clause right to a full and fair hearing on behalf of Individual Plaintiffs; (4) violation of the APA premised on the unlawful cessation of the MPP wind-down on behalf of six Individual Plaintiffs and Organizational Plaintiffs; (5) violation of the First Amendment on behalf of Individual Plaintiffs; and (6) violation of the First Amendment on behalf of Organizational Plaintiffs.  (Id. ¶¶ 329-391.)

On January 26, 2022, Defendants filed a motion to dismiss the SAC.  ("MTD SAC," Dkt. No. 189.)  On February 2, 2022, the Court denied Defendants' motion to dismiss the FAC as moot.  (Dkt. No. 193.)  On February 17, 2022, Plaintiffs filed a motion for class certification. ("Certification Motion," Dkt. No. 205.)  On December 14, 2022, Plaintiff Rodrigo Doe filed a notice of voluntary dismissal of individual claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).  (Dkt. No. 255.)  On March 15, 2023, the Court granted-in-part and denied-in-part the MTD SAC and granted the Certification Motion.  ("Order," Dkt. No. 261.)  The Court

dismissed the APA claim premised on the unlawful cessation of the MPP wind-down without leave to amend. (Id. at 41-44.) The Court also certified the "Inactive MPP 1.0 Class" comprised of "[a]ll individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose cases are not currently active due to termination of proceedings or a final removal order[,]" and three subclasses:

> **1. The "Terminated Case Subclass":**
> All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose MPP proceedings were terminated and remain inactive.
>
> **2. The "In Absentia Subclass":**
> All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States, received an in absentia order of removal in MPP proceedings, and whose cases have not been reopened and are not currently pending review before a federal circuit court of appeals.
>
> **3. The "Final Order Subclass":**
> All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States, received a final order of removal for reasons other than failure to appear for an immigration court hearing, and whose cases have not been reopened and are not currently pending review before a federal circuit court of appeals.

(Id. at 49-50.)

On April 12, 2023, Defendants filed an answer to the SAC. (Dkt. No. 264.)

On October 2, 2024, the Court granted the parties' joint stipulation to stay the matter pending settlement discussions. (Dkt. No. 360.) On February 5, 2025, the parties filed a joint stipulation to lift the stay and modify the scheduling order. (Dkt. No. 369.) Specifically, Plaintiffs "believe that settlement is no longer viable because, in part, . . . Defendants publicly announced on January 21, 2025, that they are 'reinstat[ing]' the '2019 MPP Policy' immediately." (Id. at 1.) The Court granted the parties' stipulation to lift the stay and modify the scheduling order on February 13, 2025. (Dkt. No. 374.)

On February 11, 2025, ImmDef filed the Application. (Application.) In support of the Application, ImmDef filed a declaration of attorney Hannah Coleman ("Coleman Decl.," Dkt. No. 371-2) alongside exhibits A-F (Dkt. Nos. 371-3-8), which includes:

- A declaration of Co-Founder, President, and Chief Executive Officer of ImmDef Linda Toczylowski ("Toczylowski Decl., Exhibit A," Dkt. No. 371-3);

---

- A declaration of Directing Attorney of Policy and Advocacy at ImmDef Margaret Cargioli ("Cargioli Decl., Exhibit B," Dkt. No. 371-4);
- DHS' Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021), submitted in the Administrative Record in <u>Texas v. Biden</u>, No. 2:21-cv-0067 (N.D. Tex. Sept. 2, 2022), at AR00005-43 ("Explanation Memo, Exhibit C," Dkt. No. 371-5);
- A report from Human Rights Watch ("HRW") titled "US Move Puts More Asylum Seekers at Risk" (Sept. 25, 2019), bearing the bates numbers DHS00000691-99 ("HRW Report, Exhibit D," Dkt. No. 371-6); and
- DHS' Termination of the Migrant Protection Protocols (Oct. 29, 2021), submitted in the Administrative Record in <u>Texas v. Biden</u>, No. 2:21-cv-0067 (N.D. Tex. Sept. 2, 2022), at AR00001-4 ("Termination Memo, Exhibit E," Dkt. No. 371-7).

Defendants opposed the Application on February 25, 2025. ("Opposition," Dkt. No. 378.) On March 10, 2025, ImmDef replied. ("Reply," Dkt. No. 379.)

On March 20, 2025, ImmDef filed a notice of supplemental authority in support of its Application, attaching a Ninth Circuit order vacating the opinion in <u>Arizona All. for Retired Americans v. Mayes</u>, 117 F.4th 1165 (9th Cir. 2024), and ordering that the case be reheard en banc. ("ImmDef's Supp. Authority," Dkt. No. 384-1); <u>see also</u> 130 F.4th 1177 (9th Cir. 2025). On March 25, 2025, Defendants filed a notice in response to ImmDef's Supplemental Authority. ("Defendants' Response to Supp. Authority," Dkt. No. 386.)

The Court held a hearing on the Application on March 31, 2025, at which the parties presented oral argument. At the conclusion of the hearing, the Court ordered the parties to file supplemental briefing on issues related to the irreparable harm standard for Section 705 relief and organizational standing. ("Hearing Transcript," Dkt. No. 395 at 36:3-18.) On April 7, 2025, ImmDef filed a supplemental brief in support of its Application. ("ImmDef's Supplemental," Dkt. No. 398.) The same day, Defendants filed a supplemental brief in support of their Opposition. ("Defendants' Supplemental," Dkt. No. 399.)

## B. Related Proceedings

On August 13, 2021, the District Court for the Northern District of Texas issued a nationwide permanent injunction, ordering the Government to "enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such time as the federal government has sufficient detention capacity to detain all [noncitizens] subject to mandatory detention under Section 12[2]5 without releasing any [noncitizens] because of a lack of detention resources." <u>Texas v. Biden</u>, 554 F. Supp. 3d 818, 857 (N.D. Tex.), <u>enforcement granted in part</u>, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and <u>aff'd</u>, 20 F.4th 928 (5th Cir. 2021), <u>as revised</u> (Dec. 21, 2021), <u>cert. granted</u>, 142 S. Ct. 1098 (2022), and <u>rev'd and remanded</u>, 142 S. Ct. 2528 (2022).

On August 19, 2021, the United States Court of Appeals for the Fifth Circuit denied the Government's request for a stay of the injunction.  State v. Biden, 10 F.4th 538 (5th Cir. 2021).  On August 24, 2021, the Supreme Court also denied the Government's request for a stay of the injunction pending appeal.  Biden v. Texas, 142 S. Ct. 926, 927 (2021).

On October 29, 2021, then DHS Secretary Alejandro Mayorkas issued memoranda terminating MPP and explaining the reasons for doing so.  (See Explanation Memo, Exhibit C; Termination Memo, Exhibit E (collectively, "October 29 Memoranda").)

On December 13, 2021, the Fifth Circuit affirmed the injunction on the merits.  Texas v. Biden, 20 F.4th 928 (5th Cir. 2021), as revised (Dec. 21, 2021).  On February 18, 2022, the Supreme Court granted the Government's petition for a writ of certiorari.  Biden v. Texas, S. Ct. 1098 (2022).  On June 30, 2022, the Supreme Court reversed and remanded, holding that the Government's rescission of MPP did not violate section 1225 of the Immigration and National Act ("INA") and the October 29 Memoranda did constitute final agency action.  Biden v. Texas, 142 S. Ct. 2528 (2022).

On August 3, 2022, the Fifth Circuit issued an order remanding the case to the U.S. District Court for the Northern District of Texas.  Texas v. Biden, 43 F.4th 446 (5th Cir. 2022).  On August 6, 2022, the Fifth Circuit's mandate issued.  Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 145.  On August 8, 2022, the district court lifted the nationwide injunction.  Id., Dkt. No. 147.  On December 15, 2022, the district court issued an order "stay[ing] the October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of th[e] action."  Texas v. Biden, 646 F. Supp. 3d 753, 764, 781 (N.D. Tex. 2022).  On February 14, 2023, the Government appealed that order to the Fifth Circuit.  The Government voluntarily dismissed its appeal, which the Fifth Circuit granted on May 15, 2023.  Texas v. Biden, No. 23-10143 (5th Cir. Jul. 17, 2023).  The October 29 Memoranda, therefore, remain stayed.  On October 6, 2023, the Government represented that "[b]ecause the United States cannot unilaterally return noncitizens to Mexico under MPP without Mexico's consent, their withdrawal of consent renders restarting MPP impossible."  Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 205 at 4.

On June 13, 2022, the Supreme Court held that a provision of the INA, 8 U.S.C. § 1252(f)(1), deprived two district courts of jurisdiction to entertain detained noncitizens' requests for class-wide injunctive relief.  Garland v. Aleman Gonzalez, 596 U.S. 543 (2022).

On January 21, 2025, DHS announced that it was resuming implementation of MPP 1.0 because "[t]he situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy."  U.S. Dep't of Homeland Security, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025) ("Reinstatement Announcement"), available at: https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols; see also Executive Order, Securing Our Borders (Jan. 20, 2025), available at: https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.

On January 22, 2025, the district court in <u>Texas v. Biden</u>, Case No. 21-cv-0067 (N.D.
Tex.), ordered the parties to submit a joint brief detailing how the Reinstatement Announcement
"bears on the disposition of th[e] litigation." <u>Id.</u>, Dkt. No. 207.  On January 31, 2025, the parties
filed a joint brief asserting that the Reinstatement Announcement "does not yet moot th[e] case"
and "request[ing] that the court hold th[e] case in abeyance for 180 days while incoming
leadership at [DHS] assesses th[e] case and how to proceed." <u>Id.</u>, Dkt. No. 211 at 1.  The
Government also represented that "MPP has been reimplemented and will be operational during
[the requested stay period of 180 days]." <u>Id.</u>, Dkt. No. 211 at 2.  On February 5, 2025, the district
court stayed all proceedings and deadlines in the case until July 30, 2025. <u>Id.</u>, Dkt. No. 213.

