UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 20-9893 JGB (ACCVx)** | Date | October 7, 2026 |
| Title | ***Immigrant Defenders Law Center, et al. v. Chad Wolf, et al.*** | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| MAYNOR GALVEZ | Not Reported |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings:** **Order (1) DENYING Defendants' Motion for Summary Judgment (Dkt. No. 449); (2) GRANTING Plaintiffs' Motion for Summary Judgment (Dkt. No. 450); and (3) GRANTING the Parties' Applications to File Documents Under Seal (Dkt. Nos. 451, 458) (IN CHAMBERS) [REDACTED]**

Before the Court are Plaintiffs' and Defendants' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). ("DMSJ," Dkt. No. 449; "PMSJ," Dkt. No. 450.) The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the DMSJ and PMSJ, the Court **DENIES** the DMSJ and **GRANTS** the PMSJ.

## I. BACKGROUND

On October 28, 2020, plaintiffs Immigrant Defenders Law Center ("ImmDef"), Jewish Family Service of San Diego ("JFS") (collectively, "Organizational Plaintiffs"), and several individuals filed a Complaint for Injunctive and Declaratory Relief against Defendants Chad Wolf[1], the U.S. Department of Homeland Security ("DHS"), Mark A. Morgan, William A Ferrar, Rodney S. Scott, U.S. Customs and Border Protection, Tony H. Pham, and U.S. Immigration and Customs Enforcement. ("Complaint," Dkt. No. 1.) Plaintiffs' Complaint initially challenged DHS's adopting of the Migrant Protection Protocols ("MPP" or "MPP

[1] Defendant Wolf has now been succeeded by Markwayne Mullin, the present Secretary of the Department of Homeland Security.

1.0") in 2019 pursuant to 8 U.S.C. § 1225(b)(2)(C). (See id.) Plaintiffs sought to enjoin the aforementioned defendants from continuing to implement policies affecting asylum seekers waiting at the U.S.-Mexico border. (Compl. ¶ 10.)

On November 9, 2020, Plaintiffs filed an emergency motion for provisional class certification, (Dkt. No. 35), and an emergency motion for a preliminary injunction, (Dkt. No. 36). On June 2, 2021, the Court issued an Order (1) denying Plaintiffs' emergency motion for provisional class certification; (2) denying Plaintiffs' emergency motion for a preliminary injunction; (3) denying defendants' motion to stay the case; and (4) granting defendants' ex parte application for an extension of time to answer. (Dkt. No. 135.)

On August 13, 2021, Plaintiffs filed a First Amended Complaint. ("FAC," Dkt. No. 143.) On December 1, 2021, Defendants filed a motion to dismiss the FAC. (Dkt. No. 167.) On December 22, 2021, Plaintiffs filed a Second Amended Complaint. ("SAC," Dkt. No. 175.) In addition to the Organizational Plaintiffs, the SAC was filed on behalf of twelve individuals, and others similarly situated: Lidia Doe, Antonella Doe, Rodrigo Doe, Chepo Doe, Yesenia Doe, Sofia Doe, Gabriela Doe, Ariana Doe, Francisco Doe, Reina Doe, Carlos Doe, and Dania Doe (collectively, "Individual Plaintiffs"). (SAC ¶¶ 13-25.) The SAC also names DHS, the DHS Secretary, U.S. Customs and Border Protection ("CBP"), CBP Commissioner, the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"), the Chief of U.S. Border Patrol, U.S. Immigration and Customs Enforcement ("ICE"), and Acting Director of ICE as defendants (collectively, "Defendants" or the "Government"). (Id. ¶¶ 26-33.) The SAC alleges harms arising from the initial implementation of MPP by the Trump Administration and certain actions by the Biden Administration in ceasing its wind-down of the policy. (See id.) Plaintiffs assert the following claims for relief: (1) violation of the Administrative Procedure Act ("APA") premised on the violation of the right to apply for asylum on behalf of Individual and Organizational Plaintiffs; (2) violation of the APA premised on the violation of the right to access counsel on behalf of Individual and Organizational Plaintiffs; (3) violation of the Fifth Amendment Due Process Clause right to a full and fair hearing on behalf of Individual Plaintiffs; (4) violation of the APA premised on the unlawful cessation of the MPP wind-down on behalf of six Individual Plaintiffs and Organizational Plaintiffs; (5) violation of the First Amendment on behalf of Individual Plaintiffs; and (6) violation of the First Amendment on behalf of Organizational Plaintiffs. (Id. ¶¶ 329-391.)

On January 26, 2022, Defendants filed a motion to dismiss the SAC. ("MTD SAC," Dkt. No. 189.) On February 2, 2022, the Court denied Defendants' motion to dismiss the FAC as moot. (Dkt. No. 193.) On February 17, 2022, Plaintiffs filed a motion for class certification. ("Certification Motion," Dkt. No. 205.) On December 14, 2022, Plaintiff Rodrigo Doe filed a notice of voluntary dismissal of individual claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). (Dkt. No. 255.) On March 15, 2023, the Court granted-in-part and denied-in-part the MTD SAC and granted the Certification Motion. ("MTD Order," Dkt. No. 261.) The Court dismissed the APA claim premised on the unlawful cessation of the MPP wind-down without leave to amend. (Id. at 41-44.) The Court also certified the "Inactive MPP 1.0 Class" comprised of "[a]ll individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside

the United States and whose cases are not currently active due to termination of proceedings or a final removal order[,]" and three subclasses:

**1. The "Terminated Case Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States and whose MPP proceedings were terminated and remain inactive.

**2. The "In Absentia Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States, received an in absentia order of removal in MPP proceedings, and whose cases have not been reopened and are not currently pending review before a federal circuit court of appeals.

**3. The "Final Order Subclass":**
All individuals subjected to MPP 1.0 prior to June 1, 2021, who remain outside the United States, received a final order of removal for reasons other than failure to appear for an immigration court hearing, and whose cases have not been reopened and are not currently pending review before a federal circuit court of appeals.

(Id. at 49-50.)

On April 12, 2023, Defendants filed an answer to the SAC. (Dkt. No. 264.)

On October 2, 2024, the Court granted the parties' joint stipulation to stay the matter pending settlement discussions. (Dkt. No. 360.) On February 5, 2025, the parties filed a joint stipulation to lift the stay and modify the scheduling order. (Dkt. No. 369.) Specifically, Plaintiffs "believe[d] that settlement is no longer viable because, in part, . . . Defendants publicly announced on January 21, 2025, that they are 'reinstat[ing]' the '2019 MPP Policy' immediately." (Id. at 1.) The Court granted the parties' stipulation to lift the stay and modify the scheduling order on February 13, 2025. (Dkt. No. 374.)

On February 11, 2025, ImmDef filed an ex parte application for an order staying agency action under 5 U.S.C. § 705. (Dkt. No. 371.) On April 16, 2025, the Court granted that application. ("Stay Order," Dkt. No. 405.) After Defendants filed a notice of appeal, the Court declined to stay its Stay Order pending adjudication of the appeal. (Dkt. No. 413.) On July 18, 2025, the Ninth Circuit limited the scope of the Stay Order to only ImmDef's current and future clients from the Remain in Mexico policy, as MPP is also known. ("Ninth Circuit Order," Dkt. No. 423.)

The DMSJ was filed on March 30, 2026. (DMSJ.) In support of the DMSJ, Defendants filed the following:

- Declaration of Christina Marquez and attached exhibits ("Marquez Decl.," Dkt. No. 449-1); and

- Statement of Undisputed Facts (“Def. SUF,” Dkt. No. 449-6).

Plaintiffs’ PMSJ, which also serves as Plaintiffs’ opposition to the DMSJ, was filed on March 31, 2026. (PMSJ.) The PMSJ is accompanied by:

- Statement of Undisputed Facts (“Pl. SUF,” Dkt. No. 450-1);
- Response to Def. SUF (“Pl. Resp.,” Dkt. No. 450-2); and
- Declaration of Allyson C. Myers and attached exhibits (“Myers Decl.,” Dkt. No. 450-3).

Defendants filed their opposition to the PMSJ and reply in support of the DMSJ on April 27, 2026. (“Def. Opp’n.,” Dkt. No. 455.) In support of their Opposition, Defendants filed the following:

- Statement of Genuine Disputes in Response to Pl. SUF (“Def. Resp.,” Dkt. No. 455-1);
- Declaration of Soo-Young Shin and attached exhibits (“Shin Decl.,” Dkt. No. 455-2); and
- Response to the Pl. Resp. (“Def. Resp. II,” Dkt. No. 455-6).

On May 22, 2026, Plaintiffs filed their reply in support of the PMSJ. (“Pl. Reply,” Dkt. No. 457.) In support of their reply, Plaintiffs filed their response to the Def. Resp. (“Pl. Resp. II,” Dkt. No. 457-1.)

Plaintiffs filed two applications to file documents under seal. (Dkt. Nos. 451, 458).

## II. FACTS

### A. Evidentiary Objections

“A trial court can only consider admissible evidence in ruling on a motion for summary judgment.” Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. P. 56(e). For summary judgment, courts consider evidence with ***content*** that would be admissible at trial, even if the ***form*** of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties’ objections only where necessary.[2] All other objections are **OVERRULED AS MOOT**.

[2] “[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself” and are therefore “redundant” and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (“Factual disputes that are irrelevant or unnecessary will not be counted.”).

**B. Undisputed Facts**

The following material facts are sufficiently supported by admissible evidence and are uncontroverted, except as noted. They are "admitted to exist without controversy" for purposes of the Motion. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

In the fall of 2018, DHS began to develop a plan to operationalize Section 235(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225(b)(2)(C), also known as the "Contiguous-Territory Return Authority." (Def. SUF ¶ 1.) Implementing the statute required agreement from the Mexican government. (Id. ¶ 2.) The agreement was reached in December 2018. (Id.) At that time, Mexico committed to implementing certain measures within its borders, including providing humanitarian visas to stay in Mexico, apply for work, and be afforded protection under Mexico's constitution and international treaties to which Mexico is a party.[3] (Id. ¶ 3.)

The Contiguous-Territory Return Authority had been utilized sporadically in the past, but the broader implementation of this authority in 2018 became known as MPP. (Id. ¶ 4.) According to an October 2019 briefing report from the U.S. Commission on Civil Rights, MPP "was resisted for many years due to lack of proof that Mexico was a safe place for migrants." (Pl. SUF ¶ 1.) MPP involved returning certain individuals arriving in the United States by land from Mexico—either without lawful authority or without proper documentation—to Mexico for the duration of their removal proceedings. (Def. SUF ¶ 5; Pl. SUF ¶ 8.) On December 20, 2018, DHS Secretary Kirstjen M. Nielsen announced that DHS would begin implementation of MPP pursuant to INA § 235(b)(2)(C). (Def. SUF ¶ 6.) Secretary Nielsen described MPP as an "unprecedented" change to DHS policy on January 24, 2019. (Pl. SUF ¶ 7.)

The Government implemented MPP to address what it described as a migration crisis along the southern border and to prevent what the Government viewed as exploitation of the asylum process. (Def. SUF ¶¶ 7-8.) As of December 2018, there was an asylum backlog of more than 786,000 pending cases. (Id. ¶ 8.) Under MPP 1.0, DHS required certain individuals and

[3] Plaintiffs inadequately dispute this fact. (See "Standing Order," Dkt. No. 114, at 7 ("If a party fails to dispute a fact properly by offering evidence that does not contradict the proffered fact, the Court will deem the fact undisputed . . . .").) Plaintiffs assert that Mexico did not make any meaningful commitment to implement measures to ensure protection for MPP 1.0 enrollees. They point to [redacted]. (Myers Decl., Ex. 4, at AR002990-91; Ex. 2, Huston Depo. at 78:3–5, 301:21–302:2, 307:23–25; Ex. 30, DHS00000006-12.) The fact Defendants assert is that Mexico committed to affording certain protections to migrants subject to MPP 1.0, but the fact does not assert that Mexico committed in general to keep migrants subject to MPP 1.0 safe or to protect them. As such, this fact is deemed undisputed.

families from specified non-contiguous countries who presented themselves at or near the southern U.S. land border and were enrolled in removal proceedings under INA § 240 to return to Mexico for the duration of their immigration proceedings. (Pl. SUF ¶ 8.) DHS notified Congress in August 2019 that it would build "large temporary immigration hearing facilities" in Brownsville and Laredo, Texas, to conduct MPP-related proceedings. (Id. ¶ 9.) The number of MPP 1.0 enrollees quickly outpaced the Department of Justice Executive Office for Immigration Review's ("EOIR") capacity to hear cases. (Id. ¶ 12.) Due to capacity constraints, over time MPP 1.0 enrollees were not scheduled for initial immigration court hearings until several months after their initial placement. (Id. ¶ 13.)

Defendants were aware of dangerous conditions in northern Mexico during the implementation of MPP.[4] (Id. ¶¶ 2, 40.) These conditions included "[redacted]" in some of the shelters where MPP enrollees were staying. (Myers Decl., Ex. 2 at 152:15-22.) Prior to the implementation of MPP 1.0, [redacted]. (Pl. SUF ¶ 3; Myers Decl., Ex. 4 at AR002991.) In 2019, the U.S. State Department advised U.S. citizens not to travel to many regions of Mexico where MPP 1.0 enrollees lived while waiting for their hearings in U.S. immigration courts, including the state of Tamaulipas.[5] (Pl. SUF ¶ 4.) The State Department issued a travel advisory on November 15, 2028, designating the Mexican border state of Tamaulipas as a Level 4 "Do Not Travel" risk. (Id. ¶ 5.) The U.S. State Department's 2017 Country Report on Human Rights Practices for Mexico listed "violence against migrants by

---

[4] Defendants dispute that conditions in northern Mexico can be characterized as "dangerous" and that those conditions were known of prior to the implementation of MPP. (Def. Resp. ¶ 2.) First, Defendants provide no evidence to contradict what they argue is the "subjective characterization of the conditions in Mexico." (Id.) Plaintiffs' evidence, to the contrary, refers to "[redacted], and to a United Nations report provided to Defendants that "confirmed high levels of violence." (See Myers Decl., Ex. 2, at 152:6-153:13; id., Ex. 3, at 303:7-25; id., Ex. 41, at AR002457; id., Ex. 5, at 6.) Accordingly, the Court finds the fact that the conditions in northern Mexico were "dangerous" undisputed. Second, Defendants argue that none of the evidence provided by Plaintiffs refers to conditions in Mexico prior to the implementation of MPP. (Def. Resp. ¶ 2.) The Court concurs. All of the evidence cited by Plaintiffs either refers to the implementation of MPP, is dated after December 20, 2018, or contains no time marker. (Pl. SUF ¶ 2.) Accordingly, the Court finds the fact that "Defendants were aware of the dangerous conditions in northern Mexico" *prior to* the implementation of MPP disputed. (Id.)