## II.    FACTUAL ALLEGATIONS

Asylum is designed to provide legal status to noncitizens who fear persecution in other
countries.  Noncitizens are eligible for asylum in the United States if they have either been
persecuted or have a well-founded fear of future persecution on account of their race, religion,
nationality, membership in a particular social group, or political opinion, and if they are unable or
unwilling to return to their country of origin because of that persecution or fear.  8 U.S.C. §
1101(a)(42)(A).  Although a grant of asylum is discretionary, the right to apply is not.  8 U.S.C. §
1158(a)(1).

From January 2019 to February 2021, the MPP policy orchestrated by Defendants[1]
trapped nearly 70,000 asylum seekers in Mexico in dangerous conditions that impeded their
ability to access the U.S. asylum system or obtain legal representation.  (SAC ¶¶ 1, 57, 60, 61.)  In
February 2021, Defendants suspended MPP and initiated a "wind-down" process for asylum
seekers with active cases.  (<u>Id.</u> ¶ 79.)  In doing so, former DHS Secretary Alejandro Mayorkas
conceded that MPP's "[i]nadequate access to counsel casts doubt on the reliability of removal
proceedings." (<u>Id.</u> ¶ 61.)

The wind-down allowed some individuals who were subjected to MPP to enter the
United States to pursue their asylum claims.  (<u>Id.</u> ¶ 79.)  In June 2021, Defendants expanded the
wind-down process to include individuals with terminated cases and in absentia removal orders.
(<u>Id.</u> ¶ 81.)  However, those with in absentia removal orders were required to successfully reopen
their cases to be eligible to enter the United States.  (<u>Id.</u>)

On August 13, 2021, the U.S. District Court for the Northern District of Texas issued a
nationwide permanent injunction ordering the Government to restart MPP for certain new
arrivals at the U.S.-Mexico Border.  (<u>Id.</u> ¶¶ 74-75.)  In response, Defendants ceased the wind-
down process to comply with the order.  (<u>Id.</u>)  During this period, thousands of individuals with
final orders of removal or terminated cases remained outside of the U.S. in "legal limbo,"
deprived of meaningful access to the U.S. asylum system and their right to counsel, to a full and
fair hearing, and to petition the courts.  (<u>Id.</u> ¶¶ 85, 97-102.)

---

[1] Although the individuals who hold official positions have changed, the positions have
not.

The eleven Individual Plaintiffs are asylum seekers who were subjected to MPP 1.0 and either had their cases terminated or received final orders of removal.  (See id. ¶¶ 13-23, 110-268.)  They assert that MPP stranded them in perilous conditions outside the United States with no viable way to pursue their asylum claims.  (Id. ¶¶ 86-93.)  Organizational Plaintiffs allege that the manner in which Defendants implemented MPP—i.e., depriving individuals subjected to MPP who remain outside the United States of legal representation—violated the APA and their First Amendment right to advise potential and existing clients, frustrated their missions, and required them to expend resources they otherwise would invest in other programs.  (Id. ¶¶ 270, 329-353, 361-372, 381-391.)  Individual Plaintiffs allege that the implementation of MPP violated their statutory rights to seek asylum and access counsel, their Fifth Amendment right to a full and fair hearing, and their First Amendment right.  (Id. ¶¶ 329-91.)  Plaintiffs also claim that Defendants' cessation of the wind-down was unlawful.  (Id. ¶¶ 361-72.)  Plaintiffs seek declaratory and injunctive relief and costs incurred in maintaining the action.  (Id., Prayer for Relief.)  Among other forms of relief, Plaintiffs seek an order that would "[a]llow each of the Individual Plaintiffs and class members to return to the United States . . . for a period sufficient to enable them to seek legal representation, and pursue their asylum proceedings from inside the United States."  (Id.)

## III.    LEGAL STANDARD

### A.  Ex Parte Relief

Filing an ex parte application "is justified only when (1) there is a threat of immediate or irreparable injury; (2) there is danger that notice to the other party may result in the destruction of evidence or the party's flight; or (3) the party seeks a routine procedural order that cannot be obtained through a regularly noticed motion (i.e., to file an overlong brief or shorten the time within which a motion may be brought)."  Horne v. Wells Fargo Bank, N.A., 969 F. Supp. 2d 1203, 1205 (C.D. Cal. 2013) (citing In re Intermagnetics Am., Inc., 101 B.R. 191, 193 (C.D. Cal. 1989)); see also Mission Power Eng'g Co. v. Cont'l Cas. Co., 883 F. Supp. 488, 492 (C.D. Cal. 1995) ("First, the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures. Second, it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect.").  "Ex parte applications are nearly always improper, and the opportunities for legitimate ones are extremely limited."  Doe 1 v. Manhattan Beach Unified Sch. Dist., 2020 WL 7222809, at *1 (C.D. Cal. Oct. 30, 2020) (internal quotations omitted).

### B.  Section 705

The APA permits the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705; Bakersfield City Sch. Dist. of Kern Cty. v. Boyer, 610 F.2d 621, 624 (9th Cir. 1979) ("The agency or the court may postpone or stay agency action pending such judicial review.") (citing Section 705).

"The factors considered when issuing such a stay substantially overlap with the <u>Winter</u>
factors for a preliminary injunction." <u>Immigrant Legal Res. Ctr. v. Wolf</u>, 491 F. Supp. 3d 520,
529 (N.D. Cal. 2020) (quoting <u>City and County of San Francisco v. U.S. Customs & Immigration
Servs.</u>, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019)); <u>see also</u> <u>Colorado v. United States EPA</u>,
989 F.3d 874, 883 (10th Cir. 2021) (concluding that preliminary injunction "factors also
determine when a court should grant a stay of agency action under section 705 of the APA");
<u>Cook County v. Wolf</u>, 962 F.3d 208, 221 (7th Cir. 2020) (concluding that the standard for a stay
under Section 705 is "the same" as the standard for a preliminary injunction); <u>Bauer v. DeVos</u>,
325 F. Supp. 3d 74, 104–07 (D.D.C. 2018).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on
the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the
balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v.
Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). "A preliminary injunction is an
extraordinary and drastic remedy; it is never awarded as of right." <u>Munaf v. Geren</u>, 553 U.S.
674, 690 (2008) (internal citations omitted). An injunction is binding only on parties to the
action, their officers, agents, servants, employees and attorneys and those "in active concert or
participation" with them. Fed. R. Civ. P. 65(d).

Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four
"elements of the preliminary injunction test are balanced, so that a stronger showing of one
element may offset a weaker showing of another." <u>All for The Wild Rockies v. Cottrell</u>, 632 F.3d
1127, 1131 (9th Cir. 2011). Thus, "a preliminary injunction could issue where the likelihood of
success is such that serious questions going to the merits were raised and the balance of hardships
tips sharply in [plaintiff's] favor.'" <u>Id.</u> at 1131–32 (internal quotation omitted). Put differently,
"'serious questions going to the merits' and a hardship balance that tips sharply toward the
plaintiff can support issuance of an injunction, assuming the other two elements [likelihood of
irreparable injury and public interest] of the <u>Winter</u> test are also met." <u>Id.</u> at 1132. Regardless of
the strength of its showings on the other factors, a plaintiff may not obtain a preliminary
injunction unless he or she establishes that irreparable harm is likely to result in the absence of
the requested injunction. <u>Id.</u> at 1135.

## IV.    DISCUSSION

Pursuant to Section 705, ImmDef moves this Court for emergency relief to stay
Defendants' reimplementation of MPP, pending the conclusion of this litigation. (<u>See</u>
Application at 1.) ImmDef asserts that it will suffer irreparable harm in the absence of immediate
relief, that it is likely to succeed on the merits of its claims, that the balance of hardships and
public interest tip sharply in its favor, and that no procedural issues preclude this Court's review
or the requested relief. (<u>See</u> <u>id.</u>) Defendants counter that multiple threshold issues bar
ImmDef's request for a stay, that ImmDef cannot show a likelihood of success on the merits of
any claims, and that the balance of equities weighs against granting a stay. (<u>See</u> Opposition.)
The Court addresses these arguments in turn.

## A. **Justiciability**

Defendants assert that (1) the Application is procedurally barred; (2) ImmDef lacks standing; (3) ImmDef's claims are not ripe for judicial review; (4) the Court lacks jurisdiction over the Application; and (5) the Court cannot stay already-effective agency action. (See Opposition at 3-15.)

### 1. **Ex Parte Relief**

Defendants argue that because the certified class and its subclasses are limited to individuals processed into MPP prior to June 1, 2021, ImmDef cannot show that the reimplementation of MPP has affected any of the certified class. (See Opposition at 11-12.) As such, ImmDef cannot show a threat of immediate or irreparable injury that justifies ex parte relief. (See id.) Defendants further assert that "ImmDef [] cannot explain how it will be irreparably prejudiced if the [Application] is heard per regular procedures because this litigation has been pending since December 2020 when the first iteration of MPP was still operable." (See id. at 12.) ImmDef's challenge, therefore, is premature, rendering the Application improper. (See id.) ImmDef counters that the Application is timely and appropriate because it fears imminent harm as soon as the reimplementation of MPP begins to take effect. (See Reply at 6.)

The Court finds Defendants' arguments unavailing because the Application is brought on behalf of ImmDef, and not the certified class and its subclasses. As applied to this Application, the proper inquiry is whether MPP's reimplementation presents a threat of immediate or irreparable injury to ImmDef. Nevertheless, the Court agrees with ImmDef that individuals in the Terminated Case Subclass, who remain outside the United States and whose MPP proceedings were terminated without a removal order, could again be placed in MPP if they approach the U.S.-Mexico border and reattempt to seek asylum. (See Hearing Transcript at 20:19-21:3.) Under those circumstances, the reimplementation of MPP 1.0 presents a threat of immediate or irreparable injury to the Terminated Case Subclass. Moreover, recent developments have rendered this Application timely and appropriate. Specifically, DHS' announcement that "[t]he situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy" as opposed to its previous representation that "restarting MPP [was] impossible." See Reinstatement Announcement; Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 205 at 4.

As discussed further below, the Court finds that ImmDef has provided ample evidence addressing how the reimplementation of MPP will irreparably harm its core business activities. (See Toczylowski Decl., Exhibit A; Cargioli Decl., Exhibit B; Explanation Memo, Exhibit C; HRW Report, Exhibit D.) The Court also finds that ImmDef is without fault in creating the crisis that requires ex parte relief; therefore, the Application is not procedurally barred.