[5] Defendants inadequately dispute this fact. (See Standing Order at 7.) Defendants assert that not all MPP 1.0 enrollees lived in areas with State Department warnings or dispute that living in these areas had any impact on their ability to seek asylum. (Def. Resp. ¶ 4.) This fact does not assert that *all* MPP enrollees lived in these areas, nor does it assert that living in areas the State Department recommended against traveling to was an issue because of its impact on the enrollees' ability to seek asylum. As such, this fact is deemed undisputed.

government officers and organized criminal groups" as one of the "most significant human rights issues" in Mexico. (Id. ¶ 6.)

MPP's Guiding Principles document outlined who was and was not amenable to MPP and generally described the MPP process. (Def. SUF ¶ 9.) Several categories of individuals were not covered by MPP: noncitizens processed for expedited removal; lawful permanent residents seeking admission and subject to INA § 212; noncitizens with an advance parole document or in parole status; noncitizens with known physical or mental health issues; noncitizens with histories of violence; individuals of interest to both the Mexican and United States governments; and individuals who were more likely than not to face persecution or torture in Mexico. (Id. ¶¶ 10-16.) The Port Director could also exercise his or her discretion to not subject an individual to MPP. (Id. ¶ 17.)

The process of being enrolled in MPP began with an initial encounter by CBP agents or officers of an individual who either arrived at a port of entry or entered the United States without lawful authority between points of entry, without proper documentation. (Id. ¶ 18.) Upon this encounter, officers would use their prosecutorial discretion to determine whether the individual was amenable to being placed in MPP. (Id. ¶ 19.) Individuals could be enrolled in MPP if they were arriving on land at ports of entry or between ports of entry. (Id. ¶ 20.) Individuals encountered between ports of entry were determined to have been arriving on land if they were encountered within 96 hours of crossing the land border. (Id. ¶ 21.) Individuals enrolled in MPP would be documented in the appropriate system of records and would be provided with documents, including a Notice to Appear ("NTA"), a tear sheet, and a list of legal providers local to the relevant immigration court from EOIR.[6] (Id. ¶ 22; Def. Resp. II ¶ 28.)

Defendants did not formalize MPP 1.0 procedures for quality control checks of NTAs or instruct agents and officers on reviewing MTAs for MPP 1.0 enrollees to ensure accuracy and completeness.[7] (Pl. SUF ¶ 14.) CBP Office of Field Operations ("OFO") and Border Patrol staff did not instruct supervisory agents and officers on reviewing NTAs for MPP 1.0 enrollees to

[6] Plaintiffs dispute that Defendants provided noncitizens enrolled in MPP "a list of *local* legal providers." (Pl. Resp. ¶ 22 (emphasis added).) Plaintiffs contend that the legal providers listed were not "local" to the MPP enrollees "locations in Mexico." (Id.) Defendants respond that the legal providers were "local to the relevant immigration court." (Def. Resp. II ¶ 22.) The Court has reviewed the evidence cited by both parties and finds Defendants' explanation satisfactory. (See Myers Decl., Ex. 3, at 151:10-22; id., Ex. 4, at DHS_00006191.) For the sake of clarity, the Court specifies that the legal providers listed were "local to the relevant immigration court."

[7] Defendants inadequately dispute this fact. (See Standing Order at 7.) Defendants argue that the report on which this fact is based also found that CBP generally provided accurate notices to appear. (Def. Resp. ¶ 14.) But the fact Plaintiffs assert does not contend that the NTAs were inaccurate, only that DHS failed to establish a quality control protocol. As such, the Court deems this fact undisputed.

ensure accuracy and completeness.[8] (Id. ¶ 15.) Between February 2019 and February 2020, OFO's Border Patrol's combined rate of NTA issuances increased by 80% when compared to the same time the previous year. (Id. ¶ 16.) The audit conducted by the DHS Office of the Inspector General ("OIG") also found that officers and agents made errors on NTAs that supervisors overlooked due to their increased workload. (Id. ¶ 17.) The errors in nearly 10 percent of NTAs reviewed were found by OIG to be significant enough to render them deficient under statutory requirements. (Id. ¶ 18.) These deficiencies included failing to include the date and time of the removal hearing, containing service dates preceding the preparation dates, and missing the title or signature of the issuing officer, or being signed by an agent on behalf of another agent. (Id. ¶ 19.) Other NTAs were found to contain inaccurate information, including erroneously selected status checkboxes or incorrect charges for removal authority. (Id. ¶ 20.)

Beyond the OIG findings, some Notices of Hearing ("NOH") mailed by U.S. immigration courts to MPP 1.0 enrollees used addresses of shelters where the individual had never stayed. (Id. ¶ 21.) Some NOH mailed by immigration courts to MPP 1.0 enrollees used "domicilio conocido," which translates as "known address" or, in postal terms, "address known." (Id. ¶ 22.) Some NTAs listed digital addresses such as "Facebook" or email. (Id. ¶ 23.) DHS did not provide documents to MPP 1.0 enrollees in any indigenous language.[9] (Id. ¶ 24.)

There were two types of "tear sheets" provided: an initial processing information tear sheet and a subsequent hearings information tear sheet. (Def. SUF ¶ 23.) The initial processing information "tear sheet" contained information about notice of the MPP process; contact information for the court; the right to be represented by counsel; the mechanisms by which they could meet with counsel; and instructions for how they would be transported to hearings.[10] (Id. ¶

[8] Defendants inadequately dispute this fact for the same reasons stated in footnote 7, and as such this fact is deemed undisputed. Defendants raise this same objection for a number of facts; those facts are deemed undisputed for the same reason.

[9] Defendants contest Plaintiffs' assertion that "some MPP 1.0 enrollees spoke an indigenous language rather than Spanish." (Pl. SUF ¶ 24.) Defendants offer deposition testimony that, if an individual only spoke a language other than Spanish, they would not be amenable for MPP. (Def. Resp. ¶ 24 (citing Meyer Decl., Ex. 3, at 209:6-12).) However, Plaintiffs cite to a 2021 memorandum by DHS' Office for Civil Rights and Civil Liberties ("CRCL") that provides a table of the various languages individuals in MPP spoke and states that immigration court "staff often find that the individual speaks a different language than Spanish, typically an indigenous language, and must order an interpreter for that language in order to ensure due process and a full and fair hearing." (Pl. SUF ¶ 24 (citing Ex. 35 at DHS 00000768-69).) Accordingly, the Court finds this fact disputed.

[10] Plaintiffs dispute this fact to the extent it asserts that the "tear sheet" contained conflicting information or no information as to the next appearance date, the date of the "tear sheet" preceded its preparation date, the "tear sheet" contained missing information as to the serving officer, and generally contained inaccurate information. (Pl. Resp. ¶ 24.) Defendants

24.) The subsequent hearings information tear sheet contained identical information, but advised the MPP respondent that, at the initial hearing, the court had ordered the individual back for a subsequent hearing.[11] (Id. ¶ 25.) These documents were provided in English and Spanish, and most individuals subject to MPP spoke Spanish. (Id. ¶ 26.)

The Notice to Appear ("NTA") was the charging document that initiated INA § 240 removal proceedings and would include the basis for inadmissibility or removability from the United States. (Id. ¶ 27.) CBP officers and/or Immigration Judges provided MPP 1.0 enrollees with the same EOIR pro bono lists as those provided to enrollees who were living in the United States while their immigration proceedings were pending. (Pl. SUF ¶ 11.) Officers were advised to inform MPP enrollees that they needed to arrive at the port of entry with sufficient time in advance of a scheduled hearing to allow time for processing, transportation to the court, and consultation with counsel if they wished. (Def. SUF ¶ 29.) Once MPP enrollees received the NTA, tear sheet, and list of legal services providers, they would be returned to Mexico through Mexican government officials. (Id. ¶ 30.) Each U.S. Border Patrol ("USBP") sector and OFO field officer implemented MPP according to their own standard operating procedures

respond that Plaintiffs' cited evidence does not demonstrate a systemic issue and references a notice to appear ("NTA"), not a "tear sheet." (Def. Resp. II ¶ 24.) Plaintiffs cite to two pieces of evidence to support their dispute. (Pl. Resp. ¶ 24.) Plaintiffs cite to a report by the Office of the Inspector General ("OIG") in DHS. (Id. (citing Myers Decl., Ex. 15.) As Defendants state, the cited excerpt of the report evaluates NTAs and not "tear sheets." (Def. Resp. II ¶ 24.) Plaintiffs additionally cite to an expert report by Tania Guerrero, J.D., who states that she observed discrepancies as to the next hearing date between the "tear sheet" and NTA provided to asylum seekers with whom she met. (Pl. Resp. ¶ 24 (citing Myers Decl., Ex. 15, ¶ 37).) However, she makes no statement as to which of the two forms contained the inaccurate information. (Id.) The Court notes, however, that the evidence to which Defendants cite, namely the subsequent hearings information "tear sheet" does not contain any information about the "day, time, and location" of the next appearance date for the individual enrolled in MPP. (Def. SUF ¶ 24 (citing Marquez Decl., Ex. 3, at 2296).) Rather, it directs the individual to consult a "Notice of Hearing in Removal Proceedings" provided by the immigration court. (Id.) It further directs the individual to report for transport to the next hearing, but the critical "day, time, and location" information merely contains blank lines. (Id.) The initial processing information "tear sheet," to which the Court presumes Defendants intended to cite, contains the same blank lines as to reporting for transport and directs the individual to consult their NTA for their date and time of the first immigration court hearing. (Marquez Decl., Ex. 3, at 2294.) Because Plaintiffs provide no evidence that the initial processing information "tear sheet" contained the "day, time, and location" information of the next immigration court appearance for individuals enrolled in MPP, the Court finds this fact disputed.

[11] Plaintiffs dispute this fact for the same reasons as raised in footnote 10. To the extent that Defendants state that the "subsequent hearings information 'tear sheet' contained identical information" as the initial processing information "tear sheet," including the "day, time, and location of their next appearance," the Court finds this fact disputed for the reasons discussed above. (Def. SUF ¶¶ 24-25.)

("SOPs").[12] (Id. ¶ 31.) These SOPs acknowledge the importance of access to counsel.[13] (Id. ¶ 32.) These SOPs stated:

> The United States and the Government of Mexico acknowledge that individuals subject to the MPP have a right to counsel at their own expense in U.S. removal proceedings and will not impede or inhibit access to counsel. While the Government of Mexico will continue to regulate the practice of law within its territory, U.S.-based immigration lawyers who wish to meet with their clients who are subject to the MPP to discuss or prepare their U.S. immigration cases are free to do so either in person or telephonically, provided they comply with Mexican immigration law and procedures.[14]

(Id. ¶ 33.) ICE also had its own MPP guidance, which was disseminated among Field Office Directors.[15] (Id. ¶ 34.)

---

[12] Plaintiffs dispute Defendants' assertion that "the MPP enrollment process was consistent throughout" different USBP sectors. (Pl. Resp. ¶ 31.) Specifically, Plaintiffs contend that while DHS provided the same guidance to each sector, that did not actually ensure consistent application of MPP. (Id.) However, the evidence cited by Plaintiffs does not support their position as it merely provides a variety of recommendations but takes no position as to a lack of consistency in applying MPP. (Id. (citing Myers Decl., Ex. 10, at DHS00000010).) Accordingly, the Court deems this fact undisputed.

[13] Plaintiffs dispute this fact because "foundational MPP 1.0 policy documents contain no discussion of how the statutory right to counsel would be protected under MPP 1.0." (Pl. Resp. ¶ 32.) However, Plaintiffs' argument does not negate that the SOPS contained such an acknowledgment. (Id.) Accordingly, the Court deems this fact undisputed.

[14] Plaintiffs inadequately dispute this fact. (See Standing Order at 7.) Plaintiffs dispute that "U.S.-based immigration lawyers who wished to meet with their clients who are subject to MPP were free to do so in person" because "[t]he Government of Mexico indicated that any U.S.-based lawyer who was not licensed to practice in Mexico could be deported for meeting with clients in Mexico." (Pl. Resp. ¶ 33.) Defendants' fact does not assert that sectors actually upheld the statement included in the SOPs, only that the SOPs made this statement. As such, this fact is deemed undisputed.

[15] Plaintiffs dispute whether ICE's MPP guidance "emphasized the importance of access to counsel" as asserted by Defendants. (Pl. Resp. ¶ 34.) The cited document describes the INA's authorization of counsel for individuals in proceedings before an Immigration Judge and describes the protocol intended to facilitate access to counsel for MPP enrollees. (See Marquez Decl., Ex. 1 at 2276-2279.) To the extent that the MPP guidance "emphasized the importance of access to counsel," the Court finds that fact unsupported by the evidentiary record and deems it disputed. (See id.) Plaintiffs additionally dispute whether the MPP guidance was disseminated to Field Office Directors. (Pl. Resp. ¶ 34.) The MPP guidance states that it is a memorandum for Field Office Directors. (Marquez Decl., Ex. 1 at 2276.) Plaintiffs cite to no contrary evidence. (Pl. Resp. ¶ 34.) Accordingly, the Court deems this portion of the fact undisputed.