//
//
//

---

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk mg

### 2. Standing

To establish Article III standing, a plaintiff must demonstrate that: (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61 (1992). A plaintiff's standing is assessed as of the time an action was initiated and is unaffected by subsequent developments. <u>See</u> <u>D'Lil v. Best W. Encina Lodge & Suites</u>, 538 F.3d 1031, 1036 (9th Cir. 2008). A Plaintiff must establish standing with respect to each claim and form of relief. <u>See, e.g.</u>, <u>Wildearth Guardians v. United States EPA</u>, 759 F.3d 1064, 1070–1072 (9th Cir. 2014) (organization had standing to challenge only certain EPA decisions); <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 185 (2000) (requiring plaintiff to show standing separately for injunctive relief and civil penalties).

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 n.19 (1982). In order to establish standing, an organization, like an individual, must establish: "(1) injury in fact; (2) causation; and (3) redressability." <u>La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest</u>, 624 F.3d 1083, 1088 (9th Cir. 2010). Direct organization standing can be satisfied if the organization alleges that a defendant's actions "affected and interfered with [a plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." <u>Food & Drug Admin. v. All. for Hippocratic Med.</u>, 602 U.S. 367, 395 (2024). Like an individual, an organization may not establish standing simply based on the "intensity of the litigant's interest" or because of strong opposition to the government's conduct, <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 486 (1982), "no matter how longstanding the interest and no matter how qualified the organization," <u>Sierra Club v. Morton</u>, 405 U.S. 727, 739 (1972). A plaintiff must show "far more than simply a setback to the organization's abstract social interests." <u>Havens</u>, 455 U.S. at 379.

Defendants argue that ImmDef lacks standing to challenge MPP 1.0 or to seek a stay on its reimplementation because (1) Supreme Court and Ninth Circuit precedent foreclose a finding that ImmDef has organizational standing and (2) ImmDef lacks a valid cause of action to challenge MPP. (<u>See</u> Opposition at 3-10.)

### a. Binding Precedent

The Government extensively relies on <u>Arizona</u> and <u>Hippocratic Med.</u> to argue that ImmDef lacks organizational standing to challenge MPP or request a stay. (<u>See</u> Opposition at 3-10); 117 F.4th 1165; 602 U.S. 367. However, <u>Arizona</u> has since been vacated by the Ninth Circuit on grant of rehearing en banc and thus the Court is not permitted to rely on it. (<u>See</u> ImmDef's Supp. Authority (citing 130 F.4th 1177)); <u>see, e.g.</u>, <u>Renna v. Becerra</u>, 535 F. Supp. 3d 931, 939 (S.D. Cal. Apr. 23, 2021) ("As a preliminary matter, the Court notes it cannot consider <u>Duncan v. Becerra</u>, . . ., on which [p]laintiffs rely extensively, in its determination of the issues here, because on February 25, 2021, the Ninth Circuit vacated the opinion and ordered the case be

reheard en banc."); United States v. Robinette, 2013 WL 211112, at *5 (E.D. Cal. Jan. 18, 2013) ("Because the panel opinion was vacated, this Court cannot rely on the decision as controlling."). Defendants posit that "Supreme Court precedent still forecloses a finding that [ImmDef] has organizational standing to challenge or seek a stay of MPP." (Defendants' Response to Supp. Authority (citing Hippocratic Med., 602 U.S. at 395–96).)

This Court has previously ruled that ImmDef and the other Organizational Plaintiff JFS demonstrate standing to challenge MPP and assert each of their claims. (See Order at 30.) For this holding, the Court relied on E. Bay Sanctuary Covenant v. Biden. (See id. at 32-33); 993 F.3d 640, 663 (9th Cir. 2021) ("EBSC III"); EBSC v. Biden, No. 4:18-cv-06810 (N.D. Cal.), Dkt. Nos. 43, 99. In EBSC III, the Ninth Circuit recognized that "organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all, but they can show they would have suffered some other injury had they not diverted resources to counteracting the problem." See EBSC III, at 663 (internal quotations and citations omitted). The Court found that ImmDef and JFS alleged concrete harms arising out of MPP, which "'perceptibly impaired their ability to perform the services they were formed to provide." (See Order at 32 (citing E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 765 (9th Cir. 2018) ("EBSC II")).)

Since the Court's Order, the Supreme Court decided Hippocratic Med. (See Order); 602 U.S. 367. The Ninth Circuit also remanded a decision in EBSC v. Trump, instructing the district court to assess the impact of Hippocratic Med. on the issue of organizational standing. See No. 23-16032, slip op. at 7-8 (9th Cir. April 10, 2025); EBSC v. Biden, No. 4:18-cv-06810 (N.D. Cal.), Dkt. No. 205. The Court, therefore, will assess whether ImmDef has organizational standing under Hippocratic Med. and the case it relies on, Havens.

Under the Hippocratic Med. framework, Defendants argue ImmDef lacks standing because it "needs to demonstrate that MPP directly affected their ***pre-existing services***." (See Defendants' Response to Supp. Authority (emphasis in original).) Defendants assert that ImmDef, instead, voluntarily diverted its resources and took on new activities in response to Defendants' implementation of MPP, which is an expansive theory of standing that Hippocratic Med. rejected. (See Opposition at 4-7; Hearing Transcript at 14:8-25, 16:1–3, 17:1–14; Defendants' Supplemental at 2.) Although the Government concedes that "Hippocratic Medicine does not use the term 'pre-existing,'" they argue its rationale "makes clear that an organization cannot substantively change its business activities in response to a Government policy to establish standing and so its activities must be assessed as they existed prior to the challenged policy." (See Defendants' Supplemental at 2-3.) Stated differently, the mission-frustration requirement articulated in Havens entails a showing that the defendant's conduct affirmatively interfered with a particular set of activities in which the organization was engaged apart from, and prior to, the defendant's conduct. (See id. at 3 (citing 455 U.S. at 379).) Defendants assert that ImmDef "***voluntarily chose***" to take on a new line of work in response to MPP and has not presented evidence of a direct injury to pre-existing core activities aside from its own choice to divert resources. (See id. at 7-8 (citing Application at 17, 26, 28; Toczylowski Decl., Exhibit A ¶¶ 6-7, 13-14, 16) (emphasis in original).)

ImmDef counters that it does not have to demonstrate that the reimplementation of MPP would directly affect its "pre-existing" activities. (See ImmDef's Supplemental at 4.) ImmDef contends that the requirement that "core business activities" be "pre-existing" appears only in Arizona, which has been vacated pending rehearing en banc. (See id. at 4-5 (citing Arizona, 117 F.4th at 1180, reh'g en banc granted, 130 F.4th 1177).) In any case, ImmDef argues that it has unequivocally shown that MPP impacted its preexisting core activities in critical ways and that its reimplementation will have the same effect. (See id. at 5.) ImmDef frames its core business activities as providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in and around southern California, with the goal of providing universal representation. (See id.; Reply at 1–3; SAC ¶¶ 24, 271–72; Toczylowski Decl., Exhibit A ¶¶ 2, 5; Cargioli Decl., Exhibit B ¶¶ 3, 16.) For ImmDef, the expenditures it undertook, and will further undertake, due to MPP are necessary to continue its core business activities. (See ImmDef's Supplemental at 8.)

The Court agrees with ImmDef. Unlike in Hippocratic Med., ImmDef is not "assert[ing] standing simply because [it] object[s] to [the Government's] actions" or gathering information and advocating against MPP. See 602 U.S. at 394 ("an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way"). Instead, ImmDef created initiatives—e.g., opening its San Diego Office, establishing its Cross-Border Initiative ("CBI"), and engaging in international, cross-border travel to Mexico—to limit the adverse impacts of MPP on its core business activities of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in and around southern California. (See ImmDef's Supplemental at 8; Toczylowski Decl., Exhibit A ¶¶ 2, 5-7; Cargioli Decl., Exhibit B ¶¶ 3, 16; Reply at 1–3; SAC ¶¶ 24, 271–72.)

ImmDef frames its core business activities similarly to how the plaintiff in Havens framed theirs. See 455 U.S. at 379 ("'Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to *assist equal access to housing through counseling and other referral services*.'") (emphasis added). Further, like ImmDef, plaintiff HOME took on new activities to counteract the effects of the defendant's practices. See id. ("'Plaintiff HOME *has had to devote significant resources to identify and counteract the defendant's* [sic ] racially discriminatory steering practices.'") (emphasis added). The Supreme Court found—as the Court does here as to ImmDef's allegations—that plaintiff HOME's allegations were sufficient to establish standing:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

See id.  By arguing that the injury for organizational standing must be on "pre-existing" activities, Defendants conflate an organization's core business activities with initiatives aimed at realizing them.  (See Defendants' Supplemental at 2-3.)  ImmDef's core business activities, which remain the same apart from, prior to, and after MPP's implementation, are directly affected by such implementation.

The Court also rejects Defendants' argument that ImmDef "*voluntarily chose*" to take on a new line of work in response to MPP.  (See id. at 7-8 (emphasis in original).)  Prior to MPP 1.0, ImmDef rarely needed to travel to Mexico to meet with clients and did not represent clients in San Diego immigration court because its "motions to transfer venue to the immigration courts in Los Angeles, where [ImmDef] and most of [its] staff are based, were routinely granted."  (See Toczylowski Decl., Exhibit A ¶ 9.)  "However, motions for change of venue in MPP cases were routinely denied by the San Diego immigration courts so [ImmDef] had to expand [its] operations" to provide legal representation to noncitizens it would have represented in Los Angeles prior to the implementation of MPP.  (See id.)  As such, MPP impaired ImmDef's ability to conduct removal defense work in Los Angeles immigration courts.  Put differently, because MPP affected ImmDef's core business activities in Los Angeles, the expenditures ImmDef undertook were necessary and not voluntary.  (See Reply at 1-3 ("If ImmDef failed to provide legal representation to individuals subjected to MPP [], it would abandon a segment of its core constituency.").)