On the day of an MPP participant's hearing, the participant was to arrive at the port of entry at the designated time, which was set to allow sufficient time for CBP processing, pre-hearing consultation with counsel, and timely appearance at hearings.[16] (Id. ¶ 35.) Defendants did not provide transportation assistance for MPP enrollees in Mexico to ports of entry in Mexico. (Pl. SUF ¶ 25.) MPP 1.0 enrollees were to arrive at the port of entry four hours before their scheduled hearing times. (Id. ¶ 28.) This required some enrollees to present themselves at a port of entry as early as 4:00 a.m. (Id. ¶ 29.) This arrival time posed a risk because of the possibility of violence when traveling early in the morning. (Id. ¶ 30.) ICE and Enforcement and Removal Operations ("ERO") were responsible for transporting MPP enrollees from the port of entry to the Immigration Hearing Facility ("IHF"), where necessary. (Id. ¶ 26; Def. SUF ¶ 36.) The hearing facilities in Laredo and Brownsville were at the port of entry and transportation was not required. (Def. SUF ¶ 37.) If an MPP 1.0 participant in Mexico came to a different location from that provided on their "tear sheet," CBP officers would not process them into the United States, resulting in the enrollee missing their court hearing.[17] (Pl. SUF ¶ 27.)

ERO would ensure arrival at the immigration court facility in advance of the MPP enrollee's scheduled hearing time to allow the MPP enrollee to meet with counsel in advance of their hearing.[18] (Def. SUF ¶ 38.) MPP enrollees' counsel were able to consult with their clients

[16] Plaintiffs inadequately dispute this fact. (See Standing Order at 7.) Plaintiffs contend that enrollees were required to present themselves at the port of entry at the designated time, which was hours prior to their hearings and was not flexible. (Pl. Resp. ¶ 35.) Plaintiffs also contend that [redacted]. (Id.) Defendants do not assert that the designated time was less than or more than several hours before the hearings, nor do they make any reference to what would happen if MPP enrollees arrived late. As such, this fact is deemed undisputed.

[17] Plaintiffs additionally propose as an undisputed fact that the "CBP tear sheet directed MPP 1.0 enrollees to present their Notice to Appear in order to be paroled into the United States." (Pl. SUF ¶ 31.) Defendants dispute this fact. (Def. Resp. ¶ 31.) The Court reviewed the evidence cited by Plaintiffs. The "initial processing information" tear sheet merely states that an MPP enrollee "should bring [their] NTA or Notice of Hearing in Removal Proceedings" when they arrive at the port of entry for transportation to their hearing. (Myers Decl., Ex. 15, at DHS00000051.) The cited excerpt from the expert report by Tania Guerrero, J.D. makes no mention that the CBP tear sheet directed MPP enrollees to present their NTA. (Id., Ex. 16, ¶ 38.) Accordingly, the Court finds this fact disputed.

[18] Plaintiffs dispute Defendants' assertion that ERO would ensure arrival at the immigration court facility "in advance of the MPP enrollee's scheduled hearing so the MPP enrollee could meet with counsel in advance of the hearing." (Pl. Resp. ¶ 38.) Specifically, Plaintiffs argue that, [redacted]. (Id. ¶ 38.) Defendants make no assertion as to providing sufficient time for consultation with counsel where an enrollee or their counsel arrives late. Accordingly, the Court finds this fact undisputed.

prior to the scheduled hearing time.[19] (Id. ¶ 39.)[20] While having a signed EOIR-28 establishing an attorney-client relationship was preferred, ERO would, at times, permit attorneys to meet with their clients even if there was not a signed EOIR-28, so long as they could validate the attorney-client relationship.[21] (Id. ¶ 41.) If ERO officers were present near the spaces for

[19] Plaintiffs dispute this fact on two grounds. (Pl. Resp. ¶ 39.) First, Plaintiffs argue that counsel was not always able to consult with their clients who were enrolled in MPP because counsel was not permitted entry to the immigration hearing facilities "absent a specific form." (Id.) Plaintiffs' cited evidence merely provides that [redacted] (Myers Decl., Ex. 3, at 143:12-16.) However, Plaintiffs do not cite any evidence that counsel was unable to meet with their clients enrolled in MPP, even in the absence of an E-28. Accordingly, the Court finds this dispute unsupported. Second, Plaintiffs dispute that counsel was able to consult with their clients enrolled in MPP "for a full hour." (Pl. Resp. ¶ 39.) Defendants respond that Plaintiffs refer to "isolated instances." (Def. Resp. II ¶ 39.) Plaintiffs' dispute, however, cite to multiple exhibits, which claim that attorneys were unable to meet with their clients for the full hour. (Pl. Resp. ¶ 39.) Accordingly, the Court finds this fact disputed.

[20] Defendants additionally propose the following fact as undisputed: "If the MPP enrollee met with their counsel, they could do so in private spaces, including separate rooms with the door closed, depending on the facility." (Def. SUF ¶ 40.) Plaintiffs dispute that the areas provided for consultations were sufficiently private and highlight that the San Diego immigration courthouse had "only a large waiting room." (Pl. Resp. ¶ 40.) Plaintiffs' expert witness Kennji Kizuka, J.D., states that "attorneys were forced to speak with MPP clients in the public waiting room within earshot" of others, including ICE officers. (Myers Decl., Ex. 5, at 13-14.) [redacted] (Myers Decl., Ex. 3, at 140:13-141:13.) The Court finds that Plaintiffs raise a sufficient factual dispute as to whether attorneys could meet with their clients enrolled in MPP in a private space.

[21] Plaintiffs dispute this fact because, they argue, "[a] signed EOIR-28 was a requirement." (Pl. Resp. ¶ 41.) In support, they cite to [redacted] (Myers Decl., Ex. 2, at 177:19-178:1). Likewise, Plaintiffs cite to [redacted] (Id., Ex. 3, at 143:12-19). Finally, Plaintiffs cite to a statement by the American Immigration Lawyers Association, filed in a congressional hearing, that states that DHS had restricted access to the tent courts located in Laredo and Brownsville, Texas to "clients and their attorneys of record." (Id., Ex. 21, at AR285.) Defendants' evidence in support of the fact is a separate excerpt from [redacted]

attorney-client meetings, the officers were nearby solely for purposes of safety and instructed to respect the confidentiality of attorney-client conversations.[22] (Id. ¶ 42.)

If an individual's INA § 240 removal proceedings were ongoing, ERO would transport the individual back to the port of entry and CBP officers would escort the individual to the border. (Id. ¶ 43.) If an MPP participant received a final order of removal, the individual would be brought to the U.S. port of entry for removal back to their home country. (Id. ¶ 44.) If the MPP participant was granted relief or protection, the individual would be processed according to ERO's standard practices. (Id. ¶ 45.)

MPP began at the San Ysidro Port of Entry on January 28, 2019, and expanded from there. (Id. ¶ 46.) Hearings for MPP enrollees at San Ysidro took place in existing physical non-detained immigration courts in San Diego. (Id. ¶ 47.) The existing facility did not have private meeting space, but it did have a large atrium-style waiting room.[23] (Id. ¶ 48.) Following

---

[redacted] (Marquez Decl., Ex. 2, at 313:2-13.) However, the parties do not dispute that "officers would sometimes exercise discretion" to allow clients to meet with their counsel even in the absence of an E-28. (Pl. Resp. ¶ 41; Def. Resp. II ¶ 41.) Because the parties do not dispute that, at times, attorneys without a filed E-28 could meet with their clients and because there is a dispute as to the extent that "ERO would permit attorneys" to meet with their clients without a filed E-28, the Court finds this fact partially disputed and adds the phrase "at time" to reflect the fact as undisputed between the parties.

[22] Plaintiffs dispute the fact that ERO officers were "present outside of these private spaces" because they were "also present inside the 'private spaces.'" (Pl. Resp. ¶ 42.) As discussed in footnote 20, it is disputed whether the spaces in which attorney-client meetings occurred was private. Plaintiffs further dispute that the presence of ERO officers precluded attorneys from holding confidential conversations with their clients. (Id.) However, even if ERO officers could overhear attorney-client communications, that does not sufficiently challenge the proposed fact here that ERO officers were nearby for purposes of safety and had received instructions to respect such communications. Accordingly, the Court finds the purpose behind the ERO officers presence in the spaces for attorney-client communications and the instruction they received undisputed.

[23] Plaintiffs dispute this fact to the extent it asserts that "counsel and their clients could separate and discuss privately." (Pl. Resp. ¶ 48.) The parties both cite to the deposition of [redacted] (Myers Decl., Ex. 3, at 140:13-141:25.) Plaintiffs additionally cite to a declaration by Margaret Cargiolo, the directing attorney of policy and advocacy at ImmDef, where she states that it was "impossible for us to have private conversations with our clients" at the San Diego immigration courthouse because an ICE officer was always present. (Myers Decl., Ex. 57, ¶ 10.)

implementation at San Ysidro, MPP expanded to El Paso, Brownsville, and Laredo.[24] (Id. ¶ 49.) In August 2019, DHS notified Congress that it would build "large temporary immigration hearing facilities" in Brownsville and Laredo to conduct MPP-related proceedings. (Pl. SUF ¶ 9.)

**1. Conditions in Mexico Faced by MPP Enrollees**

Most MPP 1.0 enrollees tended to stay close to the border when they were returned to Mexico. (Id. ¶ 32.) It was known in November 2019 that Nuevo Laredo was considered the most dangerous place in Mexico, followed by Reynosa and Matamoros. (Id. ¶ 33.) Many acts of violence against migrants were perpetrated by members of cartels or other organized criminal groups, often with the participation or complicity of Mexican police or other Mexican officials. (Id. ¶ 34.) DHS concluded that MPP 1.0 enrollees awaiting their court hearings in Mexico "were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico." (Id. ¶ 35.)

Human rights organizations documented more than 1,000 instances of violence towards MPP 1.0 enrollees, including murder, torture, rape, kidnapping, and other violent assaults. (Id. ¶ 36.) In November 2019, Doctors Without Borders reported that 75% of 400 MPP 1.0 enrollees whom it assessed in northern Mexico (Tijuana, Mexicali, and Ciudad Juarez) had been kidnapped in the past seven days. (Id. ¶ 37.) Attorneys who worked with MPP 1.0 enrollees reported that numerous asylum seekers were kidnapped, tortured, or assaulted in Mexico while waiting for their hearings. (Id. ¶ 38.) MPP 1.0 enrollees who worked with U.S.-based attorneys or organizations were sometimes at greater risk because cartels and organized criminal groups preyed on migrants perceived to have U.S. connections. (Id. ¶ 39.)

---

The Court finds that Plaintiffs' evidence raises a sufficient dispute of fact as to whether attorneys could lead private conversations with their clients.

[24] Plaintiffs dispute Defendants' assertion that "[f]or each expansion, the government ensured there were areas for attorney-client conversations." (Def. SUF ¶ 50.) Plaintiffs contend that "[n]o facility had areas where counsel could meet with MPP 1.0 enrollees in private, as ERO officers were present or observing the meetings." (Pl. Resp. ¶ 50.) The Court need not resolve the dispute here whether the ability to "meet with MPP 1.0 enrollees in private" is a requirement for "areas for attorney-client conversations" because the evidence cited to by Defendants does not support the fact as proposed. Page 140 of the deposition of [redacted] (Marquez Decl., Ex. 2, at 140.) [redacted] (Id. at 140-142.) Accordingly, the Court finds this fact unsupported.

[redacted] (Id. ¶ 41.) MPP 1.0 enrollees generally did not have access to stable housing in Mexico and shelters in Mexico lacked capacity to house all MPP 1.0 enrollees. (Id. ¶¶ 42-43.) Many MPP 1.0 enrollees who were unable to find or afford secure housing resorted to living outside or in tent encampments. (Id. ¶ 44.) A tent encampment in Matamoros, where MPP 1.0 enrollees resorted to living, was frequently subject to high levels of crime as well as flooding. (Id. ¶ 45.) MPP 1.0 enrollees returned to Mexico who could not find space at a shelter were usually forced to live on the street or in abandoned buildings. (Id. ¶ 46.) For some MPP 1.0 enrollees, attending an immigration-court hearing meant giving up their space in a shelter. (Id. ¶ 47.)

MPP 1.0 enrollees often did not have access to the internet, to a phone that made international calls, to a phone with reception, or to language interpretation. (Id. ¶ 48.) Many MPP 1.0 enrollees did not have stable access to the internet. (Id. ¶ 49.) MPP 1.0 enrollees' lack of access to technology and unreliable mail in Mexico limited many MPP 1.0 enrollees' ability to gather required documentation. (Id. ¶ 50.) Some shelters in Mexico required residents to relinquish their phones. (Id. ¶ 51.) Shelters in Mexico often had policies in place to prevent individuals from accessing their phones except during specific two-hour time periods during which they had no privacy. (Id. ¶ 52.) [redacted] (Id. ¶ 53 (citing Myers Decl., Ex. 3, at 94:21-25).)

MPP 1.0 enrollees could not reliably receive mail in Mexico. (Id. ¶ 54.) Some MPP 1.0 enrollees did not have a physical address in Mexico and thus could not receive mail. (Id. ¶ 55.) DHS was aware that many MPP 1.0 enrollees provided addresses that were only temporary, such as a shelter, or had addresses entered by CBP personnel as "domicilio conocido," meaning "address known." (Id. ¶ 56.) The DHS Inspector General concluded that serving MPP 1.0 Notices of Hearing by mail sent to Mexico could result in MPP enrollees missing their court dates. (Id. ¶ 57.) [redacted] (Id. ¶ 59.)