Moreover, allegations that a "threat" to a "concrete interest is . . . imminent" is sufficient to allege "an injury in fact."  See Bishop Paiute Tribe v. Inyo County, 863 F.3d 1144, 1154 (9th Cir. 2017) ("While generalized threats of prosecution do not confer [standing] or constitutional ripeness, a genuine threat of imminent prosecution does."); Lujan, 504 U.S. at 560 (For a plaintiff to meet the injury-in-fact prong of standing, the plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual *or imminent*, not conjectural or hypothetical") (internal citations omitted) (emphasis added).  As discussed further below, because MPP 1.0—with the same operative guidance as the 2019 policy—is in effect, the Court finds that a "threat" to ImmDef's "concrete interest is . . . imminent."  See Bishop, 863 F.3d at 1154; Reinstatement Announcement; Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 213; (Opposition at 19 n.7.)  Accordingly, ImmDef has organizational standing to challenge MPP, and request a stay on its reimplementation.

### b.  Valid Cause of Action: Zone of Interest

Defendants reassert their argument that ImmDef's claims fall outside the INA's zone of interests.  (See Opposition at 9; MTD SAC at 19-21.)  For Defendants, nothing in the asylum statute, 8 U.S.C. § 1158(a), suggests nonprofit organizations aiding individuals subject to MPP, have any cognizable interests in connection with a noncitizen's eligibility for asylum.  (See id.)

Whether ImmDef's claims fall within the "zone of interests" "is a 'prudential' inquiry that asks 'whether the statute grants the plaintiff the cause of action that he asserts.'" E. Bay

Sanctuary Covenant v. Trump, 932 F.3d 742, 767 (9th Cir. 2018) ("EBSC I") (internal quotations and citations omitted).  The EBSC I court squarely rejected a nearly identical argument to the one made by Defendants here.  There, the Ninth Circuit held, "[a]lthough the [o]rganizations are neither directly regulated nor benefitted by the INA, we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls within the zone of interests protected by the INA."  Id. at 768 (internal quotations and citations omitted).  That is because, "[w]ithin the asylum statute, Congress took steps to ensure that pro bono legal services of the type that the [o]rganizations provide are available to asylum seekers," while "other provisions in the INA give institutions like the [o]rganizations a role in helping immigrants navigate the immigration process."  Id. at 768-69; see also O.A. v. Trump, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) ("To start, the organizational plaintiffs' interest in providing legal assistance to as many asylum seekers as they can is consistent with the INA's purpose to establish[ ] . . . [the] statutory procedure for granting asylum to refugees. Even more to the point, the organizational plaintiffs' interest in representing asylum seekers furthers the purposes of the INA.") (internal quotations and citations omitted).

Defendants attempt to distinguish EBSC I, arguing that it never considered 8 U.S.C. § 1252, which "manifests Congress's intent to strictly limit challenges to removal-related activity to claims raised by individual [noncitizens] in removal proceedings."  (See Opposition 9-10.) However, as discussed further below, 8 U.S.C. § 1252(f)(1) does not bar this Court's jurisdiction, and, thus, has no bearing on whether ImmDef's claims fall within the INA's "zone of interest."

The zone of interests test is not difficult to pass: it "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."  EBSC I, at 768 (internal quotations and citations omitted); O.A., 404 F. Supp. 3d at 145 ("The Court, accordingly, concludes that the interests that the organizational plaintiffs seek to protect are at least 'arguably' within the zone of interests protected by the INA and [], as a result, the organizational plaintiffs' claims satisfy the zone of interests test.").  ImmDef easily meets that bar.

### 3. Ripeness of Claims

Defendants argue that ImmDef has not identified any actual or concrete injury from MPP's restart, rendering ImmDef's claims unripe.  (See Opposition at 10-11.)  Specifically, "ImmDef has identified no individuals who have been subjected to MPP [1.0's reimplementation] or pled actual experiences with MPP" and thus this Court should decline to "entangle itself in such abstract disagreements."  (See id. at 11; Hearing Transcript at 13:24-14:2; 15:8-11.)  The Court disagrees.

Article III requires that a plaintiff's claim be ripe for adjudication.  See Ass'n of Irritated Residents v. EPA, 10 F.4th 937, 944 (9th Cir. 2021) ("The ripeness doctrine, which aims to avoid premature and potentially unnecessary adjudication, 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'")

(quoting <u>Nat'l Park Hosp. Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 808 (2003)).  There are two ripeness considerations: constitutional and prudential.  <u>Stavrianoudakis v. United States Fish & Wildlife Serv.</u>, 108 F.4th 1128, 1139 (9th Cir. 2024).

Constitutional ripeness overlaps with the injury-in-fact element of Article III standing, and "therefore the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract."  <u>Id.</u>; <u>Nat'l Park Hosp.</u>, 538 at 808.  "Because [ImmDef] sufficiently allege[s] an injury in fact [as discussed above], constitutional ripeness is satisfied." <u>Stavrianoudakis</u>, 108 F.4th at 1139.

Once a court has found that constitutional ripeness is satisfied, the prudential ripeness bar is minimal, as "'a federal court's obligation to hear and decide' cases within its jurisdiction is 'virtually unflagging.'"  <u>See</u> <u>Washington v. United States Dep't of Homeland Sec.</u>, 408 F. Supp. 3d 1191, 1210 (E.D. Wash. 2019), <u>vacated in part on other grounds</u>, <u>City & County of San Francisco v. United States Citizenship & Immigr. Servs.</u>, 981 F.3d 742 (9th Cir. 2020); <u>see also</u> <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 167 (2014); <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 125–26 (2014).  The question of prudential ripeness requires the Court to first consider the fitness of the issues for judicial review, followed by the hardship to the parties of withholding court consideration.  <u>Colwell v. Dep't of Health & Human Servs.</u>, 558 F.3d 1112, 1124 (9th Cir. 2009).

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."  <u>Stormans, Inc. v. Selecky</u>, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting <u>US W. Commc'ns v. MFS Intelenet, Inc.</u>, 193 F.3d 1112, 1118 (9th Cir. 1999)).  In cases against a government agency, relevant considerations include "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms."  <u>Id.</u> (quoting <u>Ass'n of Am. Med. Colls. v. United States</u>, 217 F.3d 770, 780 (9th Cir. 2000)).

Here, the Court finds that "[a]lthough the [reimplementation of MPP 1.0] may undergo some amendment or agency construction, [it] currently ha[s] the force of law."  <u>See</u> <u>Stormans, Inc.</u>, 586 F.3d at 1126; Reinstatement Announcement ("[DHS] made the following announcement regarding restarting the Migrant Protection Protocols (MPP) ***immediately*** . . . [t]he situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy") (emphasis added); <u>Texas v. Biden</u>, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 213 (according to the Government, "MPP has been reimplemented and will be operational during [the requested stay period of 180 days]").  As such, there is no indication that the Reinstatement Announcement is anything other than a "definitive statement of an agency's position."  <u>See</u> <u>Stormans, Inc.</u>, 586 F.3d at 1126.

Defendants are also "resuming implementation of the 2019 [MPP] policy," with the same "operative guidance."  (<u>See</u> Opposition at 19 n.7); Reinstatement Announcement.  Presumably, the Court does not require substantial factual development to gauge how the reimplementation of

MPP 1.0 will impact ImmDef's core business activities once it begins to take effect. Further, the Court finds that ImmDef's First Amendment and APA claims are fit for judicial review. See Twitter, Inc. v. Paxton, 56 F.4th 1170, 1174 (9th Cir. 2022) (the ripeness requirements are applied "less stringently in the context of First Amendment claims"); Wolfson v. Brammer, 616 F.3d 1045, 1058-59 (9th Cir. 2010) ("In the context of First Amendment speech, a threat of enforcement may be inherent in the challenged statute, sufficient to meet the constitutional component of the ripeness inquiry."); Id. at 1060 ("we relax the requirements of standing and ripeness to avoid the chilling of protected speech"); Abbott Lab'ys v. Gardner, 387 U.S. 136, 140, 149-52 (1967) (challenges to the validity of a rule under the judicial review provisions of the APA present issues fit for adjudication by a court; review of a rule before it has been applied and enforced is available where "the regulations are clear-cut," present a legal issue, and constitute the agency's formal and definitive statement of policy).

Last, the hardship requirement is easily met. Hardship in this context "does not mean just anything that makes life harder; it means hardship of a legal kind, or something that imposes a significant practical harm upon the plaintiff." See Natural Res. Def. Council v. Abraham, 388 F.3d 701, 706 (9th Cir.2004). "The rule in Abbott Laboratories has been carefully circumscribed to regulations that pose an immediate dilemma." Ass'n of Am. Med. Colls. v. United States, 217 F.3d at 783. Plaintiffs must show that postponing judicial review imposes a hardship on them "that is immediate, direct, and significant." Municipality of Anchorage v. United States, 980 F.2d 1320, 1326 (9th Cir.1992). As discussed further below, ImmDef has done so.

### 4. Jurisdiction

Defendants further contend that 8 U.S.C. § 1252(f)(1) ("Section 1252(f)(1)") bars jurisdiction to stay an agency action directing how DHS will implement 8 U.S.C. 1225(b)(2)(C) ("Section 1225(b)(2)(C)"). (See Opposition at 12-18.) Specifically, Defendants argue that the relief ImmDef seeks would have the effect of enjoining or restraining DHS's implementation of Section 1225(b)(2)(C). (Id. at 12 (citing Aleman Gonzalez, 596 U.S. 543).) And, in Aleman Gonzalez, the Supreme Court held that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." See 596 U.S. at 544.

First, there is a "strong presumption . . . that the actions of federal agencies are reviewable in federal court." KOLA, Inc. v. United States, 882 F.2d 361, 363 (9th Cir. 1989); see also Sackett v. E.P.A., 566 U.S. 120, 128 (2012) (stating that "[t]he APA . . . creates a presumption favoring judicial review of administrative action"). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." See Abbott, 387 U.S. at 141.

Second, in Biden v. Texas, the Supreme Court clarified that "Section 1252(f)(1) deprives courts of the power to issue a *specific category* of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." See 597 U.S. at 798 (emphasis added). In so holding, the Supreme Court emphasized that Section 1252(f)(1)'s language and "title—'Limit on

**CIVIL MINUTES—GENERAL**

injunctive relief"—makes clear the narrowness of its scope."  See id.  The Supreme Court has also distinguished injunctive relief from other less drastic remedies such as a stay:

> An injunction and a stay have typically been understood to serve different purposes. The former is a means by which a court tells someone what to do or not to do. When a court employs "the extraordinary remedy of injunction," it directs the conduct of a party, and does so with the backing of its full coercive powers.
>
> It is true that "'[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating in personam.'" This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct.
>
> By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.
>
> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one. Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct. A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts."