**2. Legal Representation of MPP Enrollees**

MPP 1.0 enrollees were allowed to come into the United States to consult with their legal representatives only on days when they had scheduled hearings. (Id. ¶ 60.) Unlike traditional immigration courts, ICE and CBP had complete control over access to counsel policies at Immigration Hearing Facilities where immigration court hearings for MPP 1.0 enrollees were held. (Id. ¶ 61.) ICE's ERO maintained custody and control over MPP 1.0 enrollees while in the U.S. for court hearings, including during meetings with counsel. (Id. ¶ 62.) Attorneys were prohibited from speaking with pro se MPP 1.0 enrollees while they were in the United States for their hearings. (Id. ¶ 63.) MPP 1.0 enrollees were permitted to meet with counsel before their hearings only if they had previously retained such counsel. (Id. ¶ 64.) Represented MPP 1.0 enrollees were allowed at most a single hour before court appearances to meet and consult with

their counsel. (Id. ¶ 65.) [redacted] (Id. ¶ 66.) In practice, some MPP 1.0 enrollees could meet with their counsel for only 20 to 45 minutes before their hearings. (Id. ¶ 67.)

Attorney preparation of an asylum case requires multiple client meetings over the course of several months to develop facts and assist the client in obtaining all the necessary documents. (Id. ¶ 68.) Access to immigration hearing facilities was severely restricted, and Defendants only permitted attorneys with existing attorney-client relationships to enter the immigration hearing facilities. (Id. ¶ 69.) Defendants prohibited legal service providers from conducting Know Your Rights sessions for MPP 1.0 enrollees at immigration courts and immigration hearing facilities.[25] (Id. ¶ 70.) The immigration court in San Diego did not provide adequate confidential meeting spaces for attorneys representing MPP 1.0 enrollees to meet with their clients.[26] (Id. ¶ 71.)

Limitations were placed on attorneys' access to technology needed for case preparation while inside the Immigration Hearing Facilities. (Id. ¶ 73.) In some cases, attorney consultations with MPP 1.0 enrollees took place in a room with ICE officers present. (Id. ¶ 74.) MPP 1.0 enrollees were not permitted to speak with their attorneys or prospective attorneys after their court hearings. (Id. ¶ 75.) Many MPP 1.0 enrollees did not have access to legal orientation programs in Mexico, and the United Nations High Commissioner for Refugees reported that 77 percent of the MPP 1.0 enrollees it interviewed did not have access to legal orientation. (Id. ¶ 76.) Many MPP 1.0 enrollees lacked a basic understanding of asylum procedures or how to retain counsel. (Id. ¶ 77.)

---

[25] Defendants dispute this fact because DHS provided "Know Your Rights videos to [noncitizens] processed into MPP 1.0." (Def. Resp. ¶ 70.) However, that argument does not address whether "Defendants prohibited *legal service providers* from conducting Know Your Rights session." (Pl. SUF ¶ 70.) Accordingly, the Court finds this fact undisputed.

[26] Defendants dispute this fact because the El Paso immigration court and the two immigration hearing facilities had private rooms. (Def. Resp. ¶ 71.) However, the cited evidence only pertains to the El Paso immigration court. (Id. (citing Myer's Decl., Ex. 3, at 142:1-16).) [redacted] (Id.) As to the El Paso immigration court, the Court deems this fact disputed. However, Defendants do not dispute the fact as to the San Diego immigration court. (Id.) Plaintiffs additionally propose the fact that: "Meeting spaces at Immigration Hearing Facilities, if any, were inadequate with respect to privacy for confidential meetings between attorneys and MPP 1.0 enrollees." (Pl. SUF ¶ 72.) Defendants again argue that the immigration hearing facilities "contained private spaces" for attorney-client meetings. (Def. Resp. ¶ 72.) The cited evidence supports [redacted] (Marquez Decl., Ex. 2, at 138:9-14.) Accordingly, the Court finds this fact disputed.

The EOIR pro bono legal services lists that Defendants provided to MPP 1.0 enrollees were not MPP-specific and identified only U.S.-based legal service providers tied to existing U.S. court locations. (Id. ¶ 78.) Most contact information provided for legal service providers was U.S.-based with the exception of the EOIR hotline, which had an international number. (Id. ¶ 79.) The EOIR pro bono lists given to MPP 1.0 enrollees included legal services providers who were unable to receive international calls. (Id. ¶ 80.) JFS could not receive international calls at the phone number listed on the EOIR pro bono list until it modified its phone system after discovering the issue. (Id. ¶ 81.) JFS informed ICE that it could not receive international calls at the number listed on the EOIR pro bono list provided to MPP 1.0 enrollees. (Id. ¶ 82.) [redacted] (Id. ¶ 83.) Similarly, [redacted] (Id. ¶ 84.)

Because hearings for MPP 1.0 enrollees "were concentrated in a handful of courts along the border, demand for legal assistance outstripped supply." (Id. ¶ 85 (citing Myers Decl., Ex. 14, at AR00021).) Many MPP 1.0 enrollees were unable to find attorneys due to long waitlists and logistical difficulties. (Id. ¶ 86.) A Mexican government official informed DHS that only attorneys licensed in Mexico were allowed to practice law in Mexico. (Id. ¶ 87.) [redacted] (Id. ¶ 88 (citing Myers Decl., Ex. 2, at 160:1-10).) A Mexican government official informed DHS that U.S.-licensed attorneys could be deported for practicing law in Mexico. (Id. ¶ 89.) The U.S. government, including but not limited to Defendants, never provided guidance as to whether U.S.-licensed attorneys were permitted to practice law in Mexico. (Id. ¶ 90.) The U.S. government, including but not limited to Defendants, did not coordinate with Mexico to ensure that Mexican authorities would allow U.S.-licensed attorneys to provide legal services while physically located in Mexico. (Id. ¶ 91.) [redacted][27] (Id. ¶ 92.)

Few legal organizations had offices or private meeting spaces in Mexican border cities. (Id. ¶ 93.) In some cases, attorneys were forced to consult with MPP 1.0 enrollees in Mexico outdoors, including on sidewalks. (Id. ¶ 94.) ImmDef sometimes rented meeting spaces in Tijuana and Mexicali, Mexico, at significant cost. (Id. ¶ 95.) Tania Guerrero consulted with hundreds of MPP 1.0 enrollees in Ciudad Juárez from 2019 through 2021, but lacked consistent private meeting locations and often had to discuss traumatic information in public, such as in "shelters, hotels, abandoned houses, and makeshift dwellings on the streets and in the alleys." (Id. ¶ 96.) Some U.S. legal service providers had difficulty obtaining permission from shelter staff to visit shelters in Mexico where MPP 1.0 enrollees were residing. (Id. ¶ 97.) Organized crime members threatened violence against some U.S.-based attorneys who traveled to Mexico.

[27] Although Defendants attempt to dispute this fact, their evidence fails to place the fact in dispute. (Def. Resp. ¶ 92.)

(Id. ¶ 98.) Mexican officials threatened violence against some U.S.-based attorneys who traveled to Mexico. (Id. ¶ 99.)

MPP 1.0 enrollees faced barriers to accessing counsel due to safety concerns. (Id. ¶ 100.) Many MPP 1.0 enrollees were kidnapped and abducted in Mexico. (Id. ¶ 101.) Attorneys also faced threats of kidnapping, and in some cases, obtained kidnapping insurance. (Id. ¶ 102.) Jones Day prohibited attorneys working with its Laredo Pro Bono Project from entering Mexico due to safety concerns. (Id. ¶ 103.) Cross-border communication challenges limited U.S.-licensed attorneys' ability to consult with MPP 1.0 enrollees. (Id. ¶ 104.) Many MPP 1.0 enrollees lacked access to phones with international coverage. (Id. ¶ 105.) MPP 1.0 enrollees were often unable to use their phones due to sporadic or nonexistent internet service or insufficient funds to purchase cellular data or minutes. (Id. ¶ 106.) Phones and paperwork were frequently stolen or lost during kidnappings, resulting in loss of contact information and case materials. (Id. ¶ 107.) One MPP 1.0 respondent reported calling counsel from a broom closet to hide from a shelter worker whom the respondent believed was working with a cartel and might use the information she shared over the phone against her. (Id. ¶ 108.) To facilitate communication between MPP 1.0 enrollees and their counsel, Tania Guerrero had to provide logistical support in a temporary space in a cathedral basement in Ciudad Juárez so that MPP 1.0 enrollees could meet virtually with U.S.-based attorneys. (Id. ¶ 109.)

Most MPP 1.0 enrollees did not have legal representation in their immigration proceedings. (Id. ¶ 110.) EOIR records indicate that 80 percent of asylum seekers appearing in U.S. immigration courts had legal representation, but only about 7 percent of those subjected to MPP 1.0 had been represented by counsel.[28] (Id. ¶ 111.) DHS data as of October 29, 2021 reflect that only 732 individuals enrolled in MPP 1.0 out of 67,694 cases were granted relief or protection from removal—a grant rate of 1.1%.[29] (Id. ¶ 112.) In removal proceedings for similarly situated non-MPP 1.0 enrollees from Central America, "[t]he relief-granted rate [wa]s more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees." (Id. ¶ 113 (citing Myers Decl., Ex. 14, at AR000025).) DHS concluded that the discrepancies between the relief-granted rates for non-MPP 1.0 enrollees compared to MPP 1.0 enrollees "strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by

[28] Defendants dispute this fact by citing to various percentages. (Def. Resp. ¶ 111.) For example, Defendants state: "79.69% did not have legal representations." (Id.) However, Defendants do not specify whether the percentages serve to dispute the percentage of asylum seekers or MPP enrollees in Plaintiffs' proffered fact. (Id.) Because Defendants fail to specify which part of Plaintiffs' proffered fact they dispute, the Court deems the fact undisputed.

[29] Defendants do not dispute the fact in so far as it accurately reflects the information in the DHS report cited in support of the proffered fact. (Def. Resp. ¶ 112.) However, Defendants dispute the fact insofar as Defendants provide more recent data. (Id.) The Court adds the date of the report to accurately reflect the undisputed fact. (See Myers Decl., Ex. 14, at AR00005, AR000024.) To the extent that Defendants provide more recent data, the Court finds the number of MPP 1.0 enrollees who received relief from removal after October 29, 2021 disputed.

migrants in Mexico and barriers to legal access." (Id. ¶ 114.) No unrepresented MPP 1.0 enrollees obtained relief in their immigration proceedings. (Id. ¶ 115.)

As of January 2021, only 5.7 percent of completed in-person MPP 1.0 cases (excluding in absentia decisions) had been granted relief. (Id. ¶ 116.) In FY 2020, asylum or other humanitarian relief was granted in 32 percent of non-MPP asylum decisions in immigration court. (Id. ¶ 117.) In absentia removal order rates and in absentia removal order rates plus termination rates were "considerably higher for MPP cases than for comparable non-MPP cases." (Id. ¶ 118 (citing Myers Decl., Ex. 14, at AR000023).)

**3. Review of MPP**

In June 2019, Defendants initiated an internal "'top-down' review of MPP's policies and implementation strategy." (Id. ¶ 119 (citing Myers Decl., Ex. 54, at DHS_00005392).) A group of officials who "did not have involvement in the implementation of MPP," known internally as the "Red Team," conducted Defendants' "top-down" investigation of MPP 1.0. (Id. ¶ 120 (citing Myers Decl., Ex. 55, at DHS_00005395).) An October 25, 2019 Red Team Report identified "significant deficiencies in MPP." (Id. ¶ 121 (citing Myers Decl., Ex. 14, at AR000011).) These "shortfall[s]" in MPP 1.0 necessitated recommendations in the Red Team Report that Defendants "[f]acilitate migrant access to counsel and due process," including by creating a reliable method of communication, such as an email contact, to allow for communication while MPP 1.0 enrollees are in Mexico, and by engaging with external stakeholders to provide MPP 1.0 enrollees in Mexico with access to "Know Your Rights" training and pre-trial hearing advice. (Id. ¶ 122 (citing Myers Decl., Ex. 30, at DHS00000011-12).) The Red Team Report recommended Defendants support "sufficient, safe, and secure living conditions for returnees in Mexico." (Id. ¶ 123 (citing Myers Decl., Ex. 30, at DHS00000012).) The Red Team Report recommended Defendants "[e]stablish protocols to ensure regular communication with migrants during their stay in Mexico." (Id. ¶ 124 (citing Myers Decl., Ex. 30, at DHS00000013).)

Effective January 21, 2021, DHS suspended new enrollments in MPP 1.0 in what became known as the "winddown." (Id. ¶ 125.) By January 21, 2021, Defendants had processed 66,985 individuals into MPP 1.0. (Id. ¶ 126.) In October 2021, former Secretary Mayorkas issued a memorandum explaining his decision to terminate MPP 1.0. (Id. ¶ 127.) Secretary Mayorkas laid out several reasons explaining his decision to terminate MPP 1.0, including the Red Team's findings. (Id. ¶ 128.)

Secretary Mayorkas found that "[t]he difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit." (Id. ¶ 129 (citing Myers Decl., Ex. 14, at AR000024).) Secretary Mayorkas found that "[i]ndividuals in MPP 1.0 faced multiple challenges accessing counsel and receiving sufficient information about court hearings." (Id. ¶ 130 (citing Myers Decl., Ex. 14, at AR000020).) Secretary Mayorkas found

that MPP 1.0 put an "international barrier between migrants and their counsel." (Id. ¶ 131 (citing Myers Decl., Ex. 14, at AR000041).) Secretary Mayorkas found that MPP 1.0 "impos[ed] substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico," as there was "[s]ignificant evidence indicat[ing] that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico." (Id. ¶ 132 (citing Myers Decl., Ex. 14, at AR00006).) Secretary Mayorkas found that "noncitizens in MPP were substantially more likely to receive in absentia removal orders than comparable noncitizens who were not placed in MPP during the relevant time period." (Id. ¶ 133 (citing Myers Decl., Ex. 14, at AR000022).) Reports cited by Secretary Mayorkas suggest that MPP 1.0 enrollees "abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings." (Id. ¶ 134 (citing Myers Decl., Ex. 14, at AR000024).)

The DHS Secretary concluded in retrospect that "there are inherent problems with [MPP 1.0] that no amount of resources can sufficiently fix," including "the challenges associated with accessing counsel and courts across an international border," which were "endemic to the program's design." (Id. ¶ 135 (citing Myers Decl., Ex. 14, at AR000042).)