Nken v. Holder, 556 U.S. 418, 428-29 (2009).

Moreover, the Court found—and still finds—that the best reading of Biden v. Texas and Aleman Gonzalez is that district courts like this one retain jurisdiction to award declaratory relief in immigration class actions.  (See Order at 18.)  In other opinions, the Supreme Court has suggested that declaratory relief would be available even if injunctive relief is not.  See Reno, 525 U.S. at 481–82 (1999) ("By its plain terms, and even by its title, [Section 1252(f)] is nothing more or less than a limit on *injunctive relief*.") (emphasis added); Jennings v. Rodriguez, 138 S. Ct. 830, 875 (2018) (Breyer, J., dissenting) (declaratory relief remains available notwithstanding section 1252(f)(1)).  The Court finds that a stay, like declaratory relief, "is not ultimately coercive" "[]like an injunction" and thus Section 1252(f)(1) does not bar this Court's jurisdiction to issue one.  See Aleman Gonzalez, 142 S. Ct. at 2077–78 n.9 (Sotomayor, J., joined by Kagan and Breyer, JJ., concurring in the judgment and dissenting in part) (citing Steffel v.

Thompson, 415 U.S. 452, 471 (1974)); Texas v. Biden, 646 F. Supp. 3d at 769 ("A Section 705 stay can instead be seen as an interim or lesser form of vacatur . . .").

Numerous courts have also rejected the argument that Section 1252(f)(1) bars APA relief. See, e.g., Texas v. United States, 40 F.4th 205, 219–20 (5th Cir. 2022) ("There are meaningful differences between an injunction, which is a drastic and extraordinary remedy, and vacatur, which is a less drastic remedy.") (internal quotations omitted); Id. at 219 ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. . . . We decline to extend Aleman Gonzalez to such judicial orders . . ."); Texas v. United States, 126 F.4th 392, 419 n.40 (5th Cir. 2025) (reaffirming the same); Kidd v. Mayorkas, 734 F. Supp. 3d 967, 986 (C.D. Cal. 2024) ("the Court can issue declaratory relief—which is not precluded by § 1252(f)—and also vacate and set aside Defendants' unlawful policies and training materials under the APA"); Nat'l TPS All. v. Noem, 2025 WL 957677, at *15 (N.D. Cal. Mar. 31, 2025), appeal docketed, No. 25-2120 (9th Cir. Apr. 2, 2025) ("Accordingly, the Court rejects the government's contention that § 1252(f)(1) is a bar to [p]laintiffs' request for relief [pursuant to 5 U.S.C. § 706(2)]"); Florida v. United States, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) (finding that a "[v]acatur is 'a less drastic remedy' than an injunction, and the Fifth Circuit concluded . . . that § 1252(f)(1) does not preclude vacatur under the APA . . .").

The Court also finds Texas v. Biden, 646 F. Supp. at 766-769, instructive on this point. In Texas v. Biden, the district court held that it may stay the October 29 Memoranda under Section 705, in part, because Section 1252(f)(1) does not bar jurisdiction. See id. The district court noted that "the Supreme Court has expressly reserved whether Section 1252(f)(1) prohibits various types of non-injunctive relief." See id. at 767. For the district court, "[u]nlike an injunction, a stay would not 'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue." See id. at 769. "Whereas an injunction 'tells someone what to do or not to do,' a vacatur [and a stay] only reinstates 'the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making.'" See id. at 768. As such, the Court agrees with the district court in Texas v. Biden and holds that it may issue a stay pursuant to Section 705 in light of Section 1252(f)(1).

Even if the Court were to find that Section 705 implicates injunctive relief, it may still grant a stay. Because ImmDef challenges the implementation of a policy, not the statute itself, a stay would not "enjoin or restrain the operation" of Section 1225(b)(2)(C). (See Reply at 5 n.5); see also Grace v. Barr, 965 F.3d 883, 907 (D.C. Cir. 2020) (noting that Section 1252(f)(1) "refers only to 'the operation of the provisions'—i.e., the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin agency action found to be unlawful"; the Supreme Court did not "even hint that the 'operation of the provisions' refers to anything other than the statute itself") (internal citations omitted). Alternatively, the Court "may still 'enjoin the unlawful operation of a provision that is not specified in [Section] 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision.'" Kidd, 734 F. Supp. 3d at 985 (quoting Aleman Gonzalez, 596 U.S. at 553 n.4 (2022)). The relief sought here "directly implicates" constitutional rights, the right to seek

asylum, and the right to counsel, which are not covered under Section 1252(f)(1).  See Al Otro Lado v. Exec. Off. for Immigr. Rev., 120 F.4th 606, 627–28 (9th Cir. 2024).

### 5.  Already-Effective Agency Action

Defendants assert that the Court cannot "suspen[d] a policy that is ***already in effect***." (See Opposition at 16 (emphasis in original)); Reinstatement Announcement.  However, courts—including the Supreme Court—routinely stay already-effective agency action.  See, e.g., West Virginia v. EPA, 577 U.S. 1126, 1136 (2016); BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab., 17 F.4th 604 (5th Cir. 2021); Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130 (5th Cir. 2021); Texas v. EPA, 829 F.3d 405 (5th Cir. 2016); Texas v. Biden, 646 F. Supp. at 770.

The cases Defendants cite preclude agencies—not courts—from staying agency actions after the effective date because authorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements.  See, e.g., Ctr. for Biological Diversity, 597 F.Supp.3d at 204 ("it is one thing to permit an agency to stay an administrative decision pending judicial review in order to maintain the status quo, but something altogether different to alter the status quo without providing an opportunity for notice and comment").

Defendants also assert that "[a]n order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather, ***alters*** it."  (Opposition at 17 (emphasis in original).)  The Court rejects this argument because, traditionally, "[t]he 'status quo' to be restored is 'the last peaceable uncontested status existing between the parties ***before*** the dispute developed.'"  Texas v. Biden, 646 F.3d 3d at 771 (emphasis added); Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1024 (9th Cir. 2016) (stating that the "'[s]tatus quo ante litem' refers to 'the last uncontested status which ***preceded*** the pending controversy'") (emphasis added).  Here, the last uncontested status that preceded the pending controversy was the state of MPP 1.0 prior to the Reinstatement Announcement—i.e., effectively terminated although the October 29 Memoranda remain stayed.  See Texas v. Biden, No. 23-10143 (5th Cir. Jul. 17, 2023); Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 205 at 4 ("[b]ecause the United States cannot unilaterally return noncitizens to Mexico under MPP without Mexico's consent, their withdrawal of consent renders restarting MPP impossible").

## B.  Factors for Section 705 Relief

Next, Defendants argue that ImmDef cannot show a likelihood of success on the merits of any claims, cannot explain how it will be irreparably prejudiced in the absence of the requested relief, and that the balance of equities weighs against granting a stay.  (See Opposition at 18-25.)

//
//
//
//

### 1. Success on the Merits

Defendants argue that ImmDef cannot show a likelihood of success on the merits because: (1) its claims are barred by 8 U.S.C. §§ 1252(a)(5) and (b)(9) ("Sections 1252(a)(5) and (b)(9)"), and ImmDef cannot seek prospective relief for past harms; (2) its First Amendment claim fails because MPP does not involve content-based restrictions on speech; (3) Defendants' policy does not violate the INA's right to apply for asylum; and (4) Defendants' policy does not violate the INA's right to access counsel. (See Opposition at 18-25.) ImmDef bears the burden of demonstrating that it is likely to succeed on the merits of its claims.

### a. Sections 1252(a)(5) and (b)(9)

Defendants reassert their argument that ImmDef's claims are barred by Sections 1252(a)(5) and (b)(9). (See Opposition at 19-21; MTD SAC at 11-14.)

Subsection (b)(9) is typically read together with subsection (a)(5). J.E.F.M. v. Lynch, 837 F.3d 1026, 1031 (9th Cir. 2016); see also Cancino-Castellar v. Nielsen, 338 F. Supp. 3d 1107, 1111 (S.D. Cal. 2018) ("Section 1252(a)(5) is central to Section 1252(b)(9)'s scope."). Under these provisions, claims that arise from the removal process must bypass the district court and be heard instead through the administrative process. Judicial review is only by the Court of Appeals via a petition for review ("PFR"). Courts refer to this effect as jurisdictional "channel[ing]," and have dubbed Section 1252(b)(9) a "zipper clause." Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 482–83 (1999).

According to Defendants, "[w]hen a claim by a[] [noncitizen], however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is prohibited by section 1252(a)(5)." (See Opposition at 20 (citing Martinez v. Napolitano, 704 F.3d 620, 623 (9th Cir. 2012)).) "Taken together, § 1252(a)(5) and (b)(9) mean that any issue—whether legal or factual—arising from any removal-related activity can be reviewed **only** through the [PFR] process." (See id. (quoting J.E.F.M., 837 F.3d at 1031 (emphasis in original)).) For Defendants, ImmDef's claims regarding the right to apply for asylum and the right to access counsel are barred by Sections 1252(a)(5) and (b)(9) because these claims are "bound up in and an inextricable part" of removal proceedings and orders of removal. (See id. at 21 (citing J.E.F.M., 837 F.3d at 1033 (finding that right-to-counsel claims "must be raised through the PFR process because they 'arise from' removal proceedings," were "not independent or ancillary to the removal proceedings," and were instead, "bound up in and an inextricable part of the administrative process")).)

The Court finds that Individual Plaintiffs "do not directly challenge the bases for their orders of removal" but rather seek to "avail themselves of the administrative system that exists to litigate" their immigration cases, rendering their claims "independent of or collateral to the removal process." (See Order at 23, 25 (citing and quoting Chhoeun v. Marin, 306 F. Supp. 3d 1147, 1159 (C.D. Cal. 2018); Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 810 (9th Cir. 2020)).) As such, ImmDef's claims are not barred by Sections 1252(a)(5) and (b)(9).