**4. Organizational Plaintiffs**

Plaintiff ImmDef is a nonprofit organization that, before the start of MPP, provided full scope or limited representation in immigration court proceedings in the Greater Los Angeles and Orange County areas, but did not generally focus on the San Diego border area. (Id. ¶ 51; Pl. SUF ¶ 136.) In response to MPP's implementation in January 2019, ImmDef established its Cross Border Initiative ("CBI"), which focuses on providing direct representation, pro se assistance, and advocacy to individuals subjected to MPP. (Def. SUF ¶ 52.) To represent individuals subjected to MPP, ImmDef undertook two new ventures, representing individuals in the San Diego immigration court and engaging in cross-border travel and communication. (Id. ¶ 53.) Both ventures required new infrastructure, staff, materials, and funding. (Id. ¶ 54.) In response to MPP, ImmDef established an office in San Diego. (Id. ¶ 55.) To reach individuals who were forced to return to Mexico under MPP 1.0, ImmDef had to hire additional staff, engage in cross-border travel, purchase international telephone plans, and rent confidential meeting spaces in Mexico. (Pl. SUF ¶ 137.)

JFS is a nonprofit organization that, among other services, provides legal representation for individuals in immigration court proceedings in the Otay Mesa and San Diego immigration courts. (Def. SUF ¶ 56.) Specifically, JFS provides "holistic, culturally competent, trauma-informed, quality legal and other supportive services to the immigrant community in San Diego and Imperial Counties." (Pl. SUF ¶ 138.) In response to Defendants' implementation of MPP in January 2019, JFS shifted its focus to respond to the needs of individuals subjected to MPP to fulfill its core mission because many asylum seekers appearing in the San Diego immigration court were subjected to MPP 1.0. (Def. SUF ¶ 57; Pl. SUF ¶ 139.) JSD "felt compelled to represent" asylum seekers appearing in the San Diego immigration court who were subjected to

MPP 1.0 to fulfill its core mission. (Pl. SUF ¶ 140.) Before MPP, JFS had rarely engaged in cross-border legal work.[30] (Def. SUF ¶ 58.)

**5. Chepo Doe**

Chepo Doe had no choice but to return to El Salvador after a local hospital in Mexico denied his daughter treatment due to their immigration status. (Pl. SUF ¶ 141.) Chepo Doe's daughter ultimately needed emergency, life-saving surgery. (Id. ¶ 142.) Because Chepo Doe and his daughter had to return to El Salvador, they missed their fifth immigration hearing and received an in absentia removal order. (Id. ¶ 143.) A motion to reopen immigration proceedings is a complex and labor-intensive procedure and very difficult to prepare without legal representation. (Id. ¶ 144.) It was virtually impossible for MPP 1.0 enrollees to file motions to reopen while they were in Mexico. (Id. ¶ 145.)

## III. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the nonmoving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The nonmoving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

[30] Plaintiffs dispute Defendants' assertion that "JFS diverted resources from its core business activities, by establishing cross-border infrastructure . . . ." (Def. SUF ¶ 59.) Plaintiffs respond that JFS diverted resources "away from providing representation to noncitizens in the United States," but that its shift to representing MPP enrollees was not a diversion from JFS's core business activities. (Pl. Resp. ¶ 59 (citing SAC ¶ 293).) The Court finds no support in the evidence cited by Defendants that "JFS diverted resourced from its *core business activities*. . . .") (Def. SUF ¶ 59 (citing SAC ¶¶ 293-97) (emphasis added).) Rather, Plaintiffs cite to a declaration by Luis Gonzalez, the Executive Director of JFS, who states that JFS's "core mission includes providing holistic legal services to noncitizens in the immigration courts in San Diego and Imperial Counties." (Myers Decl., Ex. 59, ¶ 7.) Accordingly, the Court finds this fact disputed.

verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The nonmoving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the nonmoving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

Both parties move for summary judgment on all claims. The Court first considers Defendants' challenges to Organizational Plaintiffs' standing and to Plaintiffs' requested relief before turning to each claim.

### A. Organizational Standing

Defendants first argue that the Organizational Plaintiffs do not have standing to challenge MPP under Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 367 (2024) because they have failed to allege any injury. (DMSJ at 9-11.) Plaintiffs respond that this Court and the Ninth Circuit have already found that Organizational Plaintiffs have standing under Hippocratic Med. (PMSJ at 12-14.)

To establish standing, a plaintiff must demonstrate that they have "suffered an 'injury in fact,'" which is "concrete and particularized" and "actual or imminent," that there is a "causal connection between the injury and the conduct complained of," and a likelihood of redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Organizations may also have standing "to sue on their own behalf for injuries they have sustained" but only if they can "satisfy the usual standards for injury in fact, causation, and redressability." Hippocratic Med., 602 U.S. at 393 (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, at 378-79 (1982)). "[T]he intensity of the litigant's interest or . . . strong opposition to the government's conduct" is insufficient to establish standing. Id. at 394 (internal citation omitted). An organization also may not "manufacture its own standing" by "spend[ing] its way into standing simply by expending money to gather information and advocate against the defendant's action." Id.

The Ninth Circuit previously held, in reviewing this Court's Stay Order staying the reimplementation of MPP under 5 U.S.C. § 705, that:

> ImmDef expanded its legal representation across the U.S.-Mexico border to *continue* carrying out its core activities and longstanding mission. Prior to Remain in Mexico, such core activities had never required cross-border work because noncitizens seeking protection were not forced to remain in Mexico while their removal proceedings were pending. To avoid abandoning a core constituency and

> undermining its mission of universal representation of asylum seekers in California, ImmDef had to expend resources to counteract and offset the barriers that MPP imposed. See id. ImmDef cites to ample record evidence of how Remain in Mexico caused "concrete and demonstrable injury" to its core activities, id., which was far more extensive than the "issue-advocacy" work that was found insufficient in Hippocratic Medicine, 602 U.S. at 395, 144 S.Ct. 1540. Based on ImmDef's experience with the implementation of the 2019 Remain in Mexico, ImmDef will have to hire additional staff, expand its office space, conduct additional fundraising efforts, increase travel to Mexico, and divert staff resources away from other projects towards MPP-related projects to continue carrying out its core business activities and longstanding mission.
>
> Accordingly, ImmDef has alleged a "concrete and demonstrable injury" to these core activities, "which remain the same apart from, prior to, and after MPP's implementation." ImmDef is thus similarly situated to the plaintiff organization in Havens Realty, where the defendants' racially discriminatory steering practices "directly affected and interfered with" the plaintiff's "core business activities," Hippocratic Med., 602 U.S. at 395, 144 S.Ct. 1540, of facilitating "equal access to housing through counseling and other referral services," Havens Realty, 455 U.S. at 379, 102 S.Ct. 1114.

Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972, 988 (9th Cir. 2025). In so doing, the Ninth Circuit rejected Defendants' argument that any harm was "speculative" because the harm ImmDef "submitted evidence drawn from the initial Remain in Mexico implementation establishing imminent irreparable harm to its organization from the reimplementation of Remain in Mexico." Id. The Ninth Circuit further agreed with this Court that "the fact that Remain in Mexico was reinstated using the same operative guidance from January 2019 is sufficient to find 'that a threat to ImmDef's concrete interest is imminent.'" Id. at 989 (citing Immigrant Defs. L. Ctr. v. Noem, 781 F. Supp. 3d 1011, 1052 (C.D. Cal. 2025)).

Defendants make no attempt to distinguish this Ninth Circuit Order or the Stay Order. (See DMSJ; Def. Opp'n.) Defendants do not propose any additional facts to undercut Plaintiffs' standing. Instead, revealing the weakness of their argument, Defendants primarily cite to the dissent in the Ninth Circuit Order in support of their argument. (DMSJ at 10; Def. Opp'n at 2.) However, "comments in a dissenting opinion about legal principles and precedents are just that: comments in a dissenting opinion." Georgia v. Public.Resource.Org, Inc., 590 U.S. 255, 273 (2020) (citation modified). Because the Ninth Circuit held that ImmDef established standing to challenge the reimplementation of MPP on the basis of ImmDef's experience with the 2019 implementation of MPP—the genesis of this case—the Court holds that Organizational Plaintiffs have sufficiently demonstrated standing.

//
//
//

## B. Requested Relief

### 1. Declaratory Relief and APA Vacatur

Defendants argue that Plaintiffs' requested relief is barred by 8 U.S.C. § 1252(f)(1) and that Plaintiffs seek to "circumvent Aleman Gonzalez by seeking declaratory relief, vacatur of MPP under the APA, and injunctive relief for the named Individual Plaintiffs." (DMSJ at 13.) 8 U.S.C. § 1252(f)(1) provides, in relevant part:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court . . . shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

The Supreme Court interpreted this provision to mean that it "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." Garland v. Aleman Gonzalez, 596 U.S. 543, 550 (2022). However, this statute "does not preclude a court from entering injunctive relief on behalf of a particular alien (so long as 'proceedings' against the alien have been 'initiated.'" Id.

Defendants claim that declaratory relief and vacatur under the MPP would contravene 8 U.S.C. § 1252(f)(1) because that relief would "clearly restrain[] Defendants' statutory authority under 8 U.S.C. § 1225(b)(2)(C)." (DMSJ at 14.) Therefore, such relief, to the extent it is granted, can only be granted as to Plaintiffs. (Id.)

Plaintiffs respond that vacatur is the default remedy for unlawful agency action under the APA. (PMSJ at 41.) As a result, 8 U.S.C. § 1252(f)(1) does not bar vacatur under the APA. (Id. at 42-43.) Nor does it bar declaratory relief. (Id. at 44.)

The Court agrees with Plaintiffs. The Ninth Circuit held in this case that "§ 1252(f)(1) does not bar the district court's stay pursuant to § 705 of the APA." Immigrant Defs. L. Ctr., 145 F.4th at 990. In so holding, the Ninth Circuit reasoned that "§ 1252(f)(1) expressly identifies injunctive relief but makes no mention of stays nor other forms of relief under the APA." Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972, 990 (9th Cir. 2025). More recently, the Ninth Circuit held that "[s]et-aside relief under § 706 does not violate § 1252(f)(1) because the plain text of § 1252(f)(1)'s judicial review bar is limited to injunctive relief, and § 706 set asides are not injunctions." Nat'l TPS All. v. Noem, 166 F.4th 739, 759 (9th Cir. 2026). Circuit precedent also holds that "§ 1252(f)(1) does not 'bar classwide declaratory relief.'" Al Otro Lado v. Exec. Off. for Immigr. Rev., 138 F.4th 1102, 1123–24 (9th Cir. 2025) (citing Rodriguez v. Hayes, 591 F.3d 1105, 1119 (9th Cir. 2010)). Thus, the Court finds Defendants' argument as to the unavailability of vacatur and declaratory relief unavailing.

### 2. Injunctive Relief

Defendants argue that the requested injunctive relief constitutes a request for parole as to Plaintiff Chepo Doe, and parole determinations are "statutorily committed to the Secretary" of Homeland Security. (DMSJ at 15.) 8 U.S.C. § 1182(d)(5)(A) grants the Secretary of Homeland Security discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

Plaintiffs do not dispute that the Secretary for Homeland Security has discretionary authority regarding parole determinations. Instead, Plaintiffs respond that "district courts have the inherent authority to fashion equitable remedies that may require ordering the government to facilitate the return of unlawfully removed noncitizens to the United States." (PMSJ at 44.) While the Court is sympathetic to Plaintiff Chepo Doe's situation, Plaintiffs' argument is inapplicable to the instant case. Plaintiff Chepo Doe departed Mexico to El Salvador after his daughter "contracted a life-threatening illness." (Myers Decl., Ex. 73, ¶ 5.) That fact distinguishes the instant case from the various cases Plaintiffs cite, where courts ordered the government to return noncitizens that the government removed from the United States. (See PMSJ at 44-45; Pl. Reply at 18-20.) Plaintiffs cite to no cases where a Court ordered the government to return, or even merely facilitate the return, of a noncitizen similarly situated to Plaintiff Chepo Doe. Accordingly, the Court finds that Plaintiff Chepo Doe is not entitled to injunctive relief.

## C. Count One – Violation of the APA and the Right to Apply for Asylum

Defendants move for summary judgment because Congress granted authority to implement contiguous territory return and any concomitant limitation of a noncitizen's right to apply for asylum must be considered in light of that authority. (DMSJ at 20-22.) Plaintiffs cross-move for summary judgment on the basis that Defendants' implementation of MPP 1.0 amounted to a denial of the right to apply for asylum. (PMSJ at 16-20.)

The APA provides for judicial review of final agency actions. 5 U.S.C. § 704. An agency action is "final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) "rights or obligations have been determined," or "legal consequences will flow" from the agency action. Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted). A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Judicial review of agency action "is not toothless." Sw. Elec. Power Co. v. EPA, 920 F.3d 999, 1013 (5th Cir. 2019). The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). The agency must also consider the reliance interests of those affected by a contemplated decision and consider less disruptive policies given those interests. Dep't of Homeland Sec. v. Regents of Univ. of Cal., 591 U.S. 1, 30-33 (2020). In the immigration context, the agency's "approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." Judulang v. Holder, 565 U.S. 42, 55 (2011). Merely saying something "was considered is not enough to show reasoned analysis." State v. Biden, 10 F.4th 538, 555 (5th Cir. 2021).

The INA provides that any noncitizen who is "physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section, or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). Section 1225(b) states that DHS "may return" certain noncitizens to a contiguous country "pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C). Section 1229a, in turn, refers to "removal proceedings," in which a noncitizen's asylum application is adjudicated. 8 U.S.C. § 1229a.

The Refugee Act requires the Government to "establish a uniform procedure for passing upon an asylum application." S. Rep. No. 96-256, at 9 (1980), reprinted in 1980 U.S.C.C.A.N. 141, 149. In doing so, Congress placed "emphasis on the need for a uniform, nondiscriminatory treatment of refugees." Orantes-Hernandez v. Smith, 541 F. Supp. 351, 375 (C.D. Cal. 1982).