---

Separately, courts in this Circuit have found that organizational plaintiffs' claims are not barred under Section 1252(b)(9). See, e.g., Las Americas Immigrant Advoc. Ctr. v. Trump, 475 F. Supp. 3d 1194, 1209 (D. Or. 2020) ("Allowing organizational plaintiffs to bring claims alleging systemic problems, independent of any removal orders, that allegedly cause harms specific to those organizations does not thwart the purpose of [Section] 1252(b)(9).").

Defendants also argue that "ImmDef cannot pursue prospective relief with respect to MPP because its allegations of harm and the certified class it represents are limited to individuals subject to MPP before June 2021 and seeking relief for past harms. And no relationship exists between the injury claimed here versus that claimed in the complaint." (Opposition at 21 (citing Pac. Radiation Oncology, LLC, v. Queen's Med. Ctr., 810 F.3d 631, 636 (9th Cir. 2015) ("there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint"); Beers Consol. Mines v. United States, 325 U.S. 212, 220 (1945) (a preliminary injunction is only "appropriate to grant intermediate relief of the same character as that which may be granted finally")).) First, throughout the SAC, Plaintiffs claim that **past** decisions by Defendants continue to cause **ongoing** injury. (See SAC ¶¶ 340, 346, 352, 360, 367, 371, 380, 391.)

Second, the SAC alleges harms arising from the initial implementation of MPP 1.0 in violation of ImmDef, JFS, and Individual Plaintiffs' constitutional rights and the APA. (See SAC.) The Application seeks to stay the reimplementation of MPP 1.0, pending the conclusion of this litigation, to curb further harm and violations of rights asserted in the SAC. (See Application.) The Court, therefore, finds that "there [is] a relationship between the injury claimed in the [Application] and the conduct asserted in the underlying complaint." See Pac. Radiation Oncology, LLC, 810 F.3d at 636.

## b. First Amendment

The level of scrutiny courts apply to laws regulating speech varies depending on whether the law is content based or content neutral. See Victory Processing, LLC v. Fox, 937 F.3d 1218, 1226 (9th Cir. 2019). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015). Content-neutral laws, on the other hand, are subject to lesser scrutiny and can be justified as time, place, and manner restrictions. See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. Sorrell v. IMS Health, Inc., 564 U.S. 552, 563-65 (2011); Carey v. Brown, 447 U.S. 455, 462 (1980); Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972). "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining

regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Reed, 576 U.S. at 163–64.

The Supreme Court also recognizes a separate and additional category of laws that, though facially content neutral, are considered content-based regulations of speech: laws that cannot be "justified without reference to the content of the regulated speech," or that were adopted by the government "because of disagreement with the message [the speech] conveys." See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." Reed, 576 U.S. at 164.

Content-neutral laws, in contrast, "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994) ("Turner I"). Under that standard, courts will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 189 (1997) ("Turner II" ).

### i.  Right to Advise Potential and Existing Clients

ImmDef argues that Defendants placed specific and direct restrictions on ImmDef's and other legal service providers' speech when they implemented MPP. (See Opp. at 48-49; SAC ¶¶ 63, 278–84; Application at 13.)  Restrictions included a one-hour limit for counsel to meet with clients prior to their hearings while they were physically located in the United States and a requirement that attorney-client consultations take place in non-confidential settings. (See, e.g., Explanation Memo, Exhibit C at AR00021; Cargioli Decl., Exhibit B ¶¶ 10–11.)  In some instances, attorney consultations had to take place in a room with ICE officers present. (See Cargioli Decl., Exhibit B ¶ 10.)  Only asylum seekers who had arranged to be represented by counsel prior to their hearings were permitted to speak to counsel while in the United States for their immigration court proceedings. (See id. ¶¶ 11, 13.)  In some instances, attorneys, including ImmDef attorneys, were outright prohibited from speaking with pro se asylum seekers while they were in the United States for hearings. (See id. ¶¶ 12–13.)  The only way for ImmDef to exercise its First Amendment rights to advise potential clients and to provide legal advice to existing clients subjected to MPP was by paying for staff to travel to and rent safe meeting spaces in Mexico. (See Toczylowski Decl., Exhibit A ¶ 15; Cargioli Decl., Exhibit B ¶¶ 10–11.)

Defendants first counter that "border restrictions are not subject to this kind of analysis [i.e., First Amendment scrutiny], beyond [] extraordinarily deferential review." (See Opposition at 18 (citing Kleindienst v. Mandel, 408 U.S. 753, 770 (1972)).)  However, the Court finds that Individual Plaintiffs and ImmDef are not challenging discretionary border restrictions. (See Order at 29.)  Instead, they claim that Defendants' implementation of MPP violated their rights under the INA, the APA, and the Constitution. (See id.)  That argument is akin to the one raised in Zadvdas, wherein petitioners challenged the Attorney General's authority to detain a removable noncitizen indefinitely. Zadvydas v. Davis, 533 U.S. 678, 682 (2001).  The Supreme

Court noted that "[t]he [noncitizens] here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion." Id. at 688. Federal courts, moreover, are not deprived of jurisdiction over "questions of law" or "'application of law to undisputed facts, sometimes referred to as mixed questions of law and fact.'" Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011) (quoting Ramadan v. Gonzales, 479 F.3d 646, 648 (9th Cir. 2007) (per curiam)); Hernandez, 872 F.3d 976, 988 (9th Cir. 2017); Spencer Enterprises, Inc. v. United States, 345 F.3d 683, 689 (9th Cir. 2003).

Defendants next argue that ImmDef's First Amendment claim is unlikely to succeed on the merits because MPP does not involve content-based restrictions on speech. (See Opposition at 18-19.) According to Defendants, MPP imposes content-neutral restrictions which "are permissible when they are 'narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" (See id. at 18 (quoting Arroyo, 2019 WL 2912848, at *21).) Defendants assert that the restrictions ImmDef argues MPP imposes serve a significant government interest—i.e., protecting U.S. borders—while leaving open alternative avenues of communication. (See id.) Although attorneys are only guaranteed one hour with their clients before they walk into an asylum immigration court hearing under the current operative guidance, Defendants argue that MPP does not prohibit communications beforehand. (See id. at 19.) And, noncitizens subject to MPP continue to have a right to be represented by counsel in removal proceedings before an immigration judge ("IJ"), at no expense to the government. (See id.)

"[T]he creation and dissemination of information are speech within the meaning of the First Amendment." Sorrell, 564 U.S. at 570. The First Amendment protects legal service providers from government interference when they are "advocating lawful means of vindicating legal rights." NAACP v. Button, 371 U.S. 415, 437 (1963). "Subsequent decisions have interpreted Button as establishing the principle that 'collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.'" In re Primus, 436 U.S. 412, 426 (quoting United Transportation Union v. Michigan Bar, 401 U.S. 576 (1971)). As Primus observes, "the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants." 436 U.S. at 431. It teaches that "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." Id. at 432 (quoting Thomas v. Collins, 323 U.S. 516 (1945)). And it declares that the "First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights,' including 'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance.'" Id. (internal citations omitted).

The Court finds that, under these circumstances, the First Amendment applies to ImmDef and ImmDef has demonstrated a likelihood of success on the merits of its claim. ImmDef seeks to engage in protected speech by "advising, assisting, and consulting with asylum-seeking clients." (See Application at 12.) ImmDef's mission includes "advocating lawful means

of vindicating legal rights" for an "unpopular minority," <u>Button</u>, 371 U.S. at 435, immigrants seeking asylum at the southern border.  (<u>See id.</u> at 12; SAC ¶¶ 271-73, 278, 288-90, 294, 297-98.)

The Court declines to decide what level of scrutiny—strict or intermediate—may apply to ImmDef's First Amendment claim at this juncture; such determination is better suited for summary judgment.  However, even if the Court viewed the restriction on protected speech as content neutral, ImmDef has demonstrated that MPP "burden[s] substantially more speech than necessary to further [the Government's] interests."  <u>See</u> <u>Turner II</u>, at 189.  The Court recognizes that the Government "has a compelling interest in protecting its borders."  <u>Kariye v. Mayorkas</u>, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting cases); <u>see also</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 225 (1982) (noting "obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into" the political branches' decisions with respect to management of the border).  But that compelling interest should and can be vindicated without impermissibly restricting protected speech.  <u>See</u> <u>Arroyo</u>, 2019 WL 2912848, at *21 (citing <u>Mothershed v. Justices of the Sup. Ct.</u>, 410 F.3d 602, 611 (9th Cir. 2005)).

Defendants "placed explicit restrictions on Organizational Plaintiffs' protected speech in the United States" in at least three meaningful ways.  (<u>See</u> Order at 48.)  Defendants via MPP (1) imposed strict limitations on the time and conditions in which ImmDef could provide legal services to existing clients; (2) prevented them from communicating with or advising potential clients; and (3) forbade them from conducting "know your rights" presentations for individuals subjected to MPP.  (<u>See id.</u>)  These restrictions significantly limited the channels of communication between ImmDef and its clients and prospective clients; as a result, "ImmDef had . . . to engage in international, cross-border travel to Mexico on a regular basis."  (<u>See</u> Toczylowski Decl., Exhibit A ¶ 7.)  The reimplementation of MPP will again impose these barriers on ImmDef's ability to consult with clients and potential clients.  (<u>See id.</u> ¶¶ 21–22.)

### c.  Administrative Procedure Act

The APA provides for judicial review of final agency actions.  5 U.S.C. §§ 702, 706.  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem."  <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

Judicial review of agency action "is not toothless."  <u>Sw. Elec. Power Co. v. EPA</u>, 920 F.3d 999, 1013 (5th Cir. 2019).  The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  <u>State Farm</u>, 463 U.S. at 43 (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)).  The agency must also consider reliance interests of those affected by a contemplated decision and consider less-disruptive policies given those interests.  <u>Dep't of</u>

<u>Homeland Sec. v. Regents of Univ. of Cal.</u>, 140 S. Ct. 1891, 1913–15 (2020).  In the immigration context, the agency's "approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system."  <u>Judulang v. Holder</u>, 565 U.S. 42, 55 (2011).  Merely saying something "was considered is not enough to show reasoned analysis."  <u>State v. Biden</u>, 10 F.4th at 555.