The Ninth Circuit previously rejected Defendants' argument by holding that "the government's authority under 8 U.S.C. § 1225(b)(2)(C) must be exercised in accordance with the INA's other provisions." Immigrant Defs. L. Ctr., 145 F.4th at 993. Defendants point to no change in the case law that would allow this Court, nonetheless compel this Court, to come to a contrary conclusion.

The undisputed record demonstrates that MPP 1.0 enrollees' access to the right to apply for asylum was severely curtailed. EOIR records indicate that, although 80% of asylum seekers had legal representation in immigration court, only 7% of those asylum seekers subjected to MPP 1.0 were represented by counsel. (Pl. SUF ¶ 111.) DHS data as of October 29, 2021, show that, out of 67,649 cases, only 732 individuals enrolled in MPP 1.0, about 1.1%, were granted relief or protection from removal. (Id. ¶ 112.) Similarly situated non-MPP 1.0 enrollees from Central America were granted relief at a rate more than 26 times greater than the 1.1% grant rate for MPP enrollees. (Id. ¶ 113.) Based on this comparison, DHS concluded that "at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by Migrants in Mexico and barriers to legal access." (Id. ¶ 114 (citing Myers Decl., Ex. 14, at AR00025).) Furthermore, the rates for in absentia removal orders and termination were considerably higher for MPP cases than comparable non-MPP cases. (Id. ¶ 118.)

Prior to the implementation of MPP 1.0, [redacted]. (Id. ¶ 4.) The U.S. State Department's 2017 Country Report on Human Rights Practices for Mexico listed "violence against migrants by government officers and organized criminal groups" as one of the "most significant human rights issues" in Mexico. (Id. ¶ 6.) Yet, there is no evidence that Defendants considered the conditions in Mexico prior to implementing MPP 1.0. As discussed further below, MPP 1.0 enrollees also faced significant challenges in retaining counsel in Mexico to assist them with their U.S.-based immigration proceedings such that the vast majority of MPP 1.0 enrollees were unrepresented.

The Court finds that MPP 1.0 was "arbitrary and capricious" because Defendants did not fully consider the conditions in Mexico prior to implementing MPP 1.0. Thus, Defendants failed to "articulate a satisfactory explanation for its action." State Farm, 463 U.S. at 43. This conclusion is buttressed by Secretary Mayorkas' finding that "[t]he difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit." (Id. ¶ 129 (citing Myers Decl., Ex. 14, at AR000024).) He additionally found that MPP 1.0 "impos[ed] substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico," as there was "[s]ignificant evidence indicat[ing] that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico." (Id. ¶ 132 (citing Myers Decl., Ex. 14, at AR00006).)

Defendants urge the Court to follow Las Americas Immigrant Advoc. Ctr. v. Wolf, 507 F. Supp. 3d 1 (D.D.C. 2020). (Def. Opp'n. at 7.) In that case, the D.C. Circuit Court of Appeals rejected an APA challenge to two DHS guidance memoranda promulgated to institute faster processing of asylum requests by detaining noncitizens subject to expedited removal awaiting a credible fear interview or review of a negative credible fear determination. Id. at 8-9. The Court finds Las Americas distinguishable on two grounds. First, the challenged policies applied to noncitizens subject to expedited removal and at the credible fear stage of the expedited removal process. Id. The D.C. Circuit explained that "noncitizens at the initial screening stage are necessarily granted fewer procedural protections than noncitizens undergoing full removal proceedings." Id. at 26. Plaintiffs and Class Members are such noncitizens undergoing full removal proceedings. (Pl. Reply at 8.) Second, the D.C. Circuit concluded that the challenged memoranda were not arbitrary and capricious because the administrative record "amply demonstrated" that the government considered the consequences of the memoranda. Las Americas, 507 F. Supp. 3d at 37-38. Defendants, here, point to no facts in the record that "Defendants' new policies were sufficiently reasoned to meet the procedural requirements of the APA." Id. at 37.

Defendants also rely on Texas v. Biden, 554 F. Supp. 3d 818, 848 (N.D. Tex. Aug. 13, 2021). (Def. Opp'n. at 7-8.) The Supreme Court reversed that opinion by holding that "the contiguous-territory return authority in [8 U.S.C. §] 1225(b)(2)(C) is discretionary." Biden v. Texas, 597 U.S. 785, 807 (2022). As Plaintiffs note, the issue in that case was distinct from the right to apply for asylum and the right to counsel at issue in this case. (Pl. Reply at 4.) Furthermore, the benefits of MPP to which Judge Matthew J. Kacsmaryk referred come from a DHS document titled Assessment of the Migrant Protection Protocols dated October 28, 2019. Texas, 554 F. Supp. 3d at 833. Defendants do not introduce that document as evidence in the instant case. That document also postdates the implementation of MPP and therefore fails to demonstrate any factors that DHS considered in promulgating MPP.

Additionally, MPP 1.0 violated the Refugee Act because, as the data cited above demonstrates, MPP 1.0 did not ensure that MPP 1.0 enrollees received "uniform, nondiscriminatory treatment." Orantes-Hernandez, 541 F. Supp. at 375. Secretary Mayorkas similarly concluded that "noncitizens in MPP were substantially more likely to receive in absentia removal orders than comparable noncitizens who were not placed in MPP during the relevant time period." (Pl. SUF ¶ 133 (citing Myers Decl., Ex. 14, at AR000022).) Accordingly, the Court **GRANTS** the PMSJ as to Count One.

**D. Count Two – Violation of the APA and the Right to Access Counsel**

Defendants move for summary judgment first on the basis that 8 U.S.C. §§ 1252(a)(5) and (b)(9) bar judicial review of Count One, as well as Count Two. (DMSJ at 16.) As this Court previously explained: "Under these provisions, claims that arise from the removal process must bypass the district court and instead be heard through the administrative process. Judicial review is only by the Court of Appeals via a petition for review ('PFR')." (MTD Order at 22.) Defendants argue that 8 U.S.C. § 1252(b)(9) constitutes an "'unmistakable zipper clause' that channels judicial review of 'all questions of law and fact,' including both 'constitutional and statutory' challenges into a PFR after administrative immigration proceedings have ended." (DMSJ at 16 (quoting Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999)).) Defendants further argue that this judicial review bar extends to challenges under the APA. (DMSJ at 17.) Finally, Defendants contend that, because Plaintiffs raise claims "regarding the right to apply for asylum in removal proceedings and have counsel," Plaintiffs' claims are barred from judicial review in this Court because they are "'bound up in and an inextricable part' of removal proceedings." (Id. (quoting J.E.F.M. v. Lynch, 837 F.3d 1026, 1033 (9th Cir. 2016)).)

Defendants largely rehash arguments this Court previously rejected. This Court previously determined that: "Plaintiffs' claims are sufficiently 'independent of or collateral to the removal process' such that they are not barred by 8 U.S.C. § 1252(b)(9)." (MTD Order at 23 (citing Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 810 (9th Cir. 2020)). Defendants cite no changes in law that would compel this Court to find otherwise. Accordingly, the Court reiterates that "retention of jurisdiction is the proper course of action." Id. at 28.

Defendants next argue that the statutory right to counsel merely provides noncitizens, including MPP enrollees, the "privilege of being represented" with no responsibility placed upon the government to secure any access to counsel. (DMSJ at 17-18.) However, the Ninth Circuit previously rejected this argument. "[N]oncitizens' 'fundamental' right to counsel 'must be respected in substance as well as in name.'" Immigrant Defs. L. Ctr., 145 F.4th at 993 (citing Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 554 (9th Cir. 1990)). The Ninth Circuit also affirmed this Court's prior determination that the government must exercise its contiguous return authority, 8 U.S.C. § 1225(b)(2)(C), "in accordance with" the statutory right to counsel as located in 8 U.S.C. §§ 1158(d)(4)(A), 1229a(b)(4)(A), and 1362. Id. (citing Stay Order at 25.) Because Defendants' arguments fail as a matter of law, the Court **DENIES** the DMSJ as to Count One and Count Two.

Plaintiffs cross-move for summary judgment on the basis that MPP violated Plaintiffs' statutory right to counsel. (PMSJ at 15.) As discussed above, the Ninth Circuit affirmed this Court's prior determination that 8 U.S.C. § 1225(b)(2)(C) "does not permit the government to abrogate 'the legal rights bestowed upon asylum seekers by Congress.'" Immigrant Defs. L. Ctr., 145 F.4th at 992 (citing Stay Order at 26). The Ninth Circuit relied on DHS's October 2021 rescission memo, which found that the high rate of in absentia orders of removal and terminations of immigration proceedings and the comparatively low rates of grants of relief for MPP enrollees were due to the insecurity in Mexico and a lack of adequate notice of the immigration court hearings. Id. at 992-993.

Here, it is undisputed that MPP enrollees faced challenges in accessing counsel at multiple stages of their legal proceedings. Many MPP 1.0 enrollees lacked a basic understanding of asylum procedures or how to retain counsel. (Pl. SUF ¶ 77.) Many MPP 1.0 enrollees did not have access to legal orientation programs in Mexico. (Id. ¶ 76.) A report by the UNHCR determined that 77% of MPP 1.0 enrollees interviewed did not have access to legal orientation programs in Mexico. (Id.) Many MPP 1.0 enrollees lacked a basic understanding of asylum procedures or how to retain counsel.

8 U.S.C. § 1158(d)(4)(B) requires that the government provide an asylum seeker "a list of persons (updated not less often than quarterly) who have indicated their availability to represent [noncitizens] in asylum proceedings on a pro bono basis." Defendants provided MPP 1.0 enrollees with a pro bono legal services list. (Id. ¶ 78.) However, the list was not MPP-specific and identified only U.S.-based legal service providers tied to existing U.S. court locations. (Id.) Most of the contact information provided for those legal service providers was U.S.-based, with the exception of the EOIR hotline, which had an international number. (Id. ¶ 79.) Some of the legal service providers on the list could not receive international calls. (Id. ¶ 80.) [redacted] (Id. ¶¶ 83-84.)

Many MPP 1.0 enrollees were unable to find attorneys due to long waitlists and logistical difficulties. (Id. ¶ 86.) Demand also far outstripped supply because MPP 1.0 enrollees

were concentrated in a handful of courts along the border. (Id. ¶ 85.) Notably, a Mexican government official informed DHS that only attorneys licensed in Mexico could practice law in Mexico. (Id. ¶ 87.) [redacted] (Id. ¶ 88.) Furthermore, a Mexican government official informed DHS that U.S.-licensed attorneys could be deported for practicing law in Mexico. (Id. ¶ 89.) Attorneys who did consult with MPP 1.0 enrollees in Mexican cities often lacked private meeting spaces. (Id. ¶¶ 93-96.) Some U.S. legal service providers had difficulty obtaining permission from shelters to visit MPP 1.0 enrollees. (Id. ¶ 98.) U.S.-based attorneys faced threats of violence from members of organized crime in Mexico and Mexican officials. (Id. ¶¶ 98-99.)

MPP 1.0 enrollees faced challenges contacting attorneys licensed in the U.S. because they lacked access to phones with international coverage, they faced sporadic or nonexistent internet service, or had insufficient funds to purchase data or minutes. (Id. ¶¶ 104-107.) Many MPP 1.0 enrollees were kidnapped and abducted in Mexico, and their phones or paperwork were often stolen or lost during the kidnapping. (Id. ¶¶ 100, 108.) MPP 1.0 enrollees were also only permitted to meet with counsel before their hearings if they had previously retained counsel. (Id. ¶ 64.)

As a result of these barriers to access, most MPP 1.0 enrollees did not have legal representation in their immigration proceedings. (Id. ¶ 110.) EOIR records indicate that, although 80% of asylum seekers had legal representation in immigration court, only 7% of those asylum seekers subjected to MPP 1.0 had been represented by counsel. (Id. ¶ 111.) DHS data as of October 29, 2021, show that, out of 67,649 cases, only 732 individuals enrolled in MPP 1.0, about 1.1%, were granted relief or protection from removal. (Id. ¶ 112.) Similarly situated non-MPP 1.0 enrollees from Central America were granted relief at a rate more than 26 times greater than the 1.1% grant rate for MPP enrollees. (Id. ¶ 113.) Based on this comparison, DHS concluded that "at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by Migrants in Mexico and barriers to legal access." (Id. ¶ 114 (citing Myers Decl., Ex. 14, at AR00025).) Of the MPP 1.0 enrollees who were unrepresented, none obtained relief in their immigration proceedings. (Id. ¶ 115.)

Even when MPP 1.0 enrollees obtained counsel, they were rarely able to meet with counsel to develop their cases. MPP 1.0 enrollees were only allowed to come into the U.S. to consult with counsel on the day they had scheduled hearings. (Id. ¶ 61.) ERO maintained custody and control over MPP 1.0 enrollees while in the U.S. for court hearings, including while they met with counsel. (Id. ¶ 62.) Attorneys were only allowed at most a single hour to meet before court appearances. (Id. ¶ 65.) [redacted] (Id. ¶ 66.) In practice, some MPP 1.0 enrollees could only meet with their counsel for 20 to 45 minutes. (Id. ¶ 67.) For the reasons discussed above with regard to obtaining counsel, MPP 1.0 enrollees faced many difficulties communicating with counsel from Mexico.

Limitations were placed on attorneys' access to technology needed for case preparation. (Id. ¶ 73.) In some cases, attorney consultations with MPP 1.0 enrollees took place in a room with ICE officers present. (Id. ¶ 74.) MPP 1.0 enrollees were not permitted to speak with their attorneys after their court hearings. (Id. ¶ 75.)

As the record shows, MPP 1.0 enrollees faced serious impediments to securing legal counsel in Mexico. Even if MPP 1.0 enrollees were able to secure legal counsel, they continued to face challenges to meeting with their counsel in order to develop their case. These impediments and challenges are borne out by the data, which demonstrate that MPP 1.0 enrollees were much less likely to be represented by counsel and to successfully win relief than other similarly-situated individuals.