### i.  Violation of the Right to Apply for Asylum

The INA provides that any noncitizen who is "physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section, or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).  Section 1225(b)(2)(C) states that DHS "may return" certain noncitizens to a contiguous country "pending a proceeding under section 1229a of this title."  8 U.S.C. § 1229(a) ("Section 1229(a)"), in turn, refers to "removal proceedings," in which a noncitizen's asylum application is adjudicated.

First, Defendants argue that the APA provides no basis for ImmDef to disregard Congress's decision to create contiguous territory return.  (<u>See</u> Opposition at 23.)  As such, because the INA explicitly permits expulsion to contiguous countries during the pendency of removal hearings, ImmDef cannot establish a violation of the INA.  (<u>See</u> <u>id.</u> at 24.)  The Court rejects Defendants' argument.  While Defendants' authority pursuant to Section 1225(b)(2)(C) must be read within the context of a broader statutory scheme, it does not follow that the provision affords nearly limitless discretion to return noncitizens to a contiguous country *even if* doing so would violate the rights enacted by other statutes.  <u>See</u> <u>Epic Sys. Corp. v. Lewis</u>, 138 S. Ct. 1612, 1619 (2018) (courts interpret statutes as a "harmonious whole rather than at war with one another").  By its plain language, Section 1225(b)(2)(C) does not mention asylum at all and nothing about Section 1225(b)(2)(C), or any other provision cited by Defendants, suggests that Congress intended to undermine or modify the right to apply for asylum.

Second, Defendants assert that the INA creates a right to apply for asylum but expressly limits that right to the procedures in Section 1225(b)(2)(C).  (<u>See</u> Opposition at 24.)  In other words, noncitizens seeking admission to the United States only have rights that "Congress has provided by statute," and, here, Congress permitted asylum applications, but also permitted contiguous territory return.  (<u>See</u> <u>id.</u> (citing <u>DHS v. Thuraissigiam</u>, 591 U.S. 103, 140 (2020)).)  Because the factual allegations in the SAC show that Individual Plaintiffs were able to exercise this right by applying for asylum, Defendants argue that ImmDef is unlikely to succeed on the merits of its claim.  (<u>See</u> <u>id.</u> at 24.)  The Court disagrees.

In the SAC, ImmDef alleges that MPP "subverted and violated the right to apply for asylum by trapping Individual Plaintiffs and similarly situated individuals in a foreign country under dangerous conditions in a manner that obstructed access to all components of the U.S. asylum system."  (SAC ¶ 333.)  MPP also "subverted and violated the right to apply for asylum by irrationally treating asylum seekers at the southern border in a discriminatory and non-uniform

way." (Id. ¶ 334.) MPP violated the APA because "Defendants failed to consider how leaving individuals stranded outside the United States in life-threatening conditions and without access to legal representation would obstruct these individuals' access to the U.S. asylum system, including, where relevant, by impeding their ability to restart or reopen their asylum proceedings or appeal an unfavorable decision." (Id. ¶ 335.) Defendants also failed to consider the obstacles that Organizational Plaintiffs would face in meeting and communicating with their clients. (Id.)

Defendants have also conceded publicly and in papers filed during this litigation that MPP 1.0 is indefensible as a matter of policy, in large part because of the burdens it imposed on the right to apply for asylum. (See October 29 Memoranda.) Former DHS Secretary Alejandro Mayorkas recognized numerous structural flaws with MPP, including concerns about the non-refoulement process, fairness and reliability of proceedings, notice of hearings, and disparate impact on court appearance rates and outcomes. (See Explanation Memo, Exhibit C at 38-48.) For example, noncitizens who were subjected to MPP were two and a half times more likely than noncitizens not subjected to MPP to receive in absentia removal orders. (Id. at 45-46.) Plaintiffs have pleaded these allegations in the SAC. (See, e.g., SAC ¶¶ 4, 62.) Taken altogether, Plaintiffs have established that it is likely that decisionmakers behind the initial implementation of MPP failed to consider or inadequately weighed the considerable problems Defendants have publicly recognized, or that they used their authority in such a way that conflicted with the legal rights bestowed upon asylum seekers by Congress. See State Farm, 463 U.S. 29. The Court finds that ImmDef has demonstrated a likelihood of success on the merits that MPP violated, and will violate, the right to apply for asylum within the INA.

Finally, the Court rejects Defendants' argument that ImmDef lacks standing to bring this claim, because it is "an organization, [and] is not applying for asylum (it cannot); it seeks to help others do so." (See Opposition at 24.) The Court finds that ImmDef has standing to bring all its claims. ImmDef also alleges ongoing or potential relationships with the Individual Plaintiffs and/or proposed class and thus have standing to bring the claim; specifically, as it applies to the Terminated Case Subclass. (See Hearing Transcript at 8:20-25, 20:19-21:3.)

### ii. Violation of the Right to Access Counsel

Defendants argue that ImmDef's right to access counsel claim fails because it is premised on alleged rights beyond what Congress has provided. (See Opposition at 23 (citing United States v. Valdivias-Soto, 112 F.4th 713, 723 (9th Cir. 2024) ("the statutory and regulatory scheme make clear," a noncitizens has "the right to be represented by a pro bono attorney if he could locate one; and, indeed, he was entitled to a list of lawyers, organizations, and referral services willing to help him obtain pro bono representation")).)

The Court rejects the notion that the statutory right to counsel consists merely of the right to be advised of the right to counsel and provided a list of pro bono lawyers. At a minimum, "[t]o infuse the critical right to counsel with meaning, . . . IJs must provide [noncitizens] with reasonable time to locate counsel and permit counsel to prepare for the hearing." Biwot v. Gonzales, 403 F.3d 1094, 1098–99 (9th Cir. 2005). If a noncitizen is able to retain counsel, he is

entitled to the effective assistance of it, and is denied the right when a proceeding becomes so "fundamentally unfair that he is prevented from reasonably presenting his case." Lopez v. INS, 775 F.2d 1015, 1017 (9th Cir. 1985). In Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir. 1990), the Ninth Circuit found that errors in the lists of lawyers provided to Salvadoran noncitizens, detention of noncitizens "far from where potential counsel or existing counsel were located," restrictions on consultation with counsel before signing voluntary departure documents, failures to notify attorneys of client location transfers, limited attorney visitation hours, and inadequate efforts to ensure the privacy of attorney-client interviews cumulatively deprived the noncitizens of their right to "consult with counsel." Id. at 564-67. As such, the Court finds that the INA mandates that asylum seekers have meaningful access to counsel, including the right to contact counsel and the time, space, and ability to consult with counsel safely and confidentially. (See Order at 37.)

Plaintiffs have plead with great specificity the ways in which MPP "obstructed legal representation for all individuals subjected to [it], blocking it entirely for over 90 percent of impacted individuals." (SAC ¶ 61.) Among their allegations, Plaintiffs identify deficiencies in the lists of legal service providers akin to those in Thornburgh, 919 F.2d 549; attorney-client consultations limited to an "illusory one-hour window before a scheduled hearing"; lawyers who were forced to meet with their clients in nonconfidential settings; and unrepresented noncitizens who "were prohibited even from approaching legal representatives present in the immigration court to discuss possible representation." (SAC ¶¶ 61-63; see also ¶¶ 156-57.) Plaintiffs have thus established that it is likely that MPP constitutes an arbitrary and capricious agency action as it relates to the INA's right to counsel.

Moreover, the Court rejects Defendants' renewed objection to ImmDef's standing to bring this claim, for the same reasons stated above: ImmDef properly alleges ongoing or potential attorney-client relationships with Individual Plaintiffs and/or the proposed class. (See Hearing Transcript at 8:20-25, 20:19-21:3.)

Last, Defendants' assert that Congress does not require the Government to actively facilitate a noncitizen's access to counsel or that they impose no restrictions, and have no control over, the ability of noncitizens to communicate with or retain counsel in a foreign territory. (See Opposition at 22-23.) The Court finds these arguments unavailing. MPP 1.0 forced noncitizens to remain in Mexico pending their removal hearings in San Diego immigrations courts; the Government cannot actively facilitate a breakdown in ongoing or potential attorney-client relationships, and then claim no responsibility or control over it.

As such, ImmDef has not only demonstrated serious questions going to the merits of its claims; it has also established a likelihood of success on the merits.

//
//
//
//

## 2. Likelihood of Irreparable Harm

ImmDef must demonstrate it is likely to suffer irreparable harm in the absence of a stay. See Winter, 555 U.S. at 20. The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a [stay]." Caribbean Marine Servs. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). A plaintiff seeking a stay pursuant to Section 705 must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury. Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Where parties cannot recover monetary damages from their injury, as in APA cases, economic harm can be considered irreparable. EBSC III, at 677 (citing California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018)).

Defendants argue that "ImmDef has only offered inadmissible and speculative statements that [it] believe[s] [it] will encounter potential clients impacted by MPP in the future, and therefore, be harmed in the future." (See Defendants' Supplemental at 4 (citing Hearing Transcript at 25:12–17).) For Defendants, "[t]he injury alleged by ImmDef [] stem[] from the past . . . and otherwise simply speculates as to a future injury." (See id. at 5 (internal citations omitted).) They further contend that even if "some small number of individuals will arrive in the United States in the future and be impacted by MPP, it does not follow that ImmDef will be the organization to encounter them and then that ImmDef would be '*harmed*.'" (See id. (citing Hippocratic Med., 602 U.S. at 390) (emphasis in original).)

To support a stay, "harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough." Amylin Pharms., Inc. v. Eli Lilly & Co., 456 F. App'x 676, 679 (9th Cir. 2011). Instead, "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." Caribbean Marine Servs. Co., 844 F.2d at 674 (emphasis in original); City of Los Angeles v. Lyons, 461 U.S. 95, 103 (1983) (concluding that the threat of irreparable harm must be "sufficiently real and immediate to show an existing controversy"). "A threat of irreparable harm 'is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer irreparable harm before a decision on the merits can be rendered.'" See Boardman, 822 F.3d at 1023 (quoting Winter, 555 U.S. at 22); Nat'l TPS All., 2025 WL 957677, at *2 (granting stay of termination of TPS status for Venezuelans on the basis that DHS Secretary's action "*threatens to*: inflict irreparable harm on hundreds of thousands of persons whose lives, families, and livelihoods will be severely disrupted, cost the United States billions in economic activity, and injure public health and safety in communities throughout the United States") (emphasis added).