Defendants argue that any "asserted difficulty is inherent in any exercise of the statutory contiguous territory return authority." (DMSJ at 19.) The Court finds such an argument difficult to accept where Defendants fail to point to any consideration of access to counsel prior to the implementation of MPP 1.0, particularly where DHS was aware that only attorneys barred in Mexico could legally practice law in Mexico. (Pl. SUF ¶ 87.) In retrospect, the government concluded that MPP 1.0 contained "inherent problems . . . that no amount of resources can sufficiently fix," including "the challenges associated with accessing counsel and courts across an international border." (Id. ¶ 135 (citing Myers Decl., Ex. 14, at AR000042.) On this record, and in light of Ninth Circuit case law establishing the right of counsel, the Court concludes that Defendants' failure to consider the issue of access to counsel renders MPP 1.0 "arbitrary and capricious" and contrary to law. Accordingly, the Court **GRANTS** the PMSJ as to Count Two.

### E. Count Three – Violation of the Fifth Amendment Due Process Clause's Right to a Full and Fair Hearing

Defendants move for summary judgment as to Count Three on the basis that Plaintiffs fail to make the required showing for a substantive due process claim that their asylum proceedings were impacted by the obstacles imposed by MPP 1.0, and that MPP 1.0 had a "legitimate governmental objective" to "curtail the exploitation of the asylum process." (DMSJ at 24.) Plaintiffs cross-move for summary judgment because the dangerous conditions in Mexico, the obstruction of Plaintiffs' and Class Members' ability to access means of communication, and the obstruction of Plaintiffs' and Class Members' ability to reopen their proceedings or appeal removal decisions violated their right to a full and fair hearing and a reasonable opportunity to present evidence. (PMSJ at 28.) Additionally, Plaintiffs argue that MPP 1.0 prevented In Absentia Subclass Members from attending their immigration hearings. (Id.)

Defendants argue that Plaintiffs' claim constitutes a challenge under substantive due process because they, as noncitizens who did not enter the country, have no right to procedural due process. (DMSJ at 23.) Defendants further argue that, even were this Court to construe Plaintiffs' challenge as arising under procedural due process, Plaintiffs' claim would still fail because the only process due to noncitizens who have not entered the country is "[w]hatever the procedure authorized by Congress is." (Def. Opp'n. at 8-9 (citing Dep't of Homeland Sec. v.

Thuraissigiam, 591 U.S. 103, 139 (2020).) However, this Court previously rejected Defendants' argument that Plaintiffs' claim cannot arise under procedural due process because Thuraissigiam "did not address the regular removal process that people like Individual Plaintiffs were placed into when subjected to MPP." (MTD Order at 39.) Instead, the Court held that: "Individuals in regular removal proceedings enjoy far more robust due process protections because Congress has conferred additional statutory rights on them." (Id.) The Court also rejected Defendants' argument that procedural due process only extends as far as statute provides:

> [T]he Court finds that application of Boumediene's functional approach merits application of the Due Process Clause. It would not be "impracticable and anomalous" to apply fundamental procedural protections to Plaintiffs, whose claims "concern adoption of a [] policy that aims to impede access to the statutory-mandated asylum procedure." Al Otro Lado, Inc. v. McAleenan, 394 F. Supp. 3d 1168, 1221 (S.D. Cal. 2019). "The lesson of Boumediene is that the political branches do not enjoy the prerogative to 'switch the Constitution on or off at will[.]'" Id. (quoting Boumediene, 553 U.S. at 765.) The conduct alleged here does not occur "wholly in foreign territory"; critically, the allegedly unconstitutional policy was not "developed in Mexican border towns" but was formed by "high-level federal officials" operating from the United States. Id. at 1220. Moreover, "practical necessities" warrant the Fifth Amendment's application, for the claims concern "alleged denials of procedural due process by U.S. immigration officers upon whom Congress has placed certain statutory obligations, all in furtherance of the asylum protections Congress has also chosen to extend to certain 'arriving aliens' that express an intent to apply for asylum or fear of persecution." Id. at 1221.

(Id. at 40.) Defendants make no attempt to distinguish this Court's prior holdings in this case or to argue that any undisputed facts should change this Court's analysis. Because Defendants exclusively make a legal argument this Court once rejected, the Court **DENIES** the DMSJ as to Count Three.

Plaintiffs argue in favor of their cross-motion for summary judgment that MPP 1.0 violated their due process right to counsel. "The right to be represented by counsel at one's own expense is protected as an incident of the right to a fair hearing under the Due Process Clause of the Fifth Amendment." Gomez-Velazco v. Sessions, 879 F.3d 989, 993 (9th Cir. 2018). Congress codified this right in the INA. See Tawadrus v. Ashcroft, 364 F.3d 1099, 1103 (9th Cir. 2004). Because "Plaintiffs do not seek to reverse any decision by an IJ or the BIA, . . . prejudice is not a requirement." Torres v. United States Dep't of Homeland Sec., 411 F. Supp. 3d 1036, 1063 (C.D. Cal. 2019). Since the Court determined, as described above, that Defendants violated Plaintiffs' statutory right to counsel, the Court likewise finds that Defendants violated Plaintiffs' constitutional right to counsel. See id. (citing Biwot, 403 F.3d at 1098) ("Having found sufficiently alleged violations of statutory rights, the Court also finds Plaintiffs sufficiently allege Due Process violations.")

The Fifth Amendment also guarantees the right to "a full and fair hearing of [Plaintiffs'] claims and a reasonable opportunity to present evidence on [their] behalf." Colmenar v. I.N.S., 210 F.3d 967, 971 (9th Cir. 2000). Plaintiffs argue that Defendants violated this right by "trapping them in dangerous conditions; obstructing their ability to access means of communication, such as mail and the internet; and obstructing their ability to seek to reopen their proceedings or appeal removal decisions." (PMSJ at 28.) Additionally, Plaintiffs contend that MPP 1.0 violated the right of In Absentia Subclass members to attend their hearings. (Id.) Defendants make no argument in opposition besides its argument, rejected above, that Plaintiffs have no due process rights beyond those authorized by Congress.

First, it is undisputed that MPP 1.0 enrollees were subjected to, and DHS was aware that MPP 1.0 enrollees faced, dangerous conditions in Mexico, including [redacted] where most MPP 1.0 enrollees were concentrated. (PSUF ¶¶ 2, 40, 41). DHS concluded that MPP 1.0 enrollees awaiting their court hearings in Mexico "were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico." (Id. ¶ 35.) A noncitizen "is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." Colmenar v. I.N.S., 210 F.3d 967, 971 (9th Cir. 2000). Defendants' removal of MPP 1.0 enrollees to Mexico where they faced "face[d] persecution, torture, and possibly death" deprived them of this right. Poghosyan v. Wolf, No. 520CV02295ODWAFM, 2020 WL 7347858, at *3 (C.D. Cal. Nov. 6, 2020); see also Yaide v. Wolf, No. 19-CV-07874-CRB, 2019 WL 6896148, at *3-*4 (N.D. Cal. Dec. 18, 2019) ("Obviously, imprisonment or death would" would deny a noncitizen's due process rights). Where noncitizens face dangerous conditions, it would be "untenable" to expect them to litigate their immigration case under such conditions. Primero Garcia v. Barr, No. 20-CV-01389-NC, 2020 WL 1139660, at *4 (N.D. Cal. Mar. 9, 2020).

Second, it is undisputed that MPP 1.0 enrollees often did not have access to the internet, a phone that made international calls, a phone with reception, language interpretation, or even stable housing. (Id. ¶¶ 42, 48-49.) Plaintiffs argue that these conditions, by hindering their ability to pursue their legal claims, violated "their right to a full and fair hearing." (PMSJ at 29-30 (citing Vetcher v. Barr, 953 F.3d 361, 370 (5th Cir. 2020)).) They contend that MPP 1.0 enrollees had a right to law libraries and legal self-help materials. (Id. (citing Orantes-Hernandez v. Meese, 685 F. Supp. 1488, 1511 (C.D. Cal. 1988)).) Plaintiffs note that even detainees inside the United States have a right to access these materials. (Id. at 30.) Unfortunately, that fact is fatal to Plaintiffs' argument. The Ninth Circuit determined in Orantes-Hernandez that the Government's failure to provide immigration detainees with legal materials was a constitutional violation because "detainees have a right of access to writing materials." 685 F. Supp. at 1511 (citing Bounds v. Smith, 430 U.S. 817, 824 (1977)). Although the Court is sympathetic to the conditions that Plaintiffs faced and is aware that Plaintiffs remained in Mexico pursuant to MPP 1.0, the Court declines to find that Plaintiffs are sufficiently analogous to immigration detainees under Orantes-Hernandez. That is particularly so where the contiguous return authority serves as a discretionary alternative to immigration detention. See Biden v. Texas, 597 U.S. at 805-807.

Third, Plaintiffs argue that, because Defendants denied Plaintiffs and Class Members of the right to a full and fair hearing in the removal process for the reasons previously discussed, their right to challenge their orders of removal was similarly violated. However, the sole case that Plaintiffs cite in support specifically held that the petitioners had a due process right to file and litigate a motion to reopen before being deported on the basis that they had a liberty interest because they had "strong ties" to the U.S. after living and working in the U.S. for many years. Chhoeun v. Marin, 306 F. Supp. 3d 1147, 1159 (C.D. Cal. 2018). Plaintiffs make no argument as to why the liberty right identified in Chhoeun should be extended to MPP 1.0 enrollees.

Fourth, Plaintiffs argue that the due process rights of Plaintiffs Chepo, Yesenia, and Antonella Doe as well as the members of the In Absentia Subclass were violated where "factors inherent in the MPP 1.0 policy prevented" them "from attending their hearings on the scheduled date," and they were ordered removed in absentia. (PMSJ at 31-32.) Due process requires that a noncitizen be "entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." Colmenar v. I.N.S., 210 F.3d 967, 971 (9th Cir. 2000). An audit by the OIG found that nearly 10% of NTAs had errors sufficient to render them statutorily deficient, including failing to include the date and time of the hearing. (Pl. SUF ¶¶ 16-19.) Some NOHs were mailed to incorrect addresses. (Id. ¶¶ 21-24.) In order to be transported to their hearings, MPP 1.0 enrollees had to present themselves four hours before their scheduled hearing times. (Id. ¶ 28.) Some MPP 1.0 enrollees who had to report at 4:00 a.m. faced a risk of violence from traveling so early in the morning. (Id. ¶¶ 29-30.) If MPP 1.0 enrollees arrived at a different port of entry than instructed, they would not be processed and would miss their court hearings. (Id. ¶ 27.) Plaintiffs, however, provide no facts that any Plaintiff or Class Member missed their court hearing and was subsequently removed in absentia due to these factors.

Fifth, Plaintiffs argue that Defendants violated their due process rights by failing to provide sufficient notice. (PMSJ at 32.) The "notice afforded to noncitizens subject to removal . . . must be reasonably calculated to apprise noncitizens of the pendency of removal proceedings and to afford them the opportunity to be present and to participate. United States v. Rivera-Valdes, 157 F.4th 978, 988–89 (9th Cir. 2025) (citing Jones v. Flower, 547 U.S. 220, 226 (2006). Furthermore, "where the Government learns that its notice efforts have not succeeded, that knowledge triggers an obligation on the Government's part to take additional reasonable steps to effect notice, if it is practicable to do so." Id. (citing Jones, 547 U.S. at 234). The undisputed facts show that notice to MPP 1.0 enrollees was imperfect. An audit by the OIG found that nearly 10% of NTAs had errors sufficient to render them statutorily deficient, including failing to include the date and time of the hearing. (Pl. SUF ¶¶ 16-19.) Additionally, some NOHs were mailed to incorrect addresses. (Id. ¶¶ 21-24.) DHS also failed to provide documents to MPP 1.0 enrollees in any indigenous language. (Id. 24.) On this basis, the Court determines that there is no dispute of material fact that the Government failed to provide sufficient notice such as to "apprise noncitizens of the pendency of removal proceedings" so that they may participate. Rivera-Valdes, 157 F.4th at 989. However, "[n]otice is not 'reasonably calculated'" such that due process is violated only when "the Government knows its method of service was ineffective and takes no additional steps to effect notice that are reasonably available to it." Id. (citing Jones, 547 U.S. at 227, 229). Based on the evidence presented, the Court cannot find that notice was

not reasonably calculated. The only evidence Plaintiffs proffer as to Defendants' knowledge is an OIG report from 2021, two years after the implementation of MPP 1.0 began. (See Pl. SUF ¶ 16-20 (citing Myers Decl., Ex. 15).) Furthermore, Plaintiffs proffer no facts that Defendants' failed to take steps to cure notice.

In summary, the Court determines that Defendants deprived Plaintiffs and Class Members of their right of access to counsel and their right "to a full and fair hearing of [their] claims and a reasonable opportunity to present evidence on [their] behalf" because of the dangerous conditions they faced after Defendants removed them to Mexico. Colmenar v. I.N.S., 210 F.3d 967, 971 (9th Cir. 2000). Accordingly, the Court **GRANTS** the PMSJ as to Count Three.

**F. Count Four – Violation of the APA and Unlawful Cessation of the MPP Wind-Down**

The Court notes that neither party moves for summary judgment as to Count Four.

**G. Counts Five & Six – Violation of the First Amendment**

Defendants move for summary judgment on the basis that MPP 1.0 does not regulate speech but instead merely regulates "pure, non-expressive conduct." (DMSJ at 24.) Specifically, MPP 1.0 only regulates whether noncitizens may stay in the U.S. pending their removal proceedings. (Id.) Defendants alternatively argue that, even if MPP were considered a restriction on speech, it imposes nothing more than "content-neutral time, place, and manner restrictions" as to the communication between Organizational Plaintiffs and their clients who are MPP 1.0 enrollees. (Id. at 25.)