"[P]ast wrongs [from similar challenged conduct or policies] are evidence bearing on whether there is a real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488, 496–97 (1974); see also Maryland v. U.S. Dep't of Agric., 2025 WL 973159, at *8 (D. Md. Apr. 1, 2025) (finding that the plaintiff states had demonstrated "several highly predictable harms resulting from past and future unnoticed" firings of federal employees).

First, the Court finds that Defendants' own statements "demonstrate [an] immediate threatened injury" to warrant a stay because ImmDef is "likely to suffer irreparable harm before a decision on the merits can be rendered." See Boardman, 822 F.3d at 1022-23. Specifically, on January 21, 2025, Defendants announced that it was resuming implementation of the 2019 MPP policy "immediately." See Reinstatement Announcement. The Government also represented that "MPP has been reimplemented and [is] operational . . . ." Texas v. Biden, Case No. 21-cv-0067 (N.D. Tex.), Dkt. No. 213.

Defendants offer no evidence to support its contention that "ImmDef is speculating as to future harm," or that "some small number of individuals will arrive in the United States in the future and be impacted by MPP." (See Defendants' Supplemental at 2, 5.) Further, at the hearing on March 31, 2025, the statements Defendants' counsel made regarding the reimplementation of MPP were that: (1) their client "has not provided . . . information" on how the "situation at the border" changed and/or why the "facts on the ground" are favorable to resume the policy; (2) they "do [not] know whether anyone has been removed";  and (3) MPP "has been used on a limited basis" "due to DHS using other authorities." (See Hearing Transcript at 4:15-6:3, 24:13-17.) That is insufficient. Without any evidence, the Court will not assume that MPP has been, and will continue to be, implemented on a limited basis or that noncitizens have not been removed pursuant to the policy. Underscoring this conclusion is the fact that Defendants have the potential to ramp up MPP quickly. (See SAC ¶ 59 n.24; HRW Report, Exhibit D at 2 ("Since July [2019], the number of people being placed in the MPP program has almost tripled, from 15,079 as of June 24, [2019] to 40,033 as of September 7, [2019] according to the Mexican National Institute of Migration.").) As such, since MPP—with the same operative guidance as its 2019 implementation—is in effect, the Court finds that the irreparable harm ImmDef faces is imminent and not speculative. See Amylin Pharms., Inc., 456 F. App'x at 679; Caribbean Marine Servs., 844 F.2d at 674; (see also Defendants' Supplemental at 6; Opposition at 19 n.7.)

Second, the part harms suffered by ImmDef, JFS, Individual Plaintiffs, and class members during MPP's initial implementation demonstrate the type of "repeated [irreparable] injury" they now imminently face. See O'Shea v. Littleton, 414 U.S. at 496–97. As in 2019, Defendants' reimplementation of MPP will send ImmDef's prospective clients to Mexico to await their hearings in San Diego immigration court and thereby obstruct ImmDef's ability to contact, communicate with, and counsel them. (See SAC ¶¶ 347, 349; Toczylowski Decl., Exhibit A ¶¶ 22–23; Cargioli Decl., Exhibit B ¶¶ 9–13.)

In Mexico, MPP clients faced extraordinary risks to their personal safety; some were kidnapped, tortured, raped, sexually and/or physically assaulted, and had no meaningful shelter access while waiting for their hearings. (See Cargioli Decl., Exhibit B ¶ 9; HRW Report, Exhibit D at 7-8.) The dangerous conditions in Mexico impeded ImmDef's attorneys' ability to provide representation—making it difficult to know whether the MPP client had given up and left Mexico, whether they were alive, or whether they would contact their attorneys after being released by a cartel—and caused ImmDef to divert even more resources to these cases. (See Cargioli Decl., Exhibit B ¶ 9.)

To reach these individuals and adequately and ethically represent them, ImmDef will once again have to hire additional staff, engage in cross-border travel, purchase international phone plans, and rent confidential meetings spaces in Mexico. (See Toczylowski Decl., Exhibit A ¶¶ 12, 15, 21–25; SAC ¶¶ 273–84.) Even in cases where individuals subjected to MPP manage to retain ImmDef, the circumstances and conditions of MPP will make attorney-client communications more difficult. (See SAC ¶¶ 16, 107, 157; Toczylowski Decl., Exhibit A ¶¶ 23, 25; Cargioli Decl., Exhibit B ¶¶ 9–13.) MPP places time limits and restrictions on when and how ImmDef staff can communicate with their clients prior to court hearings. (See Reply at 8–11.) The 2019 directive establishing the one-hour limit before a court hearing is a component of MPP that Defendants have confirmed is part of the "current operative guidance" for its reimplementation. (See Opposition at 19 n.7.)

Between January 2019 and November 2020, ImmDef also spent approximately $400,000 on costs associated with launching and sustaining its CBI to provide legal services for MPP clients, and in 2021, ImmDef's funding for the CBI was $210,000, a substantial portion of which was associated with representing MPP clients. (See Toczylowski Decl., Exhibit A ¶ 15.)

Since MPP effectively ended in the summer of 2021, ImmDef has reprioritized and expanded its legal representation programs for noncitizen children and adults in and around southern California, especially in San Diego. (See Toczylowski Decl., Exhibit A ¶ 16; Cargioli Decl., Exhibit B ¶¶ 14-15.) ImmDef's primary work in Mexico has been conducting "Know Your Rights" presentations and providing legal consultations in migrant shelters. (See Toczylowski Decl., Exhibit A ¶ 17.) The reinstatement of the 2019 MPP policy threatens to undermine ImmDef's, particularly the San Diego team's, existing programs and overall capacity to provide removal defense assistance. (See Cargioli Decl., Exhibit B ¶ 16.)

In sum, Defendants' reimplementation of MPP will cause ImmDef—and the Terminated Case Subclass if they reattempt to seek asylum—irreparable harm. For ImmDef, these harms include, impairing its ability to provide meaningful legal representation to clients in removal proceedings; jeopardizing the safety of its staff; threatening its financial stability; and otherwise undermining its core business activities. (See Toczylowski Decl., Exhibit A ¶¶ 7–15, 21–25.)

### 3. Public Interest and Balancing of Harms

Where the government is the opposing party, balancing of the harm and the public interest merge. See Nken, 556 U.S. at 435. Thus, the Court asks whether any significant "public consequences" would result from issuing the stay. Winter, 555 U.S. at 24.

Defendants argue that challenges to DHS' discretion on how best to enforce immigration law "invade a special province of the Executive." (See Opposition at 25 (quoting Reno, 525 U.S. at 489).) For Defendants, a stay preventing DHS from reinstating a discretionary program would thus interfere with a core constitutional power conferred on the Executive, and would cause direct, irreparable injury to the interests of the Government and the public. (See id. (quoting Nken, 556 U.S. at 435).)

The Court disagrees.  DHS neither has the discretionary authority nor legitimate reasons to enforce programs that violate the constitution or federal law.  See United States v. U.S. Coin & Currency, 401 U.S. 715, 726 (1971) (Brennan, J., concurring); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013); Wong v. United States, 373 F.3d 952, 963 (9th Cir. 2004) ("Moreover, decisions that violate the Constitution cannot be 'discretionary . . . .'").  As implemented, MPP 1.0 had "inherent problems . . . that no amount of resources c[ould] sufficiently fix," and the Government has made clear it intends to reimplement the same "2019 MPP Policy."  (See Explanation Memo, Exhibit C at 65; Termination Memo, Exhibit E); Reinstatement Announcement.  ImmDef also has established a likelihood of success on the merits of its constitutional and APA claims against Defendants, and "there is no harm to the Government when a court prevents the Government from engaging in unlawful practices."  See Castillo v. Barr, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020); Torres v. U.S. Dep't of Homeland Sec., 2020 WL 3124216, at *9 (C.D. Cal. Apr. 11, 2020) ("As a general rule, 'it is always in the public interest to prevent the violation of a party's constitutional rights.'") (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)).

Further, "the public has an interest in the orderly administration of justice and in preventing needless administrative appeals, delay, and expense produced by the denial of access to counsel and by non-adherence to statutory and constitutional rights."  Torres, 2020 WL 3124216, at *9.  No doubt, the difficulty of adhering to such principles inclines with the issues presented at our international borders.  But surely the urgency of access to counsel, and the maintenance of access to courts, increases to the same degree.  See Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required."); Preminger v. Principi, 422 F.3d 815, 826 ("[A]ll citizens have a stake in upholding the Constitution.").  As such, the balance of equities and public interest factors tip sharply in ImmDef's favor.

## C.  National Relief

Finally, the Court rejects Defendants' request that "any stay be limited to ImmDef's clients."  (See Opposition at 25.)  "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement."  See EBSC III, at 681 (internal citations omitted); Texas v. United States, 40 F.4th at 229 n.18; Texas v. Biden, 646 F. Supp. 3d at 781.

In any event, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); see also Cook County v. Wolf, 498 F. Supp. 3d 999, 1006-07 (N.D. Ill. 2020) (noting that "vacatur will prevent DHS from enforcing the Rule against nonparties," but "that is a consequence not of the court's choice to grant relief that is broader than necessary, but of the APA's mandate that flawed agency action must be 'h[e]ld unlawful and set aside'").  "The text of Section 705 confirms this interpretation when applied to a stay. By 'postpon[ing] the effective date of an agency action,' the Court would stop the agency action in total. The postponement clause does not merely speak to part of an agency action or indicate courts should take a piecemeal approach.

And under the postponement clause's sister provision—allowing the Court 'to preserve status or rights'—the relevant status quo was that MPP was administered along the southern border as a whole [and effectively ended in 2021]." <u>Texas v. Biden</u>, 646 F. Supp. 3d at 781 (citing Section 705).

## V.    CONCLUSION

For the reasons above, consistent with the text of Section 705, the Court **GRANTS** ImmDef's Application, and the relief afforded here is nationwide in scope.


**IT IS SO ORDERED.**