Plaintiffs likewise move for summary judgment and argue that MPP 1.0 represents an unconstitutional content-based restriction or, alternatively, an unconstitutional time, place, and manner restriction because it restricted Organizational Plaintiffs' ability to advise clients and Individual Plaintiffs' and Class Members' ability to retain and consult an attorney. (PMSJ at 33-41.)

The Court has previously rejected Defendants' argument twice. (MTD Order at 45-46; Stay Order at 22-23.) Plaintiffs do not challenge that the contiguous return authority violates the First Amendment. Rather, they challenge the manner in which MPP 1.0 was executed such that it violated Organizational Plaintiffs' right to advise potential and existing clients and Plaintiffs' and Class Members' right to retain and consult attorneys. (PMSJ at 33-41.) Defendants do not dispute that the First Amendment protects these rights.

Defendants argue that any First Amendment rights are overridden by the "Government's 'compelling interest in protecting its borders.'" (DMSJ at 25 (citing Kariye v. Mayorkas, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022).) However, in Kariye, the Court specifically analyzed whether the Government had a "compelling interest in protecting its borders *and preventing acts of terrorism*" because the purported purpose of the challenged action was to ensure border

security by preventing terrorism. Id. at 895-96, 909. Defendants make no argument here that MPP 1.0 was implemented for a similar purpose. Even if they had, none of the facts that Defendants offer demonstrate that the Government considered border security when implementing MPP 1.0. At most, Defendants show that MPP 1.0 was implemented due to an increasing number of asylum applications. (Def. SUF ¶¶ 7-8.) Nowhere does the Government link the high level of asylum applications with any issues related to border security. Thus, Defendants fail to demonstrate that they implemented MPP 1.0 in pursuit of any compelling government interest.

The First Amendment requires "a measure of protection for 'advocating lawful means of vindicating legal rights,'" which includes "'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance.'" In re Primus, 436 U.S. 412, 432 (1978) (citing Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 436 (1963)). In fact, Button warned against government interference "smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority." 371 U.S. at 434. These protections apply to immigration nonprofits because "the Government may not regulate in a way that chills the ability of non-profit organizations to obtain meaningful access to the courts, especially when that access is sought to advance civil-rights objectives." Nw. Immigrant Rts. Project v. Sessions, No. C17-716 RAJ, 2017 WL 3189032, at *4 (W.D. Wash. July 27, 2017). Ultimately, "[t]he efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants." In re Primus, 436 U.S. at 431.

Additionally, the First Amendment protects the "right to hire and consult an attorney." Mothershed v. Justs. of Supreme Ct., 410 F.3d 602, 611 (9th Cir. 2005). That extends to "the right to petition an administrative agency." Nat'l Ass'n of Radiation Survivors v. Derwinski, 994 F.2d 583, 595 (9th Cir. 1992) (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)). The Court agrees that the right to petition should apply in immigration proceedings "[g]iven the stakes at issue in removal proceedings." Lyon v. U.S. Immigr. & Customs Enf't, 171 F. Supp. 3d 961, 994 (N.D. Cal. 2016).

Critically, the Ninth Circuit has held that where the First Amendment right at issue is "meaningful access" to the proceedings at issue, that right is "essentially the same as that under the Due Process Clause." Derwinski, 994 F.2d at 595. Because the Court above held that Defendants violated Plaintiffs' and Class Members' due process right to counsel, the Court likewise finds here that Defendants violated Plaintiffs' and Class Members' First Amendment right to hire and consult an attorney. Mothershed, 410 F.3d at 611.

Next, Plaintiffs argue that MPP 1.0 is subject to strict scrutiny because the one-hour limit on attorney-client communications, the ban on attorneys speaking with potential clients, and the presence of ICE officers during some of the attorney-client meetings are content-based restrictions on protected expressive conduct. (PMSJ at 35.) These restrictions, Plaintiffs continue, regulated how MPP 1.0 enrollees could seek immigration-related legal advice and how Organizational Plaintiffs could provide that advice. (Id.) Defendants contend that, to the extent

MPP 1.0 restricted speech, it only imposed content-neutral time, place, and manner restrictions on the communication between Organizational Plaintiffs and their existing clients. (DMSJ at 25.)

The Court notes that the MPP 1.0 restrictions that Plaintiffs argue violate the First Amendment all occurred inside immigration court and hearing facilities. Because the immigration court and hearing facilities constitute government property, the Court must as a first step determine "what kind of forum" the immigration court and hearing facilities are "because the type and scope of restrictions the government may place on speech depends on where the speech occurs." Reza v. Pearce, 806 F.3d 497, 502 (9th Cir. 2015). "Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." United States v. Grace, 461 U.S. 171, 177 (1983). Furthermore, "[t]he government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" Id. (citing Adderly v. Florida, 385 U.S. 39, 47 (1966)).

The Supreme Court has explained that "government-controlled spaces" can be divided into three different types: "traditional public forums, designated public forums, and nonpublic forums." Minnesota Voters All. v. Mansky, 585 U.S. 1, 11 (2018). Neither party makes any argument as to which forum the immigration courts and hearing facilities fall under. Nevertheless, the Ninth Circuit has held that "judicial and municipal complexes," such as a city building housing city agencies and courts, constitute a "nonpublic forum." Sammartano v. First Jud. Dist. Ct., in & for Cnty. of Carson City, 303 F.3d 959, 966 (9th Cir. 2002).

There is no indication from the record that the Court should consider the immigration court and hearing facilities as anything but a "nonpublic forum." Just as in Sammartano, there is no indication that they were "'opened for use by the public as a place for expressive activity,' . . . such that [they] could be considered a 'designated public forum,' or that [they] ha[ve] been intentionally opened for expression by certain groups or on certain topics, such that [they] could be considered a 'limited public forum.'" Id. (citing Hopper v. City of Pasco, 241 F.3d 1067, 1074-75 (9th Cir.2001)). Rather, the Government built immigration hearing facilities in Brownsville and Laredo, TX for the purpose of conducting removal hearings for MPP enrollees. (Def. SUF. ¶ 12.) Thus, the Court concludes that the immigration hearing facilities are nonpublic fora.

Although Plaintiffs argue that MPP 1.0's restrictions should be analyzed under strict scrutiny, or alternatively intermediate scrutiny, the proper test for restrictions on free expression in a nonpublic forum is if they "(1) are 'reasonable in light of the purpose served by the forum' and (2) are 'viewpoint neutral.'" Sammartano, 303 F.3d at 966.

Plaintiffs make no argument that the restrictions discriminated on the basis of viewpoint. "[I]n a nonpublic forum, the government may restrict access based on subject matter if doing so is reasonable, so long as it does not discriminate among viewpoints within subject matter areas." Id. at 970. The Ninth Circuit has acknowledged that the distinction between subject matter discrimination and viewpoint discrimination is "not easy to understand." Id. Nevertheless, the

Court understands the restrictions on immigration legal advice to more closely resemble a restriction based on subject matter.

As to reasonableness, "[t]here must be evidence in the record to support a determination that the restriction is reasonable." Id. at 967. Specifically, "[t]here must be evidence that the restriction reasonably fulfills a legitimate need." Id. The Government fails to point to any evidence in the record, or even make any argument that the restrictions "fulfill[] a legitimate need." Id. The most the Government can muster is a statement that "restrictions on attorney access to clients are surpassingly common, as are restrictions on speech and conduct in courtrooms and courthouses." (DMSJ at 25.) While that may be, Defendants make no argument as to any legitimate need for the challenged restrictions. Because Defendants cannot demonstrate that the restrictions are reasonable, the Court finds that the restrictions violate Organizational Plaintiffs' First Amendment rights.

In summary, the Court concludes that MPP 1.0 violated Plaintiffs' and Class Members' First Amendment Rights to hire and consult an attorney and Organizational Plaintiffs' right to advise potential and existing clients because the restrictions in place at the immigration court and hearing facilities were not reasonable. Furthermore, MPP 1.0 violated Plaintiffs' and Class Members' right to hire and consult an attorney because the First Amendment and Fifth Amendment due process rights are "essentially the same." Nat'l Ass'n of Radiation Survivors v. Derwinski, 994 F.2d at 595. Accordingly, the Court **GRANTS** the PMSJ as to Counts Five and Six.

### H. Applications to Seal

The Court **GRANTS** the applications to seal filed by Plaintiffs. (Dkt. Nos. 451, 458.) Defendants support sealing exhibit numbers four and thirteen because they contain sensitive law enforcement information. (Dkt. No. 453.) However, because Defendants only support the sealing of exhibits four and thirteen attached to the Myers Declaration and do not oppose the unsealing of the remaining exhibits with certain redactions, the Court **ORDERS** the parties to meet and confer as to the necessary redactions. Plaintiffs shall file redacted copies of the exhibits attached to the Myers Declaration, which are currently provisionally filed under seal and with the exception of exhibits four and thirteen, no later than 21 days after entry of this order.

Furthermore, given the unsealing of the majority of documents provisionally filed under seal, the Court **ORDERS** the parties to meet and confer to determine if the redactions contained in the PMSJ, Pl.'s Reply, and this order are wholly or in part necessary. If redactions remain necessary in part, Plaintiffs shall file partly unredacted copies of the PMSJ and Pl's Reply on the docket no later than 21 days after entry of this order and shall file a report informing the Court of which parts of this order may be unredacted. If redactions remain wholly necessary, Plaintiffs shall file a report no later than 21 days after entry of this order to inform the Court thereof. If no redactions are necessary, Plaintiffs shall file unredacted copies of the PMSJ and Pl's Reply on the docket whereafter the Court shall file an unredacted copy of this order.

## V. CONCLUSION

For the reasons above, the Court **DENIES** the DMSJ. The Court **GRANTS** the PMSJ. The Court **GRANTS** Plaintiffs' two applications to seal. The Court further **ORDERS**:

- The Court **DECLARES** that Defendants' implementation of MPP 1.0 constitutes final agency action and violated 5 U.S.C. § 706(2) because it was arbitrary, capricious, and contrary to law.
- The Court further **DECLARES** that Defendants' implementation of MPP 1.0 was contrary to law under 5 U.S.C. § 706(2) because it obstructed the statutory right to apply for asylum under 8 U.S.C. § 1158, including by returning Individual Plaintiffs and Class Members to dangerous conditions in Mexico, depriving them of access to counsel, and treating them in a discriminatory and non-uniform fashion vis-à-vis asylum seekers based in the United States; and by obstructing the ability of Organizational Plaintiffs to provide meaningful legal services to individuals subjected to MPP 1.0 who were seeking protection in the United States.
- The Court further **DECLARES** that Defendants' implementation of MPP 1.0 was contrary to law under 5 U.S.C. § 706(2) and tantamount to a denial of the statutory right to counsel under 8 U.S.C. §§ 1229a(b)(4)(A) and 1362 because it imposed cross-border barriers to consulting, retaining, and communicating with counsel, failed to provide reliable means of communication, relied on inadequate and mismatched legal-services provider referral lists, restricted meaningful attorney-client consultation and failed to provide confidential meeting space while MPP 1.0 enrollees were in the United States for hearings, and limited access to prospective counsel and know-your-rights presentations, obstructing Individual Plaintiffs' and Class Members' access to counsel and Organizational Plaintiffs' ability to provide meaningful legal services.
- The Court further **DECLARES** that Defendants' implementation of MPP 1.0 was arbitrary and capricious under 5 U.S.C. § 706(2) because Defendants implemented and maintained the policy despite known systemic barriers that would, and in fact did, deny access to counsel and obstruct access to the asylum system.
- The Court further **DECLARES** that Defendants' implementation of MPP 1.0 deprived Individual Plaintiffs and Class Members of procedural due process, by denying a full and fair opportunity to prepare and present claims for relief, forcing them to await their U.S. immigration court hearings under circumstances that rendered the underlying proceedings fundamentally unfair, and depriving them of access to counsel.
- The Court further **DECLARES** that Defendants' implementation of MPP 1.0 violated the First Amendment rights of Individual Plaintiffs and Class Members to retain, consult, and communicate with counsel and to petition the courts, and violated the First Amendment rights of Organizational Plaintiffs to advise, assist, consult with, and represent existing and potential clients subjected to MPP 1.0.

- Pursuant to 5 U.S.C. § 706(2), implementation of MPP 1.0, including the policies, guidance, memoranda, standard operating procedures, and related implementing directives that effectuated MPP 1.0, is hereby **VACATED** and **SET ASIDE**.
- Within 21 days of entry of this Order, Defendants shall provide Plaintiffs' counsel with a proposal to provide notice of this Order to all Class Members in a manner reasonably calculated to reach them. Plaintiffs' counsel will respond to Defendants' proposal within 7 days of receipt, and the parties shall agree on a notice plan within 14 days thereafter, subject to the Court's approval. If the parties are unable to agree on the form and manner of notice, they shall submit competing proposed notice plans within 21 days of Plaintiffs' receipt of Defendants' initial proposal.
- The Court retains jurisdiction to enforce this Order and to resolve any disputes regarding implementation of the relief ordered herein.
- The Court **ORDERS** the parties to meet and confer as to the necessary redactions for the exhibits attached to the Myers Declaration and currently provisionally filed under seal, with the exception of exhibits four and thirteen. Plaintiffs shall file redacted copies of those exhibits no later than 21 days after entry of this order.
- The Court **ORDERS** the parties to meet and confer to determine if the redactions contained in the PMSJ, Pl.'s Reply, and this order remain wholly or in part necessary. If redactions are unnecessary, Plaintiffs shall file unredacted copies of the PMSJ and Pl's Reply on the docket no later than 21 days after entry of this order whereafter the Court shall file an unredacted copy of this order. If redactions remain necessary in part, Plaintiffs shall file partly unredacted copies of the PMSJ and Pl's Reply on the docket no later than 21 days after entry of this order and shall file a report informing the Court of which parts of this order may be unredacted. If redactions remain wholly necessary, Plaintiffs shall file a report no later than 21 days after entry of this order to inform the Court thereof.
- The Court **ORDERS** the Parties to meet and confer and provide a proposed trial plan for the remaining claim within 21 days of entry of this Order.

**IT IS SO ORDERED.